JEFFREY R. SECKEL – State Bar No. 17973200
J. MARK CHEVALLIER – State Bar No. 04189170
McGuire Craddock & Strother, P.C.
2501 N. Harwood Street, Suite 1800
Dallas, Texas 75201
Phone: 214.954.6800
Fax: 214.954.6850

**ATTORNEYS FOR JOHN DUDINSKY, JR.,
RONALD G. GEARY, THOMAS HANSEN AND DOYLE PRIVETT**

## IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: SOPOREX, INC., Debtor | § | CASE NO. 08-34174-bjh-7 |
| | § | |
| | § | |
| DIANE REED, CHAPTER 7 TRUSTEE, | § | |
| | § | |
| v. | § | ADVERSARY NO. 11-03306-bjh |
| | § | |
| JOHN DUDINSKY, JR., RONALD G. | § | |
| GEARY, THOMAS HANSEN, MICKEY | § | |
| LETSON, STEPHEN D. LINEHAN, | § | |
| DOYLE PRIVETT, RICHARD J. | § | |
| SABOLIK and SCOTT D. SMITH | § | |

## BRIEF IN SUPPORT OF MOTION TO DISMISS FILED
## BY JOHN DUDINSKY, JR., RONALD G. GEARY,
## <u>THOMAS HANSEN and DOYLE PRIVETT</u>

## TABLE OF CONTENTS

**Page**

I.   BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

II.  THE *TWOMBLY/IQBAL* STANDARDS FOR 12(b)(6) MOTIONS . . . . . . . . . . .  3

III. FACTUAL ANALYSIS – CLAIMS AGAINST INVESTOR DIRECTORS . . . . . . .  5

     A.   No Facts Pled To Support Breach Of Duty Of Loyalty . . . . . . . . . . . . .  5

     B.   No Facts Pled To Support Breach Of Duty Of Care . . . . . . . . . . . . . . .  6

         (a)   No Pled Facts Establish That The Investor Directors
              "Knowingly Fail[ed] To Make Informed Decisions
              Critical To The Ongoing Business Operations." . . . . . . . . . . . . . .  7

              (i)   Business Judgment Rule Protects Directors With
                  Respect To The Retention And Use Of CareCentric . . . . .  7

              Iii)   Winmar Acquisition . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

         (b)   No Allegations Supporting A "Conscious Disregard
              And Indifference . . . With Respect To The Management
              Of Soporex's Business Operations." . . . . . . . . . . . . . . . . . . . . .  13

         (c)   The Trustee's Amd.Complaint Establishes That The
              Board Provided "Oversight" During The "Critical
              Period of December 7, 2007 through August 22, 2008." . . . . . .  15

         (d)   There Is No Factual Support For The Claim That The
              Board Failed To Ensure That Soporex Established And
              Maintained Proper Financial Accounting Methods. . . . . . . . . . .  17

         (e)   There Is No Factual Support For The Claim That
              The Board Failed To Perform Any Of Their Duties
              As Members Of Committees. . . . . . . . . . . . . . . . . . . . . . . . . .  17

         (f)   The Trustee Fails To Allege Any Facts Upon Which It
              Could Be Concluded That A Workable Plan Could
              Have Been Developed To "Address The Declining
              Condition Of Soporex." . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

(g)     The Trustee Has Alleged No Facts That Any "Decision-
        Making Authority" Was "Improperly Delegated . . .
        Following Linehan's Automobile Accident."  . . . . . . . . . . . . . . .  21

(h)     The Trustee Has Failed To Allege Any Facts Supporting
        Her Claim That Any Director "Improperly Delegated" Any
        Decision-Making Authority For Terminating The Business
        Operations . . . And For The "Orderly Liquidation"
        Of Soporex's Operating Assets. . . . . . . . . . . . . . . . . . . . . . . . .  23

(i)     There Are No Allegations Which Support The Trustee's
        Claims That The Directors Failed To Take Any Steps To
        Preserve The Going Concern Value Of The Operating
        Subsidiaries' Business Operation And To Preserve The
        Value Of SRI's And SRI II's Accounts Receivable.  . . . . . . . . . .  24

IV.    THE TRUSTEE HAS FAILED TO PLEAD ANY "CAUSATION"
       BETWEEN THE ALLEGED CONDUCT AND THE "DAMAGES"  . . . . . . . . . .  26

V.     CLAIMS AGAINST OFFICERS UPON WHICH THE TRUSTEE'S
       CLAIMS AGAINST THE INVESTOR DIRECTORS REST . . . . . . . . . . . . . . .  27

VI.    SOPOREX'S INABILITY TO GET CREDIT/RECAPITALIZATION PLAN  . . . .  28

VII.   SOPOREX APPROACHED THE WIND-DOWN APPROPRIATELY . . . . . . . .  29

VIII.  PRAYER  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

## INDEX OF AUTHORITIES

**Page(s)**

<u>**CASES:**</u>

*Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford,*
554 F. Supp.2d 538 (D. Del. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Ashcroft v. Iqbal,*
129 S. Ct. 1937 (U.S. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 5, 19, 20

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544, 127 S. Ct. 1955 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 5, 19, 20

*Cede & Co. v. Technicolor, Inc.,*
634 A.2d 345 (Del. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*In re Walt Disney Co. Derivative Litigation,*
907 A.2d 693 (Del. Ch. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*IT Litigation Trust v. D'Aniello,*
2005 WL 3050611 (D.Del. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Kaye v. Lone Star Fund V LP,*
___ F. Supp.2d ___, 2011 WL 1548967 (N.D. Tex 2011) . . . . . . . . . . . . . . . . 5, 19, 20

*Orman v. Cullman,*
794 A.2d 5 (Del. Ch. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Rosenblatt v. Getty Oil Co.,*
493 A.2d 929 (Del. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Schoonejongen v. Curtiss-Wright Corp.,*
143 F.3d 120 (3rd Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

<u>**STATUTES:**</u>

FEDERAL RULES OF CIVIL PROCEDURE, Rule 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . 3

Delaware Code Annotated, Title 8, § 102(b)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

JEFFREY R. SECKEL – State Bar No. 17973200
J. MARK CHEVALLIER – State Bar No. 04189170
McGuire Craddock & Strother, P.C.
2501 N. Harwood Street, Suite 1800
Dallas, Texas 75201
Phone: 214.954.6800
Fax: 214.954.6850

ATTORNEYS FOR JOHN DUDINSKY, JR.,
RONALD G. GEARY, THOMAS HANSEN AND DOYLE PRIVETT

## IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: SOPOREX, INC., **DEBTOR** | § § § | CASE NO. 08-34174-bjh-7 |
| | § § | |
| DIANE REED, CHAPTER 7 TRUSTEE, | § § | |
| v. | § § | ADVERSARY NO. 11-03306-bjh |
| JOHN DUDINSKY, JR., RONALD G. GEARY, THOMAS HANSEN, MICKEY LETSON, STEPHEN D. LINEHAN, DOYLE PRIVETT, RICHARD J. SABOLIK and SCOTT D. SMITH | § § § § § § | |

## BRIEF IN SUPPORT OF MOTION TO DISMISS FILED BY JOHN DUDINSKY, JR., RONALD G. GEARY, THOMAS HANSEN and DOYLE PRIVETT

COME NOW, Defendants **John Dudinsky, Jr., Ronald G. Geary, Thomas Hansen** and **Doyle Privett**, and file this, their Brief in Support of Motion to Dismiss and, for such, would respectfully show unto the Court as follows:

## I.

## BACKGROUND

1.    On or about April 15, 2011, Diane G. Reed ("**Trustee**"), the Chapter 7 Trustee in connection with the above referenced matter, brought suit against various individuals, including John Dudinsky, Jr. ("**Dudinsky**"), Ronald G. Geary ("**Geary**"), Thomas Hansen ("**Hansen**") and Doyle Privett ("**Privett**") (hereinafter jointly referred to as the "**Investor Directors**").  Said Complaint was then amended on or about April 19, 2011 ("**Amd.Complaint**") (Doc.04).

2.    Although the Investor Directors are named as Defendants in the Amd.Complaint, and are identified at Paragraph 17 as having been "Directors of Soporex" (Amd.Complaint:P6), no other substantive allegations are ever made against the Investor Directors by name.[1]  The Trustee makes no attempt to articulate any conduct undertaken by the individual Investor Directors.  Instead, the Trustee attempts to rely on generic allegations against all of the Directors as a group.

3.    The Trustee's allegations against the Directors are set forth in Count 4, entitled "Claims Against the Outside Directors for Breaches of Their Duties of Loyalty and Due Care." (Amd.Complaint:P56)  In Paragraphs 191 through 193, the Trustee alleges,

---

[1]    At Paragraph 18 of the Complaint, allegations are made about the reasoning behind the aforesaid Investor Directors being elected as Directors (Amd.Complaint:P6-7).  Similarly, Paragraph 19 of the Complaint alleges that Privett, Dudinsky and Hansen were appointed to various Committees (Amd.Complaint:P7).  Paragraph 32 of the Complaint makes various allegations regarding Hansen's and Privett's acquisition of stock (Amd.Complaint:P9).  Finally, Paragraph 35 of the Complaint alleges that Dudinsky, Hansen and Privett were members of Soporex Respiratory, Inc.'s Board for approximately nine (9) months in 2006 (Amd.Complaint:P11).

---

in a conclusory fashion, that each of the Outside Directors breached the twin "fiduciary duties of loyalty and due care."[2]

4.      The conclusory allegations in Count IV do not specify the specific conduct the Trustee seeks to attack.  Instead, the Trustee requires the reader to review Count IV and make his or her own determination as to the "factual basis" of the claims being made in Count IV.[3]

5.      As the following discussion indicates, given the protection afforded to the Investor Directors by the Business Judgment Rule, the Trustee's allegations are insufficient to state a claim against the Investor Directors, and should be dismissed.

## II.

## THE *TWOMBLY/IQBAL* STANDARDS FOR 12(b)(6) MOTIONS

6.      When faced with a rule 12(b)(6) Motion to Dismiss, the Court must determine whether the Complaint includes "enough facts to state a claim to relief that is plausible on its face," that is, "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim or element]."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1965, 1974 (2007).  A plaintiff is required to provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Id.* at 1965.  Furthermore, "[f]actual allegations must be enough to raise a right to relief

---

[2]      The specific "conduct" of the Directors alleged by the Trustee is summarized in **Exhibit A** to the Appendix (App:Tab.1:Inv.Dir.0001-Inv.Dir.0002).

[3]      A summary of the "factual allegations" made against the Directors are set forth in **Exhibit B** to the Appendix (App:Tab.2:Inv.Dir.0003-Inv.Dir.0008).  Because of the nature of the Trustee's Amd.Complaint, the Investor Directors have had to make certain guesses as to which "facts" support which claims.  To the extent the Investor Directors guessed wrong, they hereby incorporate all of their analysis of the "facts" as though applicable to the appropriate sub-part of the claims made at Paragraph 192.

above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (citations omitted).

7.    Following the Supreme Court's decision in *Twombly*, the Court decided *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (U.S. 2009). *Iqbal* explained what *Twombly's* Court meant when it announced the "plausible" standard and made it clear that the "plausible" standard applies to all federal pleadings. Of importance here, *Iqbal* made it clear that merely pleading facts "consistent with" a cause of action is not enough to meet the "plausible claim" standard. Where the well-pleaded facts do nothing more than permit the Court to infer the possibility of misconduct, *Iqbal* instructs that the Complaint must be dismissed. *Id.* at 1950.

8.    In deciding whether the Trustee's Amd. Complaint rises to the level mandated by *Twombly/Iqbal*, the Court should be mindful of Delaware's substantive law with respect to the "Business Judgment Rule." Delaware recognizes that Courts are "ill-equipped to engage in post-hock, substantive review of business decisions." *In re Walt Disney Co. Derivative Litigation*, 907 A.2d 693, 746-747 (Del. Ch. 2005). Because of this, Delaware law mandates that the Court presumes Directors "in making business decisions . . . acted on an informed basis . . . and in an honest belief that the action taken was in the best interest of the company [and its shareholders]." *Id.* The presumption afforded to Directors applies when – as here – there are no facts alleging "'fraud, bad faith or self-dealing in the usual sense of personal profit or betterment' on the part of the directors." *Id.* at 747. In the absence of such pleadings, "the board's decision will be upheld unless it cannot be 'attributed to any rational business purpose.'" *Id.*

9.    Keeping in mind Delaware's Business Judgment Rule, *Twombly/Iqbal* requires the Trustee's Amd.Complaint to plead facts which rebut the protection afforded to the Investor Directors by the Business Judgment Rule. *Kaye v. Lone Star Fund V LP*, ___ F. Supp.2d ___, 2011 WL 1548967, *28 (N.D. Tex 2011). In order to do so, the Trustee must set forth facts showing the complained of conduct cannot be attributed to any rational business purpose. *In re Walt Disney* at 746-47. The Trustee's Complaint falls woefully short of this standard.

III.

## FACTUAL ANALYSIS – CLAIMS AGAINST INVESTOR DIRECTORS

### A.    No Facts Pled To Support Breach Of Duty Of Loyalty.

10.    Although Count IV speaks in terms of a breach of the duty of both "loyalty" and "due care," the Trustee has failed to plead **any** facts to support a breach of duty of loyalty claim. To establish a breach of duty of "loyalty," the Trustee is required to show that the Directors were "interested in the challenged transaction or (2) lacked independence to objectively consider whether the transaction was in the best interest of the corporation." See *Kaye v. Lone Star Fund V (US), LP*, ___ F. Supp.2d ___, 2011 WL 1548967 at *28; *Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F. Supp.2d 538, 558 (D. Del. 2008). For a director to be "interested," the director must appear that he is "on both sides of the transaction . . . or receives a personal benefit from it that is not received by the company generally." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 362 (Del. 1993). To establish that a director lacks "independence," the Trustee must plead facts to show that the director's decision was based on "extraneous considerations or influence,

rather than the corporate merits of a decision or action." *Id.*; see also *Orman v. Cullman*, 794 A.2d 5, 24 (Del. Ch. 2002). Since the Trustee has made no effort to plead any facts showing the Investor Directors were "interested" in any challenged transaction or that they lacked independence, the Trustee's "loyalty" claim is without any factual basis and should be dismissed.

**B.    No Facts Pled To Support Breach Of Duty Of Care.**

11.    With respect to the breach of duty of care claim, despite its length, the Amd.Complaint sets forth very few, if any, substantive facts against the Investor Directors. Perhaps the reason that the Trustee's Amd.Complaint contains so few actual substantive allegations is because the Trustee knows that Soporex's Articles of Incorporation preclude such a claim. As authorized by 8 Del. Code § 102(b)(7), the Articles of Incorporation relieve the Investor Directors from liability for the breach of the duty of care. See **Exhibit C** attached to the Appendix (App:Tab3:Inv.Dir.0034). Request is hereby made that the Court take judicial notice of Exhibit C. Since the Articles of Incorporation preclude the claims which the Trustee seeks to bring, such claims should be dismissed. *IT Litigation Trust v. D'Aniello*, 2005 WL 3050611 at *11 (D.Del. 2005).

Even if the Trustee has the ability to bring a "duty of care" claim, her pleading is largely conclusory and does nothing more than plead the "possibility" of a cause of action against the Investor Directors. While the Amd.Complaint repeatedly states what the Investor Directors "failed to do," the Trustee's pleading does not state what the Investor Directors should have done or how the alternative action would have changed Soporex's fortunes. Moreover, rather than pleading facts which show the Investor Directors' actions

lacked "any rational business purpose," the Amd.Complaint seeks to impermissibly "second guess" the Investor Directors' actions. As detailed below, the Trustee's breach of the "duty of care" claims must be dismissed.

### (a) No Pled Facts Establish That The Investor Directors "Knowingly Fail[ed] To Make Informed Decisions Critical To The Ongoing Business Operations."

12.     The first claim made by the Trustee against the Directors is that they "knowingly fail[ed] to make informed decisions critical to the **ongoing** business operations . . . ." (Amd.Complaint:¶192(a):P56; **emphasis** added).   The only ongoing business operation decisions which the Trustee alleges the Directors were involved in are (i) the CareCentric Services Agreement: Paragraphs 62, 66 and 147 and (ii) the acquisition of Winmar: Paragraphs 100 and 106.[4]   None of the decisions made in these "ongoing" operations support a claim.

### (i) Business Judgment Rule Protects Directors With Respect To The Retention And Use Of CareCentric.

13.     The first transaction with which the Trustee seeks to take issue is Soporex's retention and use of CareCentric.  Here, the Trustee asserts that CareCentric failed to perform the services which it agreed to perform and, therefore, the Directors should have not retained or continued to use CareCentric.  Several facts pled by the Trustee are of prime importance in evaluating her CareCentric claims.

14.     First, the Trustee admits that Soporex had a very short period of time in which to close the "Liberty APA" and to begin its operations.  In fact, the Trustee admits that "Soporex and SRI only had 15 business days to prepare for the commencement of

---

[4]     Paragraphs 140, 143 and 145 merely complain about a general lack of information or meetings at the Director level.  Such Paragraphs do not attack any specific action.

SRI's business operations." (Amd.Complaint:¶44:P13) The Trustee goes on to assert that "[i]n the three weeks between the signing and closing of the Liberty APA, Soporex had to hire and train almost one hundred people, install a phone system to service 26,500 active patients, lease office space, lease warehouse space, apply for pharmacy licenses in 48 states or enter into subcontract arrangements with parties holding valid pharmacy licenses, and establish a billing and collection system for SRI." (Amd.Complaint:¶45:P14) In other words, Soporex had to either move quickly and look for third-party vendors such as CareCentric or pass on a potentially lucrative business opportunity presented by the Liberty APA. Unwilling to allow a lucrative opportunity to simply pass, Soporex took on the herculean task of bringing SRI online in a very short period of time.

15.     To do this, Soporex elected to outsource the "billing and collection" function to CareCentric. (Amd.Complaint:¶49:P15) As the Trustee's Amd.Complaint admits, "CareCentric's management assured Soporex's management that CareCentric had the expertise, the necessary software, and the experienced staff needed to perform the data processing and the billing and collection functions." (Amd.Complaint:¶50:P15) Nowhere does the Trustee assert that Soporex was not acting reasonably in accepting these assurances. As a result of these representations, CareCentric and Soporex entered into a letter agreement in March 2006, whereby CareCentric undertook the "pharmacy processing and billing and collection services . . . ." (Amd.Complaint:¶51:P15)[5]

16.     Despite the generality of the Amd.Complaint, it does not really appear that the Trustee is taking issue with the "reasonableness" of the Soporex's decision to retain

---

[5]     A copy of the letter agreement is attached as **Exhibit D** to the Appendix. (App:Tab4:Inv.Dir.0037-Inv.Dir.0042)

CareCentric. In fact, in other litigation pending in this Court, the Trustee has affirmatively asserted that Soporex management did, in fact, act "reasonably" in retaining CareCentric and relying upon CareCentric's representations.[6]

17.    Rather than taking issue with the retention of CareCentric, the Trustee's real complaint seems to focus on the actions taken by Soporex once it was discovered that CareCentric was not living up to its promises. While the Trustee wants the Court to believe that Soporex management took "no action" when faced with CareCentric's poor performance, the pled "facts" tell a very different story.

18.    First, the Trustee admits that Soporex retained Teresa Camfield to assist Soporex in correcting the CareCentric issues. (Amd.Complaint:¶54:P16)  Similarly, the Trustee admits that the "Soporex Board approved" the Officers recommendation that they enter into a License and Services Agreement with CMAEON for the purpose of enabling SRI to provide its own "pharmacy data processing and for SRI's billing and collections functions when those data processing functions were taken in-house." (Amd.Complaint:¶66:P20-21) Moreover, the Trustee recognizes that the creation of an in-house billing function is a lengthy and laborious process, and admits that "nine to ten months after [the start of] the transition project, the transition was still not complete." (Amd.Complaint:¶68:P21)  In fact, as the Trustee recognizes, Soporex was not able to begin its in-house billing functions until February 1, 2008.  (Amd.Complaint:¶69:P21)

---

[6]        See Paragraph 57 of the Trustee's First Amended Complaint in Adversary No. 10-03126 attached as **Exhibit E** to the Appendix. (App:Tab5:Inv.Dir.0043-Inv.Dir.0068) There, the Trustee asserts: "Soporex reasonably relied upon the false representations made by [CareCentric], including, but not limited to, Soporex's decision to continue to do business with . . . CareCentric . . . ." (App:Tab5:¶57:P15:Inv.Dir.0058)

Noticeably absent from the Amd.Complaint is any assertion that any of these actions were unreasonable or that the billing transition could have been accomplished sooner.

19.    The creation of a "in-house" Medicare / Medicaid billing department is simply not something that one can do with the snap of the fingers. Instead, it is a lengthy, time consuming and expensive process. Moreover, as the Trustee recognizes in her pleading, once CareCentric was in place, taking the billing function away from CareCentric was fraught with danger. In the words of the Trustee, "after learning that Soporex had brought SRI's billing and collection functions in-house, CareCentric . . . cut off Soporex's access to its own pharmacy data and its own billing and collection data, which were stored on CareCentric's servers." (Amd.Complaint:¶70:P21) The predatory and sharp business tactic taken by CareCentric resulted in Soporex bringing suit against CareCentric. (Amd.Complaint:¶70-71:P21-22) Certainly, the Directors were acting well within the realm of reason by trying to guard against CareCentric's predatory behavior. As the aforesaid allegations make clear, the resolution of the problem caused by CareCentric's poor performance was complex and presented no clear solution. The Trustee's claim on this point is simply an impermissible attempt to engage in second guessing. As Warren Buffet said: "In business, the view is always clearer in the mirror than from the windshield." Fortunately, the law does not allow for ad hoc second guessing based on the view in the mirror.

20.    The same is true with respect to the negotiation and execution of the Service Agreement. While it may be true that at the time that the final CareCentric Service Agreement was executed, the Directors knew that SRI had "sustained over $3,000,000.00 in damages" as a result of CareCentric's defective performance, the fact remains that

Soporex did not have any viable option but to sign the Agreement. As the Trustee's Amd.Complaint recognizes, the development of an in-house billing function was still months away. (Amd.Complaint:¶69:P21) Moreover, if Soporex attempted to move the billing functions to one of CareCentric's competitors, CareCentric could have acted in the same predatory manner as it ultimately did in February 2008 when it denied Soporex access to its "own data." (Amd.Complaint:¶70:P21) The Trustee's own Amd.Complaint demonstrates the Hobbesian choice facing Soporex: either do as CareCentric demanded or deal with a crippling disruption in the billing and collection process.

21.    Given the background pled by the Trustee, it cannot be plausibly suggested that the Directors acted outside the realm of any legitimate business judgment with respect to the execution of the CareCentric Service Agreement merely because the Agreement included a damage limitation provision. This is particularly true since the Trustee did not plead (because she cannot) that the damage limitation provision was not already part of the original Soporex/CareCentric letter agreement.[7] The original letter agreement provided: "total liability for either party . . . shall be limited to the total amount of the fees paid hereunder." (App:Tab4:Inv.Dir.0040)   Given that the preliminary letter agreement contained a damage limitation provision, how can the Directors be faulted for allowing a damage limitation to appear in the final agreement? The Trustee's position is nothing more than a shameful revisionist history and cannot support a claim. While the Trustee may not like the options that Soporex had available to it, the fact remains that the Trustee has failed to plead any facts from which it can be concluded that Soporex management did not

---

[7]      See Exhibit D attached to the Appendix. (App:Tab4:Inv.Dir.0037-Inv.Dir.0042)

exercise legitimate business judgment with respect to CareCentric. Sometimes businessmen are simply forced to make the "best" out of a bad situation. Nothing in the Trustee's Amd.Complaint "plausibly" suggests that the Directors breached any duty which they owed to the Company with respect to CareCentric.

(ii) <u>Winmar Acquisition.</u>

22.    The only other "ongoing business operation" involving the Directors pled by the Trustee in her Amd.Complaint is the decision to acquire Winmar. While the Trustee asserts that the Directors "rubber stamped" Linehan's acquisition of Winmar and that the Directors had "no information which determined a reasonable price for Winmar," the Trustee never alleges that the acquisition price for Winmar was unreasonable or otherwise irregular. Moreover, the Trustee's Amd.Complaint seemingly affirmatively negates any such contention.

23.    Notably, the Trustee asserts that Winmar was operated profitability. (Amd.Complaint:¶123:P34-35). According to the Trustee, Winmar generated a "gross profit of approximately $2,235,000." *Id.* In addition, during the first eight months of 2008, the Winmar unit generated "gross profit of approximately $1,295,000." (Amd.Complaint:¶124:P35) These allegations are a far cry from establishing that the decision to acquire Winmar was outside the realm of reasonable business judgment or that the price paid was too high. The Trustee has simply failed to plead any facts from which it could be concluded that the acquisition of Winmar caused any harm to Soporex.

24.    Given that the only "decisions critical to the ongoing business operations" which the Trustee has identified are the CareCentric transaction and the acquisition of Winmar, it is clear that Paragraph 192(a) does not state a "plausible" claim against the

Investor Directors.  Accordingly, this aspect of the Trustee's Amd.Complaint should be dismissed against the Investor Directors.

> **(b)    No Allegations Supporting A "Conscious Disregard
> And Indifference . . . With Respect To The Management
> Of Soporex's Business Operations."**

25.    A kissing cousin to the claim made at Paragraph 192(a) is the Trustee's claim that the Directors disregarded their fiduciary duties with respect to the "business operations" of Soporex.  (Amd.Complaint:¶192(b):P56)  However, the Trustee failed to assert any facts to support this conclusory allegation.

26.    All of the allegations which the Trustee makes with respect to the "business operations" seem to focus upon day to day operational activities which took place within the Winmar unit, the GE Business Financial Services line of credit, and the Harvard Drug line of credit.  However, there are simply no facts alleged from which it could be plausibly inferred that the Investor Directors acted with "conscious disregard" or "indifference" to such transactions or, for that matter, any other aspect of Soporex's "business operations."

27.    The Trustee's allegations regarding Soporex's "business operations" focus, as they should, upon the conduct of the Officers.    See Paragraphs 46 (Amd.Complaint:P14), 55-60 (Amd.Complaint:P16-18), 72 (Amd.Complaint:P22) and 111-115 (Amd.Complaint:P31-33).  As the Court is aware, the Officers are  the individuals within Soporex that were responsible for its day to day operations.  *See Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 127 (3rd Cir. 1998); *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 943 (Del. 1985).  By contrast, the Investor Directors were only responsible for setting Soporex's general course and approving major financial transactions. *Id.* Because the Investor Directors were not involved in the day to day operations of Soporex's

business, the Trustee's allegations regarding such day to day operations have no applicability to any claim against the Investor Directors.

28.    With respect to the GE Financial Services line of credit and the Harvard Drug line of credit, the Trustee does not even allege facts rising to the level of "possible" negligence, much less no "rational business purpose." The Trustee merely alleges that the loan went into default and that Soporex was unable to cure the default.   (See Amd.Complaint:¶85-87:P25-26.)   The Trustee makes no allegations that the Investor Directors had the ability to cure the default or obtain a separate line of credit.

29.    With respect to the Harvard Drug line of credit, the Trustee merely alleges that in June 2008 (long after the Trustee alleges that Soporex was in dire financial difficulties and deeply in debt to Harvard), Soporex had to enter into an Exclusive Purchasing Agreement with Harvard in order to obtain additional credit from Harvard Drug. (Amd.Complaint:¶92:P27) According to the Trustee, the Exclusive Purchasing Agreement resulted in Soporex paying "approximately $119,000 more for these medications that (sic) it would have paid if it had purchased them from other suppliers. *Id.* Assuming this to be true, the increased price alleged by the Trustee is more than justified by the credit being extended by Harvard. Importantly, the Trustee does not allege that Soporex had the cash flow or other resources sufficient to enable it to take advantage of the prices being offered by "other suppliers." Moreover, while price may be an important term of a sale, it is far from the only consideration. A buyer may reasonably select a higher price in return for better service or to ensure a ready supply.   Nowhere does the Trustee allege considerations such as these did not justify the "increased" price.

30.    Given Soporex's lack of credit and cash flow made evident by the Trustee's own pleading, an additional $119,000.00 is a small price to pay to obtain the drugs which Soporex needed to remain in business. Since the Trustee has not identified any conduct which the Investor Directors "consciously disregarded" or were "indifferent" toward with respect to the "management of Soporex's business operations," the Trustee's claims at Paragraph 192(b) should be dismissed.

(c)    **The Trustee's Amd.Complaint Establishes That The Board Provided "Oversight" During The "Critical Period of December 7, 2007 through August 22, 2008."**

31.    The Trustee claims that the Investor Directors failed to "provide oversight" between December 7, 2007 and August 22, 2008. (Amd.Complaint:¶192(c):P56). Contrary to this conclusory claim, the Trustee's Amd.Complaint establishes that the Directors were, in fact, providing "oversight" during the "critical period."

32.    At Paragraph 68, the Trustee admits that a Board meeting was held on December 19, 2007. (Amd.Complaint:¶68:P21) The Trustee's Amd.Complaint also reflects that additional formal Board meetings were held on August 6, 2008, August 14, 2008, and August 19, 2008. (Amd.Complaint:¶155:P44) Because of this, it seems the Trustee's real allegation is that the Directors failed to hold meetings between January 2008 and July 2008. (Amd.Complaint:¶145:P42) While the Trustee would have the Court believe that the Investor Directors were not providing "oversight" during this time period, the Amd.Complaint again tells a very different story.

33.    At Paragraph 146, the Trustee affirmatively alleges that during this "critical" time period, the Investor Directors were "provided sufficient information from which they could and should have concluded that Linehan's and Sabolik's reports on the financial

status of the Soporex Debtors were false and misleading." (Amd.Complaint:¶146:P42)
This allegation recognizes two things: (1) during the critical period, Linehan and Sabolik
were "reporting on the financial status of Soporex" to the Board and (2) the Board was
receiving "sufficient information" from which to determine the accuracy of these reports.
In other words, the Directors were "overseeing" the financials.

34.    Moreover, the Trustee's pleading recognizes that the Investor Directors were
receiving information in the form of action reports, memorandums and telephone
conferences with the Officers of Soporex. For instance, in Paragraph 151, the Trustee
acknowledges that a memorandum was received by the Investor Directors in May 2008
regarding the default under the GEBFS line of credit, and that the Investor Directors "were
all experienced businessmen who understood the financial consequences to the Soporex
Debtors under the Credit Agreement." (Amd.Complaint:¶151:P43)  The Trustee also
acknowledges that the Directors received other information from Linehan on an "infrequent
and irregular" basis and that such communications "were sufficient to fulfill their
responsibilities as directors to oversee the business activities of Soporex and the Operating
Subsidiaries." (Amd.Complaint:¶143:P41)  Thus, while the Trustee asserts that the
Investor Directors failed to "provide **any** oversight of or direction to the business activities
of Soporex and the Operating Subsidiaries" (Amd.Complaint:¶143:P41; **emphasis** added),
the Trustee's own allegations refute this claim.  The Trustee's allegations preclude this
claim from rising to the level of a "plausible" claim.  This is particularly true when it is
coupled with the fact that the Trustee has not alleged how "oversight" during the "critical
time period" would have or could have changed Soporex's fortune.  Accordingly, the
allegations being made in Paragraph 192(c) of the Amd.Complaint should be dismissed.

**(d)    There Is No Factual Support For The Claim That The
Board Failed To Ensure That Soporex Established And
Maintained Proper Financial Accounting Methods.**

35.    The allegations being made in Paragraph 192(d) are perhaps the easiest of

which to dispose.  Here, the Trustee asserts that the Directors failed to "**ensure** that

Soporex . . . established and maintained proper financial accounting methods . . . ."

(Amd.Complaint:¶192(d):P.56, **emphasis** added)

36.    As an initial matter, the Investor Directors had no duty to "ensure" anything.

Instead, the Directors merely had the duty to exercise their reasonable business judgment.

Even if the Directors did have a duty to "ensure" some aspect of Soporex's accounting,

there are simply no allegations identifying any improper "accounting methods" being

employed at Soporex, much less what the Investor Directors either did or failed to do which

contributed to the use of improper accounting methods.  Even if the Trustee made some

veiled allegation as to what the Investor Directors did, the Trustee has made no factual

allegation revealing how the improper accounting methods caused Soporex or anyone else

any harm.  The allegations at Paragraph 192(d) are simply without any factual support

whatsoever.  Accordingly, such claim cannot be said to be "plausibly made" by the Trustee

and should be dismissed.

**(e)    There Is No Factual Support For The Claim That The Board
Failed To Perform Any Of Their Duties As Members Of Committees.**

37.    The Trustee asserts that all of the Investor Directors are liable as a result of

their failure to perform "any of their duties as members of . . . committees . . . ."

(Amd.Complaint:¶192(e):P57)  As an initial matter, it should be pointed out that of the

Investor Directors, only Privett, Dudinsky and Hansen are alleged to have been on a

committee. Accordingly, the claims being made in Paragraph 192(e) must be dismissed, as a matter of law, as against Geary. Since Geary is not even alleged to be on a committee, he can hardly be held liable for any committee's conduct. With respect to the claims against Privett, Dudinsky and Hansen, each of these claims should likewise be evaluated on their own individual merit.

38.    The Trustee alleges that Dudinsky was appointed to the "reimbursement and lobbying" committee (Amd.Complaint:¶19:P7), but fails to indicate what the "reimbursement and lobbying" committee was suppose to do or how it could have staved off Soporex's financial problems. Similarly, there are no allegations as to what the "reimbursement and lobbying" committee either did or failed to do. The sole claim made against Dudinsky is that he was a member of the "reimbursement and lobbying" committee. The Trustee makes absolutely no other allegation about the "reimbursement and lobbying" committee. Merely being on a committee does not make Dudinsky liable. Because of this, the Trustee's claims against Dudinsky in Paragraph 192(e) must be dismissed.

39.    Similarly, the Trustee alleges that Privett was appointed as the "sole member of the audit committee." (Amd.Complaint:¶19:P7) However, as with the "reimbursement and lobbying" committee, there are no other allegations made about the audit committee. Moreover, there are no claims that any Soporex audit was improper or need guidance from the audit committee. Accordingly, the claim against Privett must likewise fail.

40.    With respect to Hansen, the Trustee alleges that Hansen was appointed to be a member of the "operations" committee (Amd.Complaint:¶19:P7). There are no allegations as to what the "operations" committee was tasked with doing, other than to "assist in operations." The only allegation made about Hansen's involvement with the

operations committee is that the "operations committee never met and never did anything to assist the Soporex Board . . . ." (Amd.Complaint:¶20:P7)  There are no allegations as to how the operations committee should have "assisted" the Soporex Board, or how such assistance would have favorably impacted Soporex.  (Amd.Complaint:¶145:P42)  Merely alleging that Hansen was a member of a committee and that such committee did not meet falls far short of establishing a "plausible" claim against Hansen.  As a minimum, the Trustee must allege what the committee should have done and how its guidance would have assisted Soporex.  Accordingly, this claim should be dismissed against Hansen.

> **(f)    The Trustee Fails To Allege Any Facts Upon Which It Could Be Concluded That A Workable Plan Could Have Been Developed To "Address The Declining Condition Of Soporex."**

41.    The Trustee asserts that the Investor Directors had a duty to take "affirmative action to address Soporex's operational and financial problems . . . ." (Amd.Complaint:¶144:P41)  Yet, no where does the Trustee suggest what "affirmative action" the Outside Directors were obligated to take other than the actions the Trustee acknowledges wee already being taken.  Similarly, the Trustee makes no effort to suggest how the as of yet undisclosed "affirmative action" would have changed the financial fortune of Soporex.  In other words, the Trustee's Amd.Complaint amounts to nothing more than her assertion that the Investor Directors did something wrong since circumstances conspired to force Soporex into bankruptcy.  Such allegations, however, fall woefully short of the "plausibility" standard mandated by *Twombly* and *Iqbal* in order to survive a Rule 12(b)(6) challenge.  *See Kaye*, ___ F. Supp.2d ___, 2011 WL 1548967 at *27 and *31.

42.    Moreover, the Trustee's conclusory claim attempts to ignore the fact that Soporex was pursuing "recapitalization" in the form of both debt and equity injections in

---

BRIEF IN SUPPORT OF MOTION TO DISMISS FILED BY JOHN DUDINSKY, JR., RONALD G. GEARY, THOMAS HANSEN AND DOYLE PRIVETT                                    Page 19
910804  3383 0004

order to "address the declining conditions . . . ." (Amd.Complaint:¶128:P36)  It is

undisputed that Soporex was in discussion with Capital Resources Partners for an

"investment package of $49 million" until July 2008. *Id.* The Trustee tries to dismiss these

efforts by baldly proclaiming them as "unduly optimistic." Yet, no factual basis is provided

for this conclusion.  Dogma is insufficient under *Twombly* and *Iqbal*, and the claims in

Paragraph 192(f) must be dismissed.

43.    Moreover, the Trustee's Amd.Complaint fails to even make a case for her

claim that the Investor Directors failed to devise a "plan . . . to address the declining

financial condition." At Paragraph 129, the Trustee acknowledges that a recapitalization

plan was "always viewed . . . as a means for expanding the Soporex Debtors' business

base, which [was] believed [as a] cure [to] their financial and cash flow problems."

(Amd.Complaint:¶129:P36)  The Trustee also acknowledges that the Investor Directors

were assured "that Soporex's recapitalization was just around the corner . . . ."

(Amd.Complaint:¶130:P37) Yet, nowhere does the Trustee allege any facts from which

it could concluded that recapitalization would not have solved the cash flow problem or that

the Investor Directors were not justified in relying on the assurances that the needed

"capitalization was just around the corner . . . ." The Trustee does not really assert that

Soporex did not have a plan for dealing with its "financial and cash flow problems" but,

instead, that the **wrong** plan was in place.  Yet, nothing alleged by the Trustee suggests

"recapitalization" was not within sound business judgment.  Moreover, the Trustee does

not suggest what the **right** plan should have been.  Such claim by the Trustee is merely

pure "second guessing."

**(g)    The Trustee Has Alleged No Facts That Any
"Decision-Making Authority" Was "Improperly
Delegated . . . Following Linehan's Automobile Accident."**

44.    At Paragraph 192(g), the Trustee claims the Board improperly delegated decision making authority following Linehan's July 18, 2008 automobile accident. (Amd.Complaint:P57)[8] Yet there are no facts alleged which support the Trustee's claim in Paragraph 192(g).

45.    Only Paragraphs 121 and 131 of the Trustee's Amd.Complaint seem to deal with any decisions made by Soporex after the July 18, 2008 accident and prior to the "orderly liquidation of the operating assets." The Trustee asserts in Paragraph 121 that a decision was made on August 8, 2008 to enter into a "letter agreement whereby Soporex forfeited any right to an equity interest in CSC and CSC was allowed to retain the $150,000 that Soporex had paid to CSC as a 'break-up fee.'" (Amd.Complaint:¶121:P34) However, the Trustee does not allege that the Directors delegated any "decision-making authority" with respect to this transaction. In fact, the Trustee's Amd.Complaint suggests quite the opposite. At Paragraph 122, the Trustee affirmatively alleges that:

> Linehan and Sabolik **never informed** the Soporex Board and, thus, **never obtained approval** from the Soporex Board for Soporex's purchase of an equity interest in CSC. **The only time** that the CSC relationship was brought to the attention of the Soporex Board was during the crisis-oriented board meeting held on July 28, 2008, when Sabolik advised the Outside Directors that Soporex's management had decided to bring the functions of CSC back in-house and that Soporex would forfeit a prepaid "break-up fee" of $150,000.

(Amd.Complaint:¶122:P34, **emphasis** added)

---

[8]    In bringing this claim, the Trustee is apparently trying to make a claim for various decisions unrelated to the "orderly liquidation" of Soporex since such claim is independently brought in 192(h).

46.    The Trustee also affirmatively alleges that Sabolik "failed to mention to the Outside Directors that the $150,000 had been part of an equity investment of Soporex in CSC, which the Soporex Board **never approved**." (Amd.Complaint:¶122:P34; **emphasis** added) In other words, rather than delegating the "decision-making authority" with respect to the CSC transaction, the Trustee affirmatively alleges that Sabolik acted **without** the authority of the Directors. Accordingly, such transaction cannot possibly support the Trustee's claim that the Board "improperly delegated decision-making authority" after Linehan's July 18, 2008 accident.

47.    The other transaction identified by the Trustee's Amd.Complaint is Sabolik's decision to continue to pursue recapitalization after he was appointed President. At Paragraph 131 of the Amd.Complaint, the Trustee alleges that "[w]ithin days after Linehan's automobile accident on July 18, 2008, Sabolik was appointed . . . to serve as president of Soporex. After his appointment, Sabolik continued to pursue the recapitalization plan . . . ." (Amd.Complaint:¶131:P37) Yet, the Trustee offers no guidance as to what "alternatives" she feels that Soporex should have pursued during this time period. Just as importantly, in order to state a "plausible" claim against the Investor Directors, the Trustee would not only need to identify an alternative course of action, but identify what actions were "improperly delegated" and how such delegation prevented Soporex from pursuing the as of yet undisclosed proper course of action. Any such claim by the Trustee falls far short of the "plausible" standard when it is remembered that there was only approximately thirty days between Sabolik's accident and the bankruptcy filing. As with the Trustee's other claims, Paragraph 192(g) simply fails to state a "plausible" claim against the Investor Directors.

**(h)** **The Trustee Has Failed To Allege Any Facts Supporting Her
Claim That Any Director "Improperly Delegated" Any Decision-
Making Authority For Terminating The Business Operations . . .
And For The "Orderly Liquidation" Of Soporex's Operating Assets.**

48.     With respect to the Trustee's contention at Paragraph 192(h), the Trustee,
once again, failed to plead any facts to support her claim. In fact, as with other claims, the
Trustee's allegations prove just the opposite.

49.     According to the Trustee's Amd.Complaint, the Outside Directors were all
"experienced businessmen" (Amd.Complaint:¶151:P43) who met with an experienced
bankruptcy counsel in order to "discuss Soporex's financial situation and Soporex's
'bankruptcy options'" as early as July 2008.   (Amd.Complaint:¶152:P43)  The Board then
subsequently met on August 6, 2008, August 14, 2008, and August 19, 2008 regarding the
financial crisis and possible bankruptcy.   (Amd.Complaint:¶¶155-156:P44)  Of particular
importance, the Trustee alleges that the Soporex Board formally "authorized Chapter 7
bankruptcy filings for all of the Soporex Debtors" on August 19, 2008, and that the Board
approved a written Resolution regarding the same.  (Amd.Complaint:¶162:P45-46)  No
where in the Trustee's Amd.Complaint does the Trustee allege any facts which even
suggest, much less plausibly state, that the Investor Directors "improperly delegated
authority" in connection with the wind-down of Soporex's business affairs.

50.     While the Trustee contends that certain of the Officers overstepped their
bounds in connection with the sale of certain assets to Med 4 Home, Inc., the Trustee does
not allege any facts which connect the Investor Directors to such transaction. Notable, the
Trustee does not point to any *carte blanche* authority which the Investor Directors extended
to Soporex's Officers. In fact, the only authority which the Trustee's pleading reveals that

the Directors gave to the Officers with respect to the "wind down" was the authority to

"negotiate, execute, deliver and file . . . any . . . documents . . . appropriate . . . to file [a

Chapter 7] petition or otherwise carry out the purposes of these resolutions."

(Amd.Complaint:¶162:P46:3rd.sub-¶.Resolutions).    Board Resolutions like this do not

plausibly state a claim for the improper delegation of decision-making authority.  Such a

Resolution is necessary to authorize the bankruptcy filing.  Accordingly, the claims being

made in Paragraph 192(h) must be dismissed.

> **(i)    There Are No Allegations Which Support The Trustee's Claims That
> The Directors Failed To Take <u>Any</u> Steps To Preserve The Going
> Concern Value Of The Operating Subsidiaries' Business Operation
> <u>And To Preserve The Value Of SRI's And SRI II's Accounts Receivable</u>.**

51.    The Trustee's final claim is that the Investor Directors "failed to take <u>any</u>

steps to preserve the going concern value of the Operating Subsidiaries' business

operations and to preserve the value of SRI's and SRI II's accounts receivable" is also

affirmatively rebutted in the Amd.Complaint. (Amd.Complaint:¶192(i):P57) It is undisputed

that the Board met repeatedly in July and August 2008 to discuss bankruptcy options, and

elected to file bankruptcy.  One of the purposes of filing bankruptcy is to preserve assets.

52.    Moreover, the decision to file the case as a Chapter 7 was well within the

"business judgment" of the Directors.  This fact is made clear by the Trustee's own

pleading wherein the Trustee acknowledges that Soporex lost its line of credit

(Amd.Complaint:¶83:P24), lost the line of credit being extended to it by its major drug

supplier (Amd.Complaint:¶91:P26) and had its collections severely disrupted by

CareCentric's predatory practices (Amd.Complaint:¶70-72:P21-22).  How could Soporex

operate as a Chapter 11 without the means to obtain drugs or pay its employees?  The fact

that a Chapter 7 filing was within the realm of "business judgment" seems conclusively established by the fact that the Trustee did not convert the case to a Chapter 11 proceeding after she was approved.  The Trustee has failed to allege any facts from which it could be concluded that the Board was acting outside its legitimate business judgment when it decided to file a Chapter 7 rather than a Chapter 11.  The Officers and Directors (as well as the employees) were not obligated to work for free in order to "preserve going-concern value."  Yet, this is exactly what the Trustee claims by asserting that only a Chapter 11 should have been filed.

53.    Moreover, while the Trustee seeks to second guess the Directors for not obtaining "turnaround specialists" or obtaining a "business valuation appraisal," the Trustee's Amd.Complaint recognizes that Soporex's financial condition had become so severe by July 2008 that Soporex could no longer "**afford** to pay MedStaff its $100,000 monthly fee" for resubmitting "the Medicare and Medicaid claims that CareCentric had failed to properly submit."  (Amd.Complaint:¶72-73:P22, **emphasis** added)  Yet, while recognizing that Soporex could not "afford" to pay vendors that were directly responsible for generating much needed revenues, the Trustee, without explanation, seeks to hold the Investor Directors liable for their "failure" to engage in the luxury of hiring turnaround specialists and/or business appraisers.  Given that Soporex did not have sufficient funds to be able to "afford" services essential to its operations, the Investor Directors can hardly be faulted for failing to spend money which Soporex did not have on consultants.  This is particularly true since the Trustee has failed to allege any facts suggesting that the hiring of a turnaround specialist or appraiser was mandated by "all reasonable business

judgment" even despite Soporex's limited resources, or to plead how such consultants would have made a difference.

54.     The Trustee's Amd.Complaint falls woefully short of alleging any facts which show that Chapter 11 was a "viable" option given the financial condition of the company, much less the only option within "rational business purpose." Accordingly, the Trustee has once again failed to allege a plausible case against the Investor Directors and this claim should be dismissed.

## IV.

### THE TRUSTEE HAS FAILED TO PLEAD ANY "CAUSATION" BETWEEN THE ALLEGED CONDUCT AND THE "DAMAGES"

55.     Another defect in the Trustee's Amd.Complaint against the Investor Directors is the failure to allege any "causation" between the Investor Directors' conduct and the "damages" being claimed. The Trustee makes little effort to connect the Investor Directors' conduct to the damages being claimed. Despite the fact that very different damages would flow from conduct associated with the retention of CareCentric and the conduct associated with the "wind-down" of Soporex, the Trustee simply asserts a "one size fits all" damage theory. Specifically, the Trustee asserts at Paragraph 193 that the Investor Directors' conduct resulted in the:

> . . . loss of payments and/or reimbursements due SRI and SRI II from Medicare . . . loss of value of SRI's assets that were fraudulently transferred to Med 4 Home . . . loss of the full going concern value of Winmar . . . loss of funds preferentially . . . transferred . . . to insiders and to certain of Soporex's creditors . . . and the administrative fees and expenses incurred by the bankruptcy estates . . . .

(Amd.Complaint:¶193:P57-58)

56.    Beyond the problems with the "one size fits all" approach to damages, certain of the Trustee's damages are not supported by any pleading.  For instance, there is no conduct which supports the Trustee's claim of a "fraudulent and/or preferential transfer" to "insiders" or "certain of Soporex's creditors."  Similarly, there are no facts alleged which would support a claim for "administrative fees and expenses" as alleged in Paragraph 193(e).  Accordingly, the Trustee's damage claim should be dismissed.

## V.

## CLAIMS AGAINST OFFICERS UPON WHICH THE
## TRUSTEE'S CLAIMS AGAINST THE INVESTOR DIRECTORS REST

57.    At its essence, the Trustee contends that the Investor Directors are liable because they failed to "ensure" that the decisions and actions of the corporate officers achieved success.  In other words, for the Trustee to establish liability, the Trustee must not only show that the Investor Directors were grossly negligent in their supervision of the Officers' conduct, but that the Officers' conduct was also grossly negligent.  When the claims against the Officers are examined, it is clear that the Trustee's claims against the Investor Directors must fail.

58.    From a review of the Trustee's claims against the Officers, it appears that the Trustee focuses on four events:

(1)    the retention of CareCentric Professional LLC to perform data processing, billing, and collection functions on behalf of Soporex Respiratory, Inc. (SRI) and the failure to more promptly replace CareCentric;

---

BRIEF IN SUPPORT OF MOTION TO DISMISS FILED BY JOHN DUDINSKY, JR.,
RONALD G. GEARY, THOMAS HANSEN AND DOYLE PRIVETT                    Page 27
910804  3383 0004

(2)    the CareCentric Service Agreement which contained a damage limitation provision;

(3)    entering into a "Exclusive Purchase Agreement" with Harvard Drugs in June 2008, the failure to obtain additional capital and/or take "affirmative action" between May 2008 and July 2008; and

(4)    the transfer of SRI's patient list to Medford Homes on the eve of bankruptcy.

The first two events have been discussed in detail above, so the Investor Directors will focus on the remaining events.

## VI.

## SOPOREX'S INABILITY TO GET CREDIT/RECAPITALIZATION PLAN

59.    The Trustee's assertion that Soporex management should not have pursued recapitalization, while recognizing that Soporex had lost its ability to finance its business through cash flow due to CareCentric is particularly problematic in that the Trustee offers no other solutions to stem the financial woes which Soporex found itself in 2008. The Trustee recognizes that Soporex was hit with the double whammy of a reduction in Albuterol reimbursements and CareCentric disrupting collection efforts by refusing to give Soporex access to its computer data. Yet, the Trustee complains that management should not have tried to find additional capital. How was Soporex to operate without equity or debt capital given the sudden choke hold placed on its receivables by the change in Medicare reimbursements and CareCentric's predatory practice? While the Trustee now seeks to second guess the decision to pursue "recapitalization," the Trustee offers no other suggestion or solution to the problems facing Soporex. Importantly, the Trustee has failed

to offer any facts which suggest pursuing recapitalization was not a legitimate exercise of business judgment. Accordingly, the alleged lack of "oversight" by the Board which allowed such pursuit cannot be actionable.

## VII.

## SOPOREX APPROACHED THE WIND-DOWN APPROPRIATELY

60.    The final major transaction which the Trustee seeks to attack is the decision to transfer the pharmacy patient base to Med 4 Home. While the Trustee apparently acknowledges that Soporex was in a dire financial condition, the Trustee asserts that Soporex should not have filed a Chapter 7 and that certain Officers should not have entered into the Med 4 Home transaction.

61.    While the Trustee seeks to fault the Officers for the transfer to Med 4 Home, she admits they had legitimate business reason to do so. The Trustee acknowledges that Sabolik and Smith believed that they "could face personal civil or criminal liability for 'patient dumping' if they did not transfer the patient list and patient data to some third party before ceasing SRI's business operations." (Amd.Complaint:¶166:P47) While the Trustee concludes that such belief was "incorrect," she does not assert that it was unreasonably held or not the product of honest judgment. In connection with these claims, the Trustee, once again, does nothing more than seek to substitute her judgment for the judgment of the Officers and Directors. This is exactly what the Business Judgment Rule precludes. Accordingly, the Trustee has failed to state a "plausible" claim for lack of supervision of the various Officers with respect to the Chapter 7 filing or the Med 4 Homes transaction.

## VIII.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Defendants **John Dudinsky, Jr., Ronald G. Geary, Thomas Hansen** and **Doyle Privett** respectfully request:

1.    that the Court take notice of this, their Motion to Dismiss;

2.    that the Court dismiss the claims being made by Diane Reed, Chapter 7 Trustee in her Complaint, including all amendments thereto; and, finally,

3.    that Defendants John Dudinsky, Jr., Ronald G. Geary, Thomas Hansen and Doyle Privett be awarded such other and further relief to which they may show themselves to be justly or equitably entitled.

Respectfully submitted,

/s/ Jeffrey R. Seckel  (06-01-11)
**JEFFREY R. SECKEL**
State Bar No. 17973200
**J. MARK CHEVALLIER**
State Bar No. 04189170

**McGuire, Craddock & Strother, P.C.**
2501 North Harwood Street, Suite 1800
Dallas, TX 75201
Phone: 214.954.6800
Fax: 214.954.6850
Email: jseckel@mcslaw.com
Email: mchevallier@mcslaw.com

**ATTORNEYS FOR DEFENDANTS:
JOHN DUDINSKY, JR., RONALD G.
GEARY, THOMAS HANSEN and DOYLE
PRIVETT**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing pleading was served

via electronic mail on all ECF participants on this, the 1st day of June, 2011.

### ATTORNEYS FOR PLAINTIFF:
David W. Elmquist
Reed & Elmquist, P.C.
604 Water Street
Waxahachie, TX 75165

### ATTORNEY FOR DEFENDANTS SMITH, LINEHAN, SABOLIK:
Thomas S. Richey
Bryan Cave Powell Goldstein
1201 W. Peachtree Street, NW, 14th Floor
Atlanta, GA 30309

### ATTORNEY FOR DEFENDANT LETSON:
Scott B. Aston
Looper Reed & McGraw PC
1601 Elm Street, Suite 4600
Dallas, TX 75201

/s/  Jeffrey R. Seckel  (06-01-11)
**JEFFREY R. SECKEL**