Keith M. Aurzada

State Bar No. 24009880

Keith.Aurzada@bryancave.com

John C. Leininger

State Bar No. 24007544

John.Leininger@bryancave.com

Bryan Cave LLP

2200 Ross Ave., Suite 3300

Dallas, Texas 75201

(214) 721-8000 (Telephone)

(214) 721-8100 (Facsimile)

Thomas S. Richey (Admitted *Pro Hac Vice*)

Ga. Bar No. 604525

tom.richey@bryancave.com

Ann W. Ferebee  (Admitted *Pro Hac Vice*)

Ga. Bar No. 431941

ann.ferebee@bryancave.com

Bryan Cave, LLP

1201 West Peachtree Street, NW, Suite 1400

Atlanta, Georgia 30309

(404) 572-6600  Telephone

(404) 572-6999  Facsimile

Attorneys for Stephen D. Linehan,
Richard J. Sabolik and Scott D. Smith

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| SOPOREX, INC., et al., | § | Case No.:  08-34174-BJH-7 |
| | § | |
| Debtors, | § | |
| _____ | § | |
| DIANE G. REED, AS | § | |
| CHAPTER 7 TRUSTEE OF SOPOREX, | § | Adversary No.: 11-03306-BJH |
| INC., SOPOREX RESPIRATORY, INC., | § | |
| d/b/a/ Independence Home Pharmacy, | § | |
| SOPOREX RESPIRATORY II, INC., | § | |
| d/b/a/ Independence Home Pharmacy II, | § | |
| and WINMAR DIAGNOSTICS NORTH | § | |
| CENTRAL, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | |
| | § | |
| STEPHEN D. LINEHAN, RICHARD J. | § | |
| SABOLIK, SCOTT D. SMITH, JOHN | § | |
| DUDINSKY, JR., RONALD G. GEARY, | § | |
| THOMAS HANSEN, MICKEY LETSON | § | |
| and DOYLE PRIVETT, | § | |
| | § | |
| Defendants. | § | |

## DEFENDANTS STEPHEN D. LINEHAN, RICHARD J. SABOLIK AND
## SCOTT D. SMITH'S BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................... 1

THE TRUSTEE'S COMPLAINT.................................................................................. 2

    I.    The Soporex Debtors and the Officer Defendants' Positions ............................ 2

    II.    The Allegations Against the Officer Defendants ............................................... 4

        A.   The CareCentric Relationship ........................................................... 4

           1.   The outsourcing decision and the selection of CareCentric ................. 4
           2.   The development of an in-house billing/collection system and the
               April 17, 2007 CareCentric Agreement ...................................... 6

        B.   Soporex's Revolving Credit Facility ................................................. 9

        C.   Soporex's Recapitalization Plan ...................................................... 12

        D.   Letco Medical and Harvard Drug .................................................... 14

        E.   The Bankruptcy Decision ............................................................... 16

        F.   The Med 4 Home Transaction ......................................................... 17

        G.   Alleged Failure to Disclose and Misrepresentations to the Board ........... 19

LEGAL ARGUMENT AND CITATION OF AUTHORITY ................................................. 21

    I.    Legal Standard ........................................................................................ 21

    II.    The Trustee Has Failed to State a Claim for Breach of Fiduciary Duties ........... 22

        A.   The Allegations of Breach of Fiduciary Duty.................................... 22

        B.   The Delaware Corporations ........................................................... 23

           1.   Pleading Standards – Business Judgment Presumption........................ 23
           2.   Duty of Loyalty.................................................................... 24
           3.   Duty of Care......................................................................... 26

         C.   The Missouri Corporation – SRI..................................................... 32

           1.   Duty of Loyalty.................................................................... 33
           2.   Duty of Care......................................................................... 34

         D.   The North Dakota Corporation – Winmar .......................................... 35

    III.    The Trustee Has Failed to State a Claim for Corporate Waste............................ 36

        A.   Allegations of Waste..................................................................... 36

        B.   Elements of Claims of Waste.......................................................... 37

    IV.    The Trustee's Claims Fail for Lack of Proximate Cause ................................... 39

i

# TABLE OF AUTHORITIES

## Cases

Anza v. Ideal Steel Supply Corp., 547 U.S. 451 (2006) .................................................................. 40

Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) .......................................................................... 21, 22

Baron v. Pressed Metals of Am., Inc., 123 A.2d 848, 853-54 (Del. Supr. 1956) .............................. 38

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 545 (2007) ...................................................................... 21

Benihana of Tokyo, Inc. v. Benihana, Inc., 891 A.2d 150, 191 (Del. Ch. 2005) ......................... 24, 29

Bromschwig v. Carthage Marble & White Lime Co., 66 S.W.2d 889, 891-92 (1933) ............... 33

Cargill, Inc. v. JWH Special Circumstance LLC, 959 A.2d 1096, 1113 (Del. Ch. 2008)............ 29

Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 361 (Del. Supr. 1992) ........................................... 24

Dixon v. McKenzie County Grazing Ass'n, 675 N.W.2d 414 (N.D. 2004) ..................................... 35

Dura Pharmaceuticals, Inc. v. Brouda, 544 U.S. 336, 347 (2005)................................................... 39

Faulkner v. Kornman (In re The Heritage Organization, LLC), Bankr. No. 04–35574–BJH–11, Adv. No. 06–3377–BJH, 2008 WL 5215688, at *15 (Dec. 12, 2008) (Houser, J.) ("Texas follows the . 23

Gantler v. Stephens, 965 A.2d 695, 708-09 (Del. 2009) ....................................................... 23, 28, 29

Gieselmann v. Stegeman, 443 S.W.2d 127, 136 (Mo. 1969) .......................................................... 33

Gonzalez v. Kay, 577 F.3d 600, 603 (5th Cir. 2009)........................................................................ 22

Guth v. Loft, 5 A.2d 503 (Del. 1939).............................................................................................. 24

Hampshire Grp. Ltd. v. Kuttner, C.A. No. 3607-VCS, 2010 WL 2739995, at *12 (Del. Ch. July 12, 2010) ............................................................................................................................................ 25

Hicks v. Lingle, No. 09-10426, 2010 WL 1141552, at *1 (5th Cir. Mar. 17, 2010) ........................... 6

Hollis v. Hill, 232 F.3d 460, 464–64 (5th Cir. 2000)........................................................................ 23

In re Caremark Int'l Inc. Deriv. Litig., 698 A.2d 959, 967 (Del. Ch. 1996) ................... 25, 30, 31, 39

In re Citigroup Inc. Shareholder Deriv. Litig., 964 A.2d 106, 136 (Del. Ch. 2009) .......................... 37

In re Conservatorship of Sickles, 518 N.W.2d 673, 680-81 (N.D. 1994) .......................................... 35

In re Fedders North America, Inc., 405 B.R. 527, 539 (Bankr. Del. 2009)...................................... 29

In re Lear Corp. Shareholder Litig., 967 A.2d 640, 651-52 (Del. Ch. 2008) ............................... 29

In re Nantucket Island Assocs. Ltd. P'ship Unitholders Litig., No. 17379 NC, 2002 WL 31926614, at *3 (Del. Ch. Dec.16, 2002) ........................................................................................................ 27

In re Parkcentral Global Litig., No. 3:09-CV-0765-M, 2010 WL 3119403, at *11 (N.D. Tex. Aug. 5, 2010) ............................................................................................................................................ 27

In re Verestar, Inc. v. Am. Tower Corp., 343 B.R. 444, 473 (Bankr. S.D.N.Y. 2006) ............... 25, 28

IT Group Inc. v. D'Aniello, No. 02-10118, Civ. A. 04-1268-KAJ, 2005 WL 3050611, at *11 (D. Del. Nov. 15, 2005) ..................................................................................................................... 27, 28, 30

Jackson v. St. Regis Apartments, Inc., 565 S.W.2d 178, 183 (Mo. App. 1978) ............................... 34

Kates v. Beard Research, Inc., 2010 WL 1644176, at *5 (Del. Ch. Apr. 23, 2010) ......................... 38

Kaye v. Lone Star Fund V (U.S.), L.P., No. 3:09-cv-2263-M, 2011 WL 1548967, at *9 (N.D. Tex. Apr. 26, 2011) ........................................................................................... 6, 7, 23, 24, 31

Leggett v. Missouri State Life Insurance Co., 342 S.W.2d 833, 851 (Mo. 1960).............................. 32

Lill v. Cavalier Rural Elec. Co-op., 456 N.W.2d 527 (N.D. 1990) .................................................. 35

Lonesome Dove Petroleum, Inc. v. Nelson, 611 N.W.2d 154, 161 (N.D. 2000) .............................. 35

Malpiede v. Townson, 780 A.2d 1075, 1095 (Del. 2001)................................................................ 27

McCall v. Sw. Airlines Co., 661 F. Supp. 2d 647, 654 (N.D. Tex. 2009) .................................. 21, 22

McKnight v. Midwest Eye Institute of Kansas City, Inc., 799 S.W.2d 909, 913 (Mo. App. 1990)... 32, 34

McMullin v. Beran, 765 A.2d 910, 918 (Del. 2000) ........................................................................ 24

Neidert v. Neidert, 637 S.W.2d 296, 301 (Mo. App. 1982) ............................................................. 32

Nixon v. Lichtenstein, 959 S.W.2d 854, 859 (Mo. App. E.D. 1997) ..................................... 33, 34

Official Committee of Unsecured Creditors of Integrated Health Servs., Inc. v. Elkins, No. Civ. A. 20228-NC, 2004 WL 1949290, at *9 n.38 (Del. Ch. Aug. 24, 2004) ............................................. 27

Preston v. Preston, Civil Action No. 6049, 1981 WL 15086, at * (Del. Ch. Apr. 16, 1981) ............. 39

Ramacciotti v. Joe Simpkins, Inc., 427 S.W.2d 425, 431 (Mo. 1968) ......................................... 33

Red River Wings, Inc. v. Hoot, Inc., 751 N.W.2d 206, 222 (N.D. 2008) ........................................ 35

Resnik v. Woertz, C.A. Nos. 10-527-GMS, 2011 WL 1184739, at *12 (D. Del. Mar. 28, 2011) 24, 25, 29

Rhodes v. Prince, No. 08-10794, 2010 WL 114203, at *2 (5th Cir. Jan. 12, 2010) ........................... 22

Ronsdorf v. Jacobson, No. Civ.A. 20614, 2004 WL 2158050, at *2 (Del. Ch., Sept. 16, 2004) ........ 23

Simmons v. Peavy-Welsh Lumber Co., 113 F.2d 812, 813 (5th Cir. 1940) ............................... 21, 38

Solash v. Telex Corp., 1988 WL 3587, at *9 (Del. Ch. Jan. 19, 1988) ...................................... 29

Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001) ........................................... 21

St. Paul Commodities, LLC v. DB Fleet, LLC, No. 3:09-CV-582-L, 2009 WL 3378598, at *2 (N.D. Tex. Oct. 21, 2009) ...................................................................................................................... 22

Steiner v. Meyerson, 1995 WL 441999, at *1 (Del. Ch. July 19, 1995) ........................................... 37

Tomczak v. Morton Thiokol, Inc., Civ. A. No. 7861, 1990 WL 42607, at *12 (Del. Ch. Apr. 5, 1990) ............................................................................................................................................... 29

Unocal Corp. v. Mesa Petroleum Co., 493 A.2d 946, 954 (Del. Supr. 1985) ............................... 29

White v. Panic, 783 A.2d 543, 554 n.36 (Del. 2001) ..................................................................... 37

**Statutes**

11 U.S.C. § 706(a) .......................................................................................................................... 17

8 Del. Code § 102(b)(7) ................................................................................................................. 26

N.D.C.C. § 10-19.1 ........................................................................................................................ 35

N.D.C.C. § 10-19.1-50 ................................................................................................................... 36

N.D.C.C. § 10-19.1-50(1) .............................................................................................................. 35

N.D.C.C. § 10-19.1-60 ................................................................................................................... 35

**Rules**

Fed. R. Civ. P. 12(b)(6) .................................................................................................................. 22

Fed. R. Civ. P. 8(a) ........................................................................................................................ 22

Pursuant to Federal Rule of Bankruptcy Procedure 7012 and Federal Rule of Civil Procedure 12(b)(6), Defendants Stephen D. Linehan, Richard J. Sabolik and Scott D. Smith (collectively, "Officer Defendants") hereby move to dismiss all claims asserted against them by the Plaintiff Diane G. Reed, Chapter 7 Trustee (the "Trustee"), Chapter 7 trustee for the bankruptcy estates of, *inter alia*, Soporex, Inc. ("Soporex"), Soporex Respiratory, Inc. d/b/a Independence Home Pharmacy ("SRI"), Soporex Respiratory II, Inc., d/b/a Independence Home Pharmacy II ("SRI II"), and Winmar Diagnostics North Central, Inc. ("Winmar") (collectively, "the Soporex Companies")[1] in the Trustee's Amended Complaint (the "Complaint") filed on April 19, 2011.  The Trustee has failed to state any claim against the Officer Defendants on which relief may be granted, and accordingly, the Complaint should be dismissed as to them.

## PRELIMINARY STATEMENT

The allegations in the Complaint serve as a criticism of seemingly every major decision and transaction undertaken by the Defendants as officers and/or directors on behalf of Soporex and its subsidiaries.  The Trustee characterizes the decisions and transactions as mistakes and points to the Soporex Companies' losses.  Yet nowhere in the Complaint does she allege any facts indicating bad faith, any failure on the part of the Officer Defendants to inform themselves or to act in what they believed was the best interest of the Soporex Companies or any other circumstances that would constitute gross negligence or suffice to overcome the protection of the business judgment rule.  Moreover, stripped of empty pejorative characterization, the actual specific factual allegations in the Complaint paint a much different picture, describing eminently reasonable decisions and actions that simply failed to succeed and businesses that were wiped out by a "perfect storm" of unforeseen calamities that eventually led to the Soporex Companies' bankruptcy filing.  The Trustee's failure to

---

[1]   The Complaint defines SRI, SRI II and Winmar collectively as the "Operating Subsidiaries." (Complaint, ¶ 12).  The Operating Subsidiaries together with Soporex are defined to be the "Soporex Debtors."  (Id. at p. 2, n.1).

1

allege essential facts supporting her claims, together with her numerous admissions, require dismissal of the Complaint as to the Officer Defendants.

**THE TRUSTEE'S COMPLAINT**

Here, we discuss the allegations of the Trustee's Complaint against the Officer Defendants. Only well-pleaded facts are assumed to be true for purposes of the motion. For reasons discussed below, the Court should consider certain facts not alleged in the Complaint.

## I.    The Soporex Debtors and the Officer Defendants' Positions.

The allegations against Linehan and Sabolik focus on their conduct as officers and/or directors of the Soporex Companies; Smith is sued for his conduct as an officer. Soporex was incorporated under the laws of the state of Delaware on July 14, 2005. (Complaint, ¶ 15). Linehan was Chief Executive Officer ("CEO")[2] and Chairman of the Board of Directors of Soporex from its inception until August 22, 2008 (the "Petition Date"). Sabolik was Soporex's Chief Financial Officer ("CFO") from March 31, 2006 until July 21, 2008, when he took over for Linehan[3] as President. (Id. at ¶¶ 17, 21-22). Smith began work at Soporex in February 2007 and served as its Secretary and General Counsel through the Petition Date. (Id. at ¶ 23).

SRI was a wholly-owned subsidiary of Soporex, incorporated under the laws of Missouri.[4] (Id. at ¶¶ 12, 33). On April 1, 2006, SRI commenced its mail-order pharmacy business focusing on medications for respiratory disorders. (Id. at ¶ 12). Linehan served as Chairman of the SRI Board of Directors from February 9, 2006 through August 20, 2008, when he resigned from the Board, and he served as SRI's CEO through the Petition Date. (Id. at ¶¶ 35, 36). Sabolik was CFO of SRI

---

[2]  Linehan was also, President of Soporex from June 14, 2005 until July 21, 2008. (Id. at ¶ 21).

[3]  Linehan was involved in a very serious automobile accident on July 18, 2008. (Id. at ¶ 22). He was hospitalized from that date until after the Petition Date.

[4]  SRI was originally formed as Mitchell Oxygen, Inc., a Missouri corporation. In connection with Soporex's purchase of the business, it was renamed Soporex Respiratory, Inc. A newly-formed similarly-named Delaware acquisition corporation was merged into SRI on March 31, 2006 (See id. at ¶¶ 33 n.5, 42). The Missouri corporation was the survivor.

2

beginning March 31, 2006, was a director of SRI beginning December 28, 2006 and served in both positions through the Petition Date.  (Id. at ¶¶ 35-36).  Smith was named General Counsel and Secretary of SRI on April 25, 2007 and held those positions through the Petition Date.  (Id. at ¶ 36).

SRI II was incorporated as a Delaware corporation on April 12, 2007 to facilitate Soporex's transfer of the billing and collection functions of SRI's mail-order pharmacy business to an in-house system.  (Id. at ¶ 38).  SRI II conducted its mail-order pharmacy business from April 13, 2007 until August 20, 2008.  (Id. at ¶ 12).  Linehan served as Chairman of SRI II's Board of Directors from the date of incorporation until he resigned from the Board on August 20, 2008; he was the CEO of SRI II from April 12, 2007 until the Petition Date.  (Id. at ¶¶ 40-41).  Sabolik is alleged to have been a director of SRI II from April 13, 2007 until July 16, 2008,[5] and was the CFO of SRI II from April 13, 2007 through the Petition Date.  (Id.).  Smith was General Counsel and Secretary of SRI II from April 13, 2007 through the Petition Date.  (Id. at ¶ 41).

Winmar, a sleep-diagnostic services company that also sold related sleep-disorder treatment supplies, was incorporated under the laws of the state of North Dakota.  It became a wholly-owned subsidiary of Soporex when Soporex purchased 100% of its stock on December 28, 2006.  (Id. at ¶¶ 13, 99-101).  Linehan and Sabolik were both directors of Winmar beginning on December 28, 2006, with Linehan serving as Chairman of the Board until he resigned on August 20, 2008, and Sabolik serving as a director through the Petition Date.  (Id. at ¶ 107).  Both also served as officers of Winmar from December 28, 2006 through the Petition Date, with Linehan as president and

_____

[5]   The Complaint states that "Sabolik was a director of SRI II from April 13, 2007 until her employment was terminated on July 16, 2008."  (Id. at ¶ 40) (emphasis added).  Other allegations claim that Sharon Tolliver's employment with Soporex was terminated on either July 28, 2008 (id. at ¶ 25) or July 16, 2008 (id. at ¶ 35).  Except for this apparent mistake in paragraph 40, there are no allegations that Sabolik's employment with any of the Soporex Debtors was ever terminated.  For purposes of this motion, it will be assumed that Sabolik is alleged to have been a director of SRI II from April 13, 2007 until the Petition Date.

3

secretary and Sabolik as CFO. (Id. at ¶ 108). Smith is not alleged to have been an officer or director of Winmar.

## II.    The Allegations Against the Officer Defendants.

The Trustee's allegations against the Officer Defendants center on seven specific transactions or events, beginning with events before the Soporex Companies even opened for business and ending with their allegedly wrongful filing for bankruptcy, which she alleges caused loss to Soporex and/or the Soporex Debtors and/or their creditors.[6]

### A.    The CareCentric Relationship.

1.    **The outsourcing decision and the selection of CareCentric.**   The Complaint alleges that SRI began its mail-order pharmacy business operations following Soporex's and SRI's acquisition of the respiratory pharmaceutical business of Liberty Home Pharmacy Corporation ("Liberty"), a wholly-owned subsidiary of Polymedica Corporation ("Polymedica"). (Id. at ¶ 42). Pursuant to the asset purchase agreement, Soporex acquired Liberty's active patient list of approximately 26,500 patients, and the closing date of the acquisition was set for March 31, 2006, giving Soporex and SRI fifteen business days to prepare for the commencement of SRI's business operations. (Id. at ¶¶ 42-44). The Trustee alleges that time constraints imposed by Polymedica did not permit SRI to establish its own in-house billing and collections system,[7] and as a result Soporex utilized an outside vendor to provide these services. (Id. at ¶¶ 47-49). Except for repeated negative

---

[6]   Despite the term "Soporex" being defined in the Complaint's introductory paragraph as referring to Soporex, Inc., the allegations in the Complaint often appear to use the term "Soporex" to refer to one or more of the Soporex Debtors. See, e.g., Complaint at ¶¶ 181-82 (alleging that Sabolik owed fiduciary duties to Soporex and its shareholders and creditors, SRI, SRI II and Winmar and their creditors, but alleging that he breached his fiduciary duties of loyalty and care to Soporex only), and ¶ 183 (alleging that Soporex and Soporex's creditors suffered damages as a result of Sabolik's alleged actions and omissions, but then claiming the damages were sustained by the Soporex Debtors).

[7]   Approximately 90% of Liberty's patients were Medicare or Medicaid patients, which meant that billing and collections had to be processed electronically through the Medicare and Medicaid reimbursement programs. (Id. at ¶ 47).

characterizations that Linehan "failed" to establish an internal billing and collections capability, the

Trustee alleges no facts that would indicate that the decision to outsource this function was not a

perfectly acceptable approach in the industry, and for Soporex an entirely logical solution that would

enable it to make use of an excellent business opportunity. There are no allegations that show the

decision to be irrational and none indicating any self-interest on Linehan's part. Nor does the

Complaint allege any facts to show that Linehan failed to properly inform himself of the facts

needed to make such a decision or that he did not have a good faith belief that this decision was in

Soporex's and SRI's best interests.

The Trustee alleges that Soporex's management chose CareCentric National, LLC

("CareCentric") for the billing and collections services at the suggestion of Brendan Cooper,

Soporex's chief information officer, and following meetings between Soporex's management and

CareCentric in which "CareCentric's management assured Soporex's management that CareCentric

had the expertise, the necessary software, and the experienced staff needed to perform the data

processing and the billing and collection functions." (Id. at ¶¶ 49-50). Nowhere does the Trustee

allege that Linehan and Sabolik did not have the right to rely and did not reasonably rely on these

representations. She does not allege any failure to conduct due diligence. In fact, she affirmatively

and repeatedly alleges that Soporex did reasonably rely, not only on these representations, but on

representations made throughout its relationship with CareCentric – just not in this Complaint, but

in another one.[8] The Complaint also contains the conclusory statement that "[t]he decision to

---

[8]  In a related adversary proceeding within this bankruptcy case, the Trustee has filed claims on
behalf of Soporex and SRI against CareCentric and various related entities and individuals, Reed v.
CareCentric National, LLC, et al., Adv. No. 10-3126-BJH, United States Bankruptcy Court for the
Northern District of Texas ("CareCentric Adversary Proceeding"), in which the Trustee repeatedly
alleges that Soporex reasonably relied upon false misrepresentations made by CareCentric
representatives, including representations regarding CareCentric's handling of the billing and
collections functions. (See CareCentric Adversary Proceeding Original Complaint, Docket No. 1, at
¶¶ 16-17, 22, 26, 57; CareCentric Adversary Proceeding Amended Complaint, Docket No. 51, at ¶¶

employ CareCentric to perform these tasks was disastrous . . . ." (<u>Id.</u> at ¶ 132). What it utterly fails

to allege, however, is any actionable misconduct of any kind against the Officer Defendants.

      2.    **The development of an in-house billing/collection system and the**

**April 17, 2007 CareCentric Agreement.** The Complaint alleges that on or about March 13, 2006,

CareCentric and Soporex entered into a letter agreement (the "CareCentric Letter Agreement"), in

which CareCentric agreed to perform pharmacy processing and billing and collection services, and

which anticipated the execution of a much more extensive written contract within one month of its

execution. (<u>Id.</u> at ¶¶ 51-52). A true and correct copy of the CareCentric Letter Agreement is at

Appx., p. 45.[9] However, Soporex did not execute the final service agreement with CareCentric (the

---

16-17, 22, 26, 57). True and correct copies of the CareCentric Adversary Proceeding Original
Complaint and Amended Complaint are filed concurrently herewith in the Appendix ("Appx.") at
pp. 2 and 20, respectively. While generally, a court may not go outside the pleadings in deciding a
motion to dismiss, the Fifth Circuit recognizes that a court may consider matters of public record,
documents attached to the complaint and documents attached to a motion to dismiss if they are
referred to in the complaint and central to the plaintiff's claim. <u>See</u> <u>Hicks v. Lingle</u>, No. 09-10426,
2010 WL 1141552, at *1 (5th Cir. Mar. 17, 2010); <u>Kaye v. Lone Star Fund V (U.S.), L.P.</u>, No. 3:09-
cv-2263-M, 2011 WL 1548967, at *9 (N.D. Tex. Apr. 26, 2011). Here, the CareCentric Adversary
Proceeding Complaint and Amended Complaint are mentioned in paragraph 71 n.6 of the Trustee's
Complaint. The allegations regarding Soporex's reasonable reliance contained in the CareCentric
Adversary Proceeding pleadings are central, albeit fatal, to the Trustee's claims in this action that the
Officer Defendants breached their fiduciary duties to Soporex and/or SRI by, among other things,
using CareCentric as its billing and collections vendor, failing to bring those services in-house once
CareCentric's failures became apparent, and approving the CareCentric Services Agreement, which
contained a limitation of liability provision, even after suffering alleged losses in excess of the
limitation. (<u>See</u> Complaint at ¶¶ 53-57, 60-63). Thus, these pleadings should be considered here. In
the alternative, the Officer Defendants respectfully request that the Court take judicial notice of the
CareCentric Adversary Proceeding Complaint and Amended Complaint and the statements they
contain regarding Soporex's reasonable reliance on alleged misrepresentations made by
CareCentric's representatives. <u>See</u> <u>Kaye</u>, 2011 WL 1548967, at *12-13 (holding that it is proper to
take judicial notice of matters of public record "in order to determine what statements they contain"
in deciding a motion to dismiss).
[9] <u>See</u> discussion at footnote 8, <i>supra</i>. The CareCentric Letter Agreement is central to the Trustee's
claims against the Officer Defendants, because her claims of breach of duty hinge on, first, the
contention that CareCentric did not perform its obligations under the CareCentric Letter Agreement
and, second, the allegation that the Officer Defendants later recommended to the Soporex Board of
Directors that it approve the Billing and Accounts Receivable Services and Software License
Agreement between Soporex and CareCentric (the "CareCentric Services Agreement"), which

CareCentric Services Agreement) until May 2007. (Complaint at ¶¶ 52, 62). The Trustee alleges that between the time the CareCentric Letter Agreement and the CareCentric Services Agreement were executed, Soporex and SRI experienced numerous problems with CareCentric's performance. (Id. at ¶ 53). For example, CareCentric improperly submitted claims to Medicare and Medicaid resulting in many claims being rejected and failed to timely resubmit corrected billing statements for these claims. (Id. at ¶ 53).

The Trustee alleges that on or around February 14, 2007, Sharon Tolliver, Soporex's chief operating officer, and Teresa Camfield, Soporex's and SRI's Medicare and Medicaid billing and collections compliance officer, sent e-mails to various Soporex officers, including the Officer Defendants, outlining problems with CareCentric's performance and suggesting the need to move the billing and collections in-house. (Id. at ¶¶ 58-59). Shortly thereafter, the Officer Defendants recommended to the Soporex Board that it approve the CareCentric Services Agreement, which it did at its April 25, 2007 meeting. (Id. at ¶¶ 60-62). The CareCentric Services Agreement contained a provision limiting CareCentric's liability for damages to the total fees paid by Soporex and SRI during the last fifteen (15) months and under the CareCentric Letter Agreement. (Id. at ¶ 61). The Trustee faults the Officer Defendants for recommending approval of the CareCentric Services Agreement when they allegedly knew that Soporex and SRI had already sustained damages in excess of the limitation due to CareCentric's negligent performance and with "no apparent discussion"

---

contained a limitation of liability provision, despite the Officer Defendants' alleged knowledge that Soporex and SRI had already sustained damages in excess of the amount allowed under the provision due to CareCentric's negligent performance under the CareCentric Letter Agreement. (See Complaint at ¶¶ 60-62). As discussed below, what the Trustee fails to allege, but the CareCentric Letter Agreement shows, is that the parties had already agreed to the same limitation of liability under the terms of the CareCentric Letter Agreement. (See Appx., p. 45; Kaye, 2011 WL 1548967, at *10 ("[W]hen a plaintiff's claim is based on the terms of a contract, the documents constituting the contract are central to the plaintiff's claim.")).

about the fact that CareCentric had materially breached the CareCentric Letter Agreement or that

SRI had already sustained over $3 million in damages due to a bad debt write-off. (Id. at ¶ 62).[10]

This allegation, too, is made in a vacuum. The Trustee does not contend that the Officer

Defendants failed to seek better terms or that Soporex could have conducted business while

developing its own system without entering into this agreement, i.e., that Soporex had any real

choice in the matter. In fact, the Trustee alleges nothing about the negotiations concerning the

terms of the agreement or the decision to enter into it.

Notably, the Trustee does not even claim that the new agreement reflected a change in the

existing arrangement – and that is with good reason, because it did not. The CareCentric Letter

Agreement, under which the parties were operating, *already contained the same limitation of CareCentric's*

*liability*: "The total liability for either party hereunder shall be limited to the total amount of the fees

paid hereunder." (See Appx., p. 47). Thus the limitation of liability would have applied even if the

CareCentric Services Agreement had never been approved or executed. There is, accordingly, no

causal nexus between the alleged wrongdoing and any loss.

The Trustee also criticizes the Officer Defendants for allegedly ignoring Tolliver's and

Camfield's suggestion, in February 2007, to move the billing and collections functions in-house and

instead recommending at the April 25, 2007 board meeting that the Soporex Board approve the

CareCentric Services Agreement. (See Complaint at ¶ 60). Yet her other allegations indicate that at

the time of the same April 2007 board meeting, the Officer Defendants were already working on

moving the billing and collections function to an in-house system. (See id. at ¶¶ 38 (SRI II was

incorporated on April 12, 2007 "in anticipation of Soporex transferring the billing and collection

---

[10]   The Trustee later alleges that the Soporex board was informed of the problems associated with
CareCentric's billing and collection activities and SRI's $3 million bad debt write-off prior to
approving and executing the CareCentric Services Agreement. (Complaint at ¶ 147). Thus, the "no
apparent discussion" allegation is rank speculation.

functions to an in-house system."); and 66 (at the same April 25, 2007 board meeting, the Soporex

board also approved an agreement between Soporex and Convergent Media Network, Ltd.

("CMAEON") "to provide the software and data processing systems necessary to bring the

medication dispensing, billing, and collection functions in-house.")).  In other words, in the two

months between Tolliver's and Camfield's suggestion and the April 25, 2007 Board meeting, the

Officer Defendants had selected a vendor to host the new in-house system, negotiated and

documented an agreement with that vendor to work on the system and submitted the proposed

agreement for Board consideration.  Nothing in the Complaint – other than undefined generalities –

even addresses the decisions and actions made during that interval, explains how it could have been

materially shortened, identifies any culpable conduct associated with the delay or shows any

proximately-caused damages resulting from it.  Apparently, the Officer Defendants should be held

personally liable for originally selecting CareCentric simply because they did not take enough time

and for CMAEON and the development of the in-house system because they took too much time.

Nothing in the law requires corporate officers to account to a second-guessing bankruptcy trustee

for the passage of time, the speed of their decision-making or all the vicissitudes that cause delay.

### B.    Soporex's Revolving Credit Facility.

In addition to the problems with CareCentric's performance, Soporex faced other problems

resulting in a "perfect storm" of calamities, from which it and the other Soporex Companies were

eventually unable to recover.  In late 2006, Soporex, SRI, Winmar and two other Soporex

subsidiaries were parties to a Credit and Security Agreement with Merrill Lynch Business Financial

Services, Inc. ("MLBFS"), which provided a revolving credit facility with maximum borrowings of

$5 million, secured by a first-priority security interest in the accounts receivable, general intangibles

and other assets of Soporex, SRI and Winmar.  (Complaint at ¶ 79).  Under the terms of the

revolving credit facility, all collections of the Operating Subsidiaries[11] accounts receivable were

deposited into a lockbox account controlled by MLBFS and swept daily.  (<u>Id.</u> at ¶ 80).  In February

2008, Sabolik and Linehan met with MLBFS's representatives and informed them of Soporex's

billing and collection problems.  MLBFS granted Soporex an informal oral waiver of Soporex's

borrowing base covenant default and allowed it to continue to borrow funds under the line of credit.

(<u>Id.</u> at ¶ 82).  Despite alleging that Sabolik and Linehan relied on the assurances of MLBFS

representatives regarding the partial waiver on the borrowing base covenant default, the Trustee

alleges that Sabolik and Linehan somehow knew or should have known that Soporex's borrowing

base would be reduced, which meant that Soporex would have no cash to fund its working capital

needs.[12]  (<u>Id.</u> at ¶¶ 82-83).   However, the Trustee's allegations show no connection between those

circumstances and the events that ensued.

     Shortly after the MLBFS representatives waived Soporex's borrowing base covenant default,

GE Business Financial Services, Inc. ("GEBFS") acquired MLBFS, and all of the MLBFS employees

who had been Soporex's business contacts were terminated and replaced.  (<u>Id.</u> at ¶ 84).  Following a

May 5, 2008 meeting between the Officer Defendants and GEBFS representatives, GEBFS sent

Soporex a letter dated May 14, 2008 advising Soporex of an event of default under the credit

agreement, namely, that the outstanding loan balance exceeded the borrowing base.  GEBFS also

---

[11] The Complaint alleges that the Operating Subsidiaries' accounts receivable were deposited into the
lockbox, despite the fact that the credit agreement is never alleged to have included SRI II, which
was not even incorporated until April 2007.  (<u>See</u> Complaint at ¶¶ 38, 80).

[12] The Trustee bases this claim on the vague allegation that there would be an "imminent reduction"
in the Medicare reimbursement rate for Albuterol, a respiratory medication representing
approximately 35% of SRI's sales in 2006-07.  (<u>See</u> Complaint at ¶¶ 75, 83).  In July, 2007, the
Medicare reimbursement rate for Albuterol had increased more than 600%, at which time Camfield
and Hewlett allegedly warned Linehan and Sabolik that the increase was temporary.  (<u>Id.</u> at ¶¶ 76-
77).  Revised reimbursement rate guidelines for Albuterol and other medications were allegedly
approved and implemented through legislation enacted on December 29, 2007, but apparently did
not actually reduce the reimbursement rate until some time after the first quarter of 2008.  (<u>See id.</u> at
¶¶ 76, 78).

informed Soporex that GEBFS was not required to make any loans or other advances to Soporex by virtue of this default.  (Id. at ¶ 85).

On May 22, 2008, Linehan and Sabolik sent a memorandum to the Outside Directors, telling them that "we expect that we will be able to utilize the credit facility to meet our working capital needs through the closing of our recapitalization."[13]  (Id. at ¶ 86).  A true and correct copy of the May 22, 2008 memorandum is at Appx. p. 50.[14]  The Trustee vaguely alleges that the May 22, 2008 memorandum contained misrepresentations "that Soporex would be able to borrow the funds needed to meet the Soporex Debtors' working capital needs," with no explanation as to how this was a misrepresentation, nor any allegations of reliance or damages.  (Id. at ¶ 87).  In fact, the Trustee fails to quote the entire sentence, which says, "Also, despite [GEBFS's] interpretation of the overage of our borrowing base, we were authorized to access the credit facility during the past week and we expect that we will be able to utilize the credit facility to meet our working capital needs through the closing of our recapitalization."  (Appx., p. 51).  The memo also indicated that Soporex received verbal assurances from GEBFS that it would allow Soporex to access the revolving credit facility to meet its working capital needs.  (Id.).  Furthermore, the Trustee later alleges that the May 22, 2008 memorandum informed the Outside Directors of Soporex's default under the credit agreement with GEBFS, and that "[t]he Outside Directors were all experienced businessmen who understood the financial consequences to the Soporex Debtors under the Credit Agreement."  (Complaint at ¶ 151).

---

[13]  Throughout the Complaint, the Trustee alleges that Linehan (and later, Sabolik) was focused on a recapitalization plan for Soporex, which he believed would solve all of Soporex's financial problems.  (Id. at ¶¶ 125-26, 129-30).  During the time GEBFS was declaring default, Soporex had already entered into a termsheet with Capital Resource Partners ("CRP") regarding an overall investment package of $49 million in debt and equity financing.  It was not until July 2008 that CRP withdrew its term sheet, causing the anticipated recapitalization never to materialize.  (Id. at ¶ 128).

[14]  See discussion at footnote 8, supra.  The May 22, 2008 memo is central to the Trustee's claim that Sabolik and Linehan breached their fiduciary duties by misrepresenting and/or failing to inform the Outside Directors of Soporex's financial problems.  (Complaint, at ¶¶ 178(d), 182(b)-(d)).

Completely missing from any of these allegations are any facts that would show that the

Officer Defendants' conduct was unreasonable, much less grossly negligent, that they acted in bad

faith, that they made uninformed decisions not protected by the business judgment rule, that they

could have obtained a written waiver or that if they had, that subsequent defaults would not have

permitted MLPFS or GEBFS to act exactly as they did, that the Soporex Companies could have

altered this sequence of events or that any associated loss resulted from the Officer Defendants'

conduct.  The Trustee does not even allege that there was alternative financing available or sources

of working capital that the Officer Defendants neglected  – understandable omissions given the fact

that the entire economy was in the throes of a recession and a hard freeze in credit.

C.      **Soporex's Recapitalization Plan.**

The Complaint also contains contradictory allegations regarding Linehan's and Sabolik's

plans to address Soporex's financial decline.  On the one hand, the Trustee repeatedly alleges that

Linehan and Sabolik failed to develop any plans to address the financial challenges.  (See id. at

¶¶ 142 ("Linehan and Sabolik never developed any plan for dealing with the Soporex Debtors'

imminent financial demise . . . ."); 178(e) and 182(e) (alleging that Linehan and Sabolik breached

their fiduciary duties by "failing to develop any plan, process, or procedure to address the steady

financial decline of Soporex and the Operating Subsidiaries")).  Yet on the other hand, the Trustee

repeatedly refers to Linehan's plan for recapitalization, "which he believed would cure [the Soporex

Debtors'] financial and cash flow problems."  (Id. at ¶ 129 ("At Linehan's insistence, recapitalization

and a continued growth strategy became the primary focus of Soporex's management throughout

the two and one-half years that the Soporex Debtors conducted business."); see id. at ¶¶ 130

(alleging that Linehan and Sabolik had unduly optimistic views about the inevitable success of the

recapitalization plan); 131 (alleging that Sabolik continued to pursue the recapitalization plan after

Linehan's automobile accident on July 18, 2008); and 142 (alleging that despite Soporex's financial

problems, "Linehan and Sabolik continued to focus on the recapitalization of Soporex which they believed would cure all of Soporex's financial problems")). She also alleges that the "recapitalization plan was also the reason why Soporex aggressively pursued every available opportunity to market Winmar's sleep studies and the sale of sleep products.[15] They had pursued these initiatives because the inclusion of the sleep studies businesses would give a favorable impression in the offering memorandum prepared by [investment banker Croft & Bender]." (Id. at ¶ 129).

The Trustee further alleges, upon "information and belief," that Linehan's and Sabolik's focus on the recapitalization plan "and their disregard of creditors' interests during the final months of business operations" was the result of self-interest because a recapitalization would enable them to sell some or all of their preferred shares of Soporex stock. (Id. at ¶ 142). Contradicting herself again, she alleges that "the goals of the recapitalization were four-fold: (i) raise capital for new acquisitions; (2)[sic] *provide additional working capital*; (3)[sic] purchase up to 20% of the outstanding preferred stock from existing shareholders; and (iv) *retire and/or replace Soporex's existing secured debt*." (Id. at ¶ 126 (emphasis added).) While the Trustee claims that Joseph Gaudio, Soporex's vice

---

[15]  The Trustee relentlessly criticizes the Winmar marketing campaign, conducted under the direction of David Dubrof as Soporex's executive vice president for sales and marketing, which allegedly resulted in significant expenses and "various dead-end projects." (See Complaint at ¶ 112). These allegations are remarkable for their complete lack of any nexus to any of the Defendants, whose knowledge, decisions and conduct with respect to these marketing efforts are nowhere mentioned. She focuses other criticisms on the services agreement between Soporex and Classic SleepCare, LLC ("CSC"), a California-based healthcare business that sells CPAP machines and related supplies, which involved having CSC's licensed respiratory therapists make phone calls to sleep-disorder patients to, among other things, sell Winmar's supplies and/or CPAP machines. (Id. at ¶ 115). Over the six-month time period in which CSC was providing these services, Soporex paid CSC a total of $203,000 under the services agreement, which the Trustee alleges "upon information and belief," represented an overpayment by over $100,000. (Id. at ¶ 119). This allegation appears to be based on the Trustee's own interpretation of the services agreement, with which no one else agrees. (See id. at ¶ 118). In any event, none of the allegations relating to the CSC services agreement names any of the Defendants, nor is it clear who the parties to the CSC agreement even were, and who is alleged to have been responsible for any wrongdoing. (See, e.g., id. at ¶¶ 115 (alleging that Soporex entered into the agreement with CSC); 118 (alleging that Winmar entered into a new letter agreement, which obligated Winmar to pay CSC); and 119 (alleging that Soporex paid for CSC's services and Soporex was overcharged).

president of finance,[16] provided projections in mid-May 2008 that Soporex would run out of money in July, the Officer Defendants were already holding a written commitment to the recapitalization from CRP.  Notably absent from the Complaint is any allegation that the recapitalization plan, had it been successful, would not have cured all of Soporex's financial problems and would not have been in its creditors' interest.  The Trustee does not allege that the $49 million CRP committed would have been inadequate.  Even more telling, the Trustee has not alleged any facts showing that Linehan or Sabolik lacked good faith in their belief that the recapitalization would succeed, that they failed to inform themselves adequately in deciding to pursue that financial plan, or that their conduct was beyond the bounds of all rationality.

### D.     Letco Medical and Harvard Drug.

Another piece of the "perfect storm" of challenges facing Soporex involved its relationship with SRI's principal supplier of respiratory medications, Letco Medical, Inc. ("Letco"), later acquired by and merged into the Harvard Drug Group ("Harvard").  (See id. at ¶¶ 88-89).  At the same time that Soporex was experiencing cash flow problems and GEBFS was declaring default of the borrowing base covenants in its credit agreement with Soporex, Harvard advised Soporex's management that it would no longer extend credit to Soporex for the purchase of pharmaceuticals it supplied due to a large past due balance that Soporex owed to Harvard.  (Id. at ¶¶ 85, 90-91).  After entering into an agreement providing for repayment of the debt owed to Harvard, involving a large "balloon payment" to be made when Soporex closed on its anticipated recapitalization, Harvard then insisted and forced Soporex to enter into an Exclusive Purchase Agreement (the "Harvard EPA") pursuant to which Soporex agreed to purchase exclusively from Harvard seven respiratory medications, which represented over 95% of the medications sold by SRI.  (Id. at ¶¶ 91-92, 96).  The

---

[16] Gaudio is alleged to have been Soporex's vice president of finance from September 17, 2007 until July 21, 2008 when he took over as CFO for Sabolik.  (See Complaint at ¶¶ 22, 24).  However, he is later alleged to have been Soporex's CFO as early as May 2008 (see id. at ¶ 141).

Harvard EPA forced Soporex to overpay for the respiratory medications.  (Id. at ¶ 96).

On July 8, 2008, Harvard informed Gaudio, that Soporex was in default on its payment obligations under the Harvard EPA, and that Harvard was not going to ship any product to SRI until past due invoices were paid in full.  The Harvard EPA also prohibited Soporex from purchasing the seven medications from any other supplier.  (Id. at ¶ 93).  The position taken by Harvard "forced" Soporex to make payments to Harvard so that SRI could continue to provide medication to its patients.  However, on or about July 24, 2008, Soporex and Harvard entered into a First Amendment to the Exclusive Purchase Agreement whereby Soporex was required to pay in advance for each order of product purchased from Harvard.  (Id. at ¶¶ 94-97).  By this time, GEBFS had declared a default, CRP had withdrawn its term sheet, the Medicare reimbursement rate for Albuterol had dropped dramatically, and Soporex had no working capital.  (Id. at ¶¶ 76-78, 86, 128, 131, 141-42).  With no way to pay for the medications in advance, and because the Harvard EPA prohibited SRI from purchasing medications from other suppliers, SRI could not provide its mail-order pharmacy patients with the life-sustaining medications they required.  (Id. at ¶¶ 92-93, 97, 142).  By letter dated August 19, 2008, Harvard made demand upon Soporex for immediate payment of all outstanding invoices which, according to Harvard, totaled over $2.5 million.  (Id. at ¶ 98).  Three days later, the Soporex Debtors filed for bankruptcy.  (Id. at ¶ 2).  There is nothing in these allegations that indicates that the Officer Defendants acted improperly with regard to Harvard, that they could have obtained credit to purchase medications from any other source or that anything they did or failed to do would have changed the result.  There are no allegations that would show gross negligence, self-dealing, bad faith or lack of business judgment rule protection with regard to these events.

E.    **The Bankruptcy Decision.**

The Complaint contains numerous contradictory allegations, to the point that many of the

claims are self-defeating.  Another such example can be found in the Trustee's criticisms of the

Officer Defendants' conduct in making the decision to file for bankruptcy under Chapter 7.  For

example, the Trustee alleges on the one hand, that Soporex management never retained or consulted

with professionals or advisors to address Soporex's financial decline (see id. at ¶¶ 141-42, 154, 178,

182), and on the other hand that Soporex was working with investment bankers in relation to the

recapitalization plan and consulted with a bankruptcy attorney on multiple occasions to discuss

Soporex's bankruptcy options.  (Id. at ¶¶ 153, 155-56).  The Trustee further alleges that the minutes

of an August 14, 2008 Soporex board meeting reflect that the bankruptcy attorney informed the

Soporex Board of its bankruptcy options, but goes on to allege that "there was no discussion about

how Soporex and/or any of the Operating Subsidiaries might finance their business operations in

Chapter 11 through the use of the secured creditors' cash collateral."  (Id. at ¶ 157).  Only two

paragraphs later, the Trustee contradicts herself once again, alleging that the Defendants, other than

Mickey Letson, were informed by the bankruptcy attorney "that they could sell the Operating

Subsidiaries' businesses as going concerns during a Chapter 11 proceeding, [but] those Defendants

rejected this approach and chose instead to file Chapter 7 cases for all the Soporex Debtors . . . ."

(Id. at ¶ 159).  A true and correct copy of the August 14, 2008 minutes of the Soporex Board

meeting is at Appx., p. 52.[17]  The minutes reveal that Soporex's bankruptcy counsel recommended

filing under Chapter 7 after concluding that filing under Chapter 11 would not be available.  (Appx.,

p. 53).  These allegations, too, are missing essential elements to comprise a viable claim.  In addition

---

[17] See discussion at footnote 8, *supra*.  The August 14, 2008 minutes are central to the Trustee's
claims that Linehan and Sabolik breached their fiduciary duties by approving the filing of Chapter 7
cases for the Soporex Debtors without giving any consideration to other options, including the filing
of liquidating Chapter 11 cases.  (See Complaint at ¶¶ 178, 182(g)-(h)).

to lacking allegations that the Officer Defendants failed to inform themselves, acted out of self-interest or in bad faith, or had no conceivable rational basis for their decision, the Trustee fails to allege that there was sufficient cash collateral to sustain business operations, fails to allege any reason that the Officer Defendants were unable to reasonably rely on the advice of counsel, nor does she account for her own failure to convert any of the Soporex Debtors' cases to Chapter 11, when she clearly had an absolute right to do so under 11 U.S.C. § 706(a).

F.      **The Med 4 Home Transaction**.

Following the August 14, 2008 Board meeting in which Soporex's bankruptcy options were discussed with counsel, the Soporex Debtors adopted resolutions authorizing the Soporex Debtors "to take any and all actions necessary, appropriate and desirable in connection with the[ir] orderly liquidation." (See Complaint at ¶¶ 162-64). The Trustee alleges that Sabolik and Smith used this resolution as justification to fraudulently transfer to Med 4 Home, Inc. ("Med 4 Home") SRI's active patient list and records on the Petition Date. (Id. at ¶ 165). In a conclusory allegation, with no factual support or further explanation, the Trustee alleges that the SRI patient list was Soporex's "most valuable asset." The purchase price for SRI's respiratory medications business (the "SRI Business") and Winmar's oxygen business (the "Winmar Oxygen Business") was $40,000. (Id.).

The Trustee alleges that Sabolik and Smith orchestrated the transfer of SRI's patient list and patient files "based upon the incorrect belief that they could face personal or criminal liability for 'patient dumping' if they did not transfer the patient list and patient data to some third-party before ceasing SRI's business operations." (Id. at ¶ 166). Yet the Med 4 Home Letter Agreement, which is attached to the Complaint as Exhibit A, recites that the Sellers (SRI and Winmar) had ceased business operations and desired "to meet their obligations under federal, state, and local laws, regulations, codes or standards, including Medicare, Medicaid, State Board of Pharmacy and such other rules and regulations regarding patient care and continuity of service to provide for the

17

continuity of care of their patients" and transferred the SRI Business and the Winmar Oxygen Business to Med 4 Home "to ensure continuity of patient care . . . ." (Complaint, Ex. A, p. 1).

Indeed, the Trustee admits that at this time, Harvard had stopped supplying medications to SRI, SRI had no other way to obtain medications, SRI's patients were relying on SRI to provide life-sustaining medications, such as Albuterol, and SRI was ceasing business operations and would not be able to honor its commitment to supply medication to its patients. (Complaint at ¶¶ 75-76, 93, 97-98, 142; Ex. A to Complaint).

In her criticism of the decision to transfer the SRI Business and Winmar Oxygen Business to Med 4 Home and/or Smith's and Sabolik's reasons for doing so, the Trustee attempts to allege that these actions constituted corporate waste, but fails to allege that there was any alternative option. (See Complaint at ¶¶ 184-89). While the Trustee alleges that prior to the Med 4 Home transfer, Sabolik and Smith failed to contact Polymedica to inquire whether it had any interest in purchasing back SRI's pharmacy business, she notably fails to allege that Polymedica would have had any such interest in purchasing back a business it was in such a hurry to sell a little over two years earlier. (See id. at ¶¶ 42-43, 168). Nor does the Trustee allege that there were any willing buyers other than Med 4 Home, or that a higher price could have been obtained. Furthermore, the Trustee also fails to allege that she was in a position to fill the outstanding orders for medication any more than Soporex, SRI and SRI II could. Any liability that Smith and Sabolik would face from failing to provide life-sustaining respiratory drugs to their patients would have been a liability of Soporex, SRI and SRI II, and after filing, potentially the Trustee.

The Trustee fails to allege that Sabolik and Smith did not make every attempt they could think of to save the Soporex Companies and to find other purchasers. Her allegation that there was no reasonable basis for their decision is mere characterization and fails to consider the laudable concern for patient well-being and their efforts to ensure that the Soporex Companies' obligations

18

to patients were met.  The underlying premise of the Trustee's Med 4 Home claim that Smith and

Sabolik had a duty, on pain of personal liability, to put the interests of creditors before the welfare of

patients – which the Court must accept in order to permit this claim to proceed – is  legally and

morally repugnant and very dangerous in a health care system dependent on private enterprise.

G.    **Alleged Failure to Disclose and Misrepresentations to the Board.**

The Trustee bases her breach of fiduciary duty claims against Linehan and Sabolik, in part,

on their alleged failure to keep the Outside Directors informed about various matters.  For example,

the Trustee alleges that Linehan and Sabolik: (a) failed to inform the Outside Directors of a

forbearance agreement entered into with GEBFS following its declaration of default (Complaint at

¶ 87); (b) failed to inform the Soporex Board or obtain its approval for Soporex's purchase of an

equity interest in CSC, for which Soporex paid $150,000 that it later had to forfeit as a "break-up

fee" when Soporex could no longer perform under the agreement (id. at ¶ 120-22); (c) failed to

forward to the Outside Directors monthly financial statements they received during the first half of

2008 (id. at ¶ 140); and (d) failed to inform the Outside Directors that in mid-May, Gaudio had

determined that as of July 2008 there would be insufficient cash to operate the businesses of the

Soporex Debtors (id. at ¶ 141).[18]  She also makes the vague and conclusory allegations that Linehan's

---

[18] See also id. at ¶¶ 178(d) (alleging that Linehan's "reckless actions and omissions" included "failing
to timely advise the Outside Directors of material adverse conditions affecting the business
operations of Soporex and the Operating Subsidiaries, including but not limited to the full extent of
SRI's billing and collection problems, the amount of SRI's bad debt write-offs and the dire financial
consequences to Soporex and SRI arising from these write-offs, the significant reduction in
Soporex's borrowing base after GEBFS sent the May 14, 2008 notice of default letter, the
restrictions on SRI's ability to purchase inventory imposed by Harvard, and Soporex's insolvency
which Linehan knew or had reason to know of by mid-May 2008") and 182 (alleging that Sabolik
failed to inform the Outside Directors regarding the declining financial condition of Soporex and
the Operating Subsidiaries resulting from SRI's failure to timely bill and collect its accounts
receivable, failed to inform the Outside Directors of adverse financial consequences arising from
Soporex's cash flow and failed to advise of Soporex's insolvency as of May 2008).

and Sabolik's reports to the Outside Directors on the financial status of the Soporex Debtors were false and misleading. (Id. at ¶ 146).

Fatal to the Trustee's claim, these allegations fail to show how the alleged failure to convene meetings or make disclosures to the Board caused any loss to the Soporex Debtors. She makes no effort to connect the alleged wrongdoing with any of the loss that she does contend occurred.

Equally important, her allegations are undercut by admissions she makes in numerous conflicting allegations to the contrary. She alleges that the following significant adverse financial events were brought to the Outside Directors' attention: the significant problems with the billing and collection of the SRI accounts receivable, the multi-million dollar write-offs of pharmacy bad debt due to CareCentric's negligent performance, the significant decrease in the Albuterol reimbursement rate, GEBFS's notice of default letter dated May 14, 2008 and the termination of available credit with Soporex's primary pharmaceuticals supplier, Harvard. (Id. at ¶ 144). She further alleges that: (a) the Outside Directors were informed at the April 25, 2007 Board meeting of the problems associated with CareCentric's billing and collections activities, and that at or around the time of this meeting, the Soporex Board was informed that SRI would have to write off in excess of $3 million in bad debt (id. at ¶ 147); (b) the Outside Directors were informed at the September 19, 2007 board meeting that SRI had written off an additional $2,100,000 in accounts receivable for the first eight months of 2007 due to billing and collections problems (id. at ¶ 148); (c) Linehan and Sabolik informed the Outside Directors of Soporex's continuing financial decline at a December 18, 2007 board meeting, which meant that the Soporex Board had clear evidence of an ongoing financial crisis from December 18, 2007 to July 22, 2008 (id. at ¶¶ 145, 150-51); and (d) the Outside Directors were provided sufficient information from which they could and should have concluded that Linehan's and Sabolik's reports were allegedly false and misleading (id. at ¶ 146).

20

These allegations negate the Trustee's contentions that the alleged misrepresentations and omissions even occurred, much less had any appreciable effect if they did occur.

## LEGAL ARGUMENT AND CITATION OF AUTHORITY

I.    **Legal Standard.**

To survive a motion to dismiss, a plaintiff must set forth factual allegations that give rise to a claim for relief that is plausible on its face. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 545 (2007); see also Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009); Reed v. CareCentric Nat'l, LLC (In re: Soporex, Inc.), Bankr. No. 08-34174-BJH-7, Adv. No. 10-3126-BJH, 2001 WL 841281, at *11 (Bankr. N.D. Tex. Mar. 7, 2011) (Houser, J.).  This standard requires more than mere possibility, and the complaint must contain enough "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949.  If the alleged facts are merely consistent with a defendant's liability, "it stops short of the line between possibility and plausibility of entitlement to relief," and the claims will not survive.  See id.; McCall v. Sw. Airlines Co., 661 F. Supp. 2d 647, 654 (N.D. Tex. 2009) ("Where the facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has stopped short of showing that the pleader is plausibly entitled to relief." (citations omitted)).  When faced with self-contradictory allegations or allegations that contradict matters properly subject to judicial notice or by exhibit, a court may draw on its "judicial experience and common sense" in evaluating the plausibility of a plaintiff's claims.  See Iqbal, 129 S. Ct. at 1950; Simmons v. Peavy-Welsh Lumber Co., 113 F.2d 812, 813 (5th Cir. 1940) (where there is a conflict between allegations in a complaint and exhibits attached thereto, the exhibit controls, and trial court properly dismissed claims where written correspondence attached as an exhibit to the complaint made clear that no liability existed); Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001) (court need not accept as true allegations that contradict matters properly subject to judicial notice or by exhibit).

21

While the court must accept all well-pleaded facts as true and view them in the light most favorable to the non-moving party, it is not required to accept as true legal conclusions couched as factual allegations.  Gonzalez v. Kay, 577 F.3d 600, 603 (5th Cir. 2009); see McCall, 661 F. Supp. 2d at 653 (Fed. R. Civ. P. 8(a) demands "more than an unadorned accusation devoid of factual support.").  Thus, review of a motion to dismiss under Fed. Civ. P. 12(b)(6) involves a two-pronged approach.  Iqbal, 129 S. Ct. at 1949-50; see Reed, 2001 WL 841281, at *11.  First, the court should identify the allegations that are not entitled to a presumption of truth because they are no more than conclusions.  Rhodes v. Prince, No. 08-10794, 2010 WL 114203, at *2 (5th Cir. Jan. 12, 2010); Iqbal, 129 S. Ct. at 1949-50.  Second, the court will presume the truth only of the well-pleaded factual allegations and determine whether they plausibly give rise to an entitlement to relief.  Iqbal, 129 S. Ct. at 1950; Rhodes, 2010 WL 114203, at *2.

As discussed more fully below, after the "conclusory allegations, unwarranted deductions [and] legal conclusions" are discounted (see St. Paul Commodities, LLC v. DB Fleet, LLC, No. 3:09-CV-582-L, 2009 WL 3378598, at *2 (N.D. Tex. Oct. 21, 2009) (citations omitted)), the remaining factual allegations in the Trustee's Complaint utterly fail to state a plausible claim against the Officer Defendants, and the claims against them should be dismissed in their entirety.

II.    **The Trustee Has Failed to State a Claim for Breach of Fiduciary Duties**.

A.    **The Allegations of Breach of Fiduciary Duty**.

The Trustee claims that Linehan and Sabolik breached their fiduciary duties of loyalty and due care as officers and/or directors of Soporex and the Operating Subsidiaries.  As an initial matter, it is difficult to determine which Debtors were allegedly harmed by which alleged acts or omissions and whether the alleged acts or omissions were committed by either Linehan or Sabolik in their capacities as officer or director.  In addition, while Soporex and SRI II were both Delaware corporations, SRI was a Missouri corporation, and Winmar was a North Dakota corporation.

22

Breach of fiduciary duty claims should be analyzed under the laws of the state of incorporation.  See

Faulkner v. Kornman (In re The Heritage Organization, LLC), Bankr. No. 04–35574–BJH–11, Adv.

No. 06–3377–BJH, 2008 WL 5215688, at *15 (Dec. 12, 2008) (Houser, J.) ("Texas follows the

internal affairs doctrine—that is, 'the internal affairs of the foreign corporation, including but not

limited to the rights, powers, and duties of its board of directors and shareholders and matters

relating to its shares are governed by the laws of the jurisdiction of incorporation.'" (citing Hollis v.

Hill, 232 F.3d 460, 464–64 (5th Cir. 2000))).  Generally the laws of Delaware, North Dakota and

Missouri are the same in that both officers and directors owe duties of loyalty and due care, and

both officers and directors are protected by the business judgment rule.  The claims against Linehan

and Sabolik are individually analyzed below as they relate to each entity.

> **B.**    **The Delaware Corporations.**

> **1.**    **Pleading Standards – Business Judgment Presumption.**

Under Delaware law, both officers and directors owe the same fiduciary duties of care and

loyalty.  Gantler v. Stephens, 965 A.2d 695, 708-09 (Del. 2009).  Decisions made by officers and

directors are "insulated from court review by the business judgment rule, which is a presumption

that in making a business decision, the directors and officers 'acted on an informed basis, in good

faith and in the honest belief that the action taken was in the best interests of the company.'"  Kaye,

2011 WL 1548967, at *26 (quoting Gantler, 965 A.2d at 705-06).  The business judgment rule thus

acts as a substantive rule of Delaware law, "providing that directors are not liable to the corporation

for any injury or loss arising from action taken by them in good faith and with appropriate care."

Ronsdorf v. Jacobson, No. Civ.A. 20614, 2004 WL 2158050, at *2 (Del. Ch., Sept. 16, 2004).

The Trustee here is required to "plead around" the presumption of the business judgment

rule by alleging facts plausibly showing not only that the Officer Defendants' decisions or actions led

the Soporex Debtors to suffer harm, but also "plausibly showing that those decisions or actions

were the result of disloyalty or a lack of due care, or that their conduct cannot be attributed to a

rational business purpose." Kaye, 2011 WL 1548967, at *26.

> "In order to state a claim for breach of fiduciary duty under Delaware law
> that is plausible on its face, a plaintiff must plead factual content that allows
> the court to draw the reasonable inference that in making the challenged
> decisions, the directors or officers breached their duties of loyalty or care. A
> plaintiff may not simply allege that a fiduciary undertook a business strategy
> that was all consuming and foolhardy and that turned out badly and thereby
> seek to have the court infer that the later failure resulted from a breach of the
> duties of care or loyalty. Such allegations are merely consistent with
> wrongdoing, and often have an obvious alternative explanation—that
> sometimes business strategies and decisions do not pan out despite the best
> intentions and the most exacting care."

Id. at *28 (internal citations and punctuation omitted). Thus, unless well-pleaded factual allegations

in the Complaint successfully rebut the procedural presumption of the business judgment rule, the

Officer Defendants are protected by the substantive operation of the rule. See McMullin v. Beran,

765 A.2d 910, 918 (Del. 2000); Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 361 (Del. Supr. 1992)

(plaintiff challenging a board decision "has the burden at the outset to rebut the [business judgment]

rule's presumption").

2.      **Duty of Loyalty.**

Officers and directors owe the corporation a duty of loyalty. See Guth v. Loft, 5 A.2d 503

(Del. 1939). In Guth v. Loft, the Delaware Supreme Court described the duty of loyalty by stating

that "[c]orporate officers and directors are not permitted to use their position of trust and

confidence to further their private interests." 5 A.2d 503, 510 (Del. 1939). An officer's or director's

duty of loyalty "requires that the best interest of the corporation and its shareholders takes

precedence over the officer or director's interests that is not shared by the stockholders generally."

Resnik v. Woertz, C.A. Nos. 10-527-GMS, 2011 WL 1184739, at *12 (D. Del. Mar. 28, 2011); see

Cede, 634 A.2d at 361; Benihana of Tokyo, Inc. v. Benihana, Inc., 891 A.2d 150, 191 (Del. Ch.

2005). If an officer or director is not alleged to have engaged in self-dealing, it must be alleged that

they acted in bad faith for a purpose other than advancing the best interests of the corporation to state a claim that they breached the duty of loyalty.  See Hampshire Grp, Ltd. v. Kuttner, C.A. No. 3607-VCS, 2010 WL 2739995, at *12 (Del. Ch. July 12, 2010); In re Caremark Int'l Inc. Deriv. Litig., 698 A.2d 959, 967 (Del. Ch. 1996) (indicating that duty of loyalty claims generally involve charges of self-dealing or suspect motivations, such as entrenchment).  However, the allegations of bad faith must be more than conclusory in order to overcome the business judgment rule.  See In re Verestar, Inc. v. Am. Tower Corp., 343 B.R. 444, 473 (Bankr. S.D.N.Y. 2006) (under Delaware law, "the business judgment rule protecting directors from having their decisions second-guessed cannot be overcome by conclusory allegations of bad faith").

Here, there are no allegations that the Officer Defendants engaged in self-dealing nor that they acted in bad faith for purposes other than advancing the best interests of the Soporex Debtors. The Trustee only vaguely alleges, in a conclusory fashion and only with respect to a single narrow aspect of the case, that Linehan and Sabolik may have been motivated by self-interest.  (See Complaint at ¶¶ 127 ("Linehan, Sabolik and the Outside Directors . . . saw Soporex's recapitalization as a way to recoup their initial equity investments while preserving their equity stake after recapitalization.  Thus, each of them had a personal self-interest in pursuing the recapitalization plan."); and 142 ("*Upon information and belief*, Linehan's and Sabolik's single-minded focus on the recapitalization plan and their disregard of creditors' interests during the final months of business operations was the result of self-interest." (emphasis added))).  Such conclusory allegations are not entitled to a presumption of truth and should not be considered in relation to this motion.  Even if they were considered to be true, they do not sufficiently allege self-dealing, because any interest in recapitalization would have been held by the shareholders generally.  See Resnik, 2011 WL 1184739, at *12 (the duty of loyalty "requires that the best interest of the corporation and its shareholders takes precedence over the officer or director's interests *that is not shared by the stockholders generally.*"

(emphasis added)).  The Trustee has thus failed to adequately allege any <u>possible</u> self-dealing on the part of the Officer Defendants, much less any <u>plausible</u> self-dealing.

Because the Trustee does not allege self-dealing, in order to overcome the business judgment rule for any claims of breach of the duty of loyalty, she must plead that Linehan and Sabolik acted in bad faith for a purpose other than advancing the best interests of the corporation.  None of the criticized decisions are alleged to have been made in bad faith, nor are there any allegations from which it could be inferred that Linehan or Sabolik acted or failed to act in bad faith.  In fact, the Trustee alleges Linehan's and Sabolik's focus on a recapitalization plan was based on the apparently good faith, "optimistic" belief that recapitalization would cure the Soporex Debtors' financial and cash flow problems.  (<u>See</u> Complaint at ¶¶ 129-131).  As shown above, it was clearly intended to benefit the Soporex Companies and all their constituencies.  Furthermore, the Trustee fails to allege that such a recapitalization would not have accomplished those goals.  Nothing in Delaware corporate governance principles requires success.  Thus, all claims of breach of duty of loyalty should be dismissed, and because there are no allegations of bad faith, all the Trustee's claims must clear the high bar that Delaware sets for claims for breach of the duty of care, which they do not.

>    **3.**    **Duty of Care.**

>    **1.**    **Exculpation for Directors.**

Linehan is alleged to have been a director and officer of both Soporex and SRI II, although the specific allegations relating to his alleged breaches of duties owed to SRI II focus only on alleged acts and omissions in his capacity as officer.  Sabolik is alleged to have been an officer and director of SRI II, and the allegations against him focus on alleged acts and omissions in his capacities as such.  Soporex and SRI II are both Delaware corporations, and their articles of incorporation contain the provisions allowed under Delaware law exculpating directors from liability for breach of the duty of care.  <u>See</u> 8 Del. Code § 102(b)(7).  Once such a provision is raised against duty of care

claims, that is "the end of the case," and the claims must be dismissed.  See IT Group Inc. v.

D'Aniello, No. 02-10118, Civ. A. 04-1268-KAJ, 2005 WL 3050611, at *11 (D. Del. Nov. 15, 2005)

(citing Malpiede v. Townson, 780 A.2d 1075, 1095 (Del. 2001)).  The articles of incorporation of

both Soporex and SRI II contain exculpatory provisions relieving the directors from liability for

breach of fiduciary duty to the full extent as allowed under Delaware law.  (See Amended and

Restated Certificate of Incorporation of Soporex, Inc., dated Mar. 31, 2006, at Appx., p. 75 ("[T]o

the fullest extent permitted by law, a director of the Corporation shall not be personally liable to the

Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director.  If

the General Corporation Law or any other law of the State of Delaware is amended after approval

of the stockholders of this Article Ninth to authorize corporate action further eliminating or limiting

the personal liability of directors, then the liability of a director of the Corporation shall be

eliminated or limited to the fullest extent permitted by the General Corporation Law as so

amended."); Certificate of Incorporation of Soporex Respiratory II, Inc., dated Apr. 12, 2007, at

Appx., p. 79 ("The personal liability of a director to the Corporation or its stockholders for

monetary damages for breach of fiduciary duty as a director is hereby eliminated to the fullest extent

permitted by the provisions of paragraph (7) of subsection (b) of § 102 of the General Corporation

Law of the State of Delaware, as the same may be amended and supplemented.")).[19]

As discussed above, because the Trustee fails to allege any self-dealing or bad faith, all the

---

[19] A defense relating to exculpation provisions under §102(b)(7) may be considered in the context of
a motion to dismiss.  See In re Parkcentral Global Litig., No. 3:09-CV-0765-M, 2010 WL 3119403,
at *11 (N.D. Tex. Aug. 5, 2010) (considering exculpation clause in limited partnership agreement on
motion to dismiss (citing In re Nantucket Island Assocs. Ltd. P'ship Unitholders Litig., No. 17379
NC, 2002 WL 31926614, at *3 (Del. Ch. Dec.16, 2002) ("To vindicate the statutory purpose behind
provisions like . . . § 102(b)(7) of the Delaware General Corporation Law, it is critical that
defendants be able to assert those defenses in a motion directed to the face of the complaint, such as
a motion under Rule 12(b)(6).")); Official Committee of Unsecured Creditors of Integrated Health
Servs., Inc. v. Elkins, No. Civ. A. 20228-NC, 2004 WL 1949290, at *9 n.38 (Del. Ch. Aug. 24, 2004).
See also discussion at footnote 8, *supra*.

allegations relating to Linehan's and/or Sabolik's alleged breaches of duty as directors must be read

as claims that they breached their duty of care.  For example, the Trustee alleges that, as a director of

Soporex, Linehan breached his fiduciary duties by failing to call board meetings, failing to insure that

committees carried out their functions, failing to timely advise Outside Directors of material adverse

conditions, failing to develop any plan to address the financial decline of the Debtors and failing to

retain a financial advisor to advise the board.  (See Complaint at ¶ 178).  The Trustee further alleges

that Sabolik breached his fiduciary duties as a director of SRI II by failing to take any steps to

preserve the operating assets of SRI and SRI II and transferring the assets for no consideration.

(See id. at ¶ 182).  Because these claims all relate to alleged breaches of Linehan's and Sabolik's

duties of care as directors of Soporex and/or SRI II, they must be dismissed pursuant to the

exculpation clauses in the respective articles of incorporation.[20]

### 2.    Gross Negligence Standard.

Under Delaware law, non-director officers are held to the same standard of care as directors.

See Gantler, 965 A.2d at 708-09.  The duty of care "includes a duty that directors inform themselves,

before making a business decision, of all material information reasonably available to them" and

requires that the directors "reasonably inform themselves of alternatives."  Benihana, 891 A.2d at

---

[20]  In addition, the exculpatory clause should apply to all allegations that are made against Linehan
and Sabolik in their capacities as both officers and directors.  See D'Aniello, 2005 WL 3050611, at
*11 ("since no allegations are made against [defendant] based on his actions as an officer separate
from those as a director, he is treated as a director for purposes of the Motion to Dismiss for failure
to state a claim, and his alleged culpability is covered by the discussion above [regarding an
exculpatory provision]").  There is also some authority that even the allegations lodged against them
solely in their capacities as officers should also be dismissed due to the exculpation clauses.  See
Verestar, 343 B.R. at 475 ("As for the officers' breach of the duty of care, the exculpatory clause in
the Verestar certificate of incorporation protects only directors, not officers.  However, the
decisions that impose a fiduciary duty on officers of a Delaware corporation hold them to the same
standards as a director.  No reason has been suggested why an officer should be held to a higher
standard.  Accordingly, only claims sounding in breach of the duty of loyalty are sustained as against
the officers.").

192.  To prove breach of the duty of care, the plaintiff must show gross negligence.  See In re

Fedders North America, Inc., 405 B.R. 527, 539 (Bankr. Del. 2009); Cargill, Inc. v. JWH Special

Circumstance LLC, 959 A.2d 1096, 1113 (Del. Ch. 2008) ("a corporate director is only considered to

have breached his duty of care in instances of gross negligence"); Resnik, 2011 WL 1184739, at *12

(D. Del. Mar. 28, 2011) (duty of care obligates directors and officers to act on an informed basis, but

a duty of care claim is only actionable if the officers or directors acted with gross negligence).

To adequately plead gross negligence and overcome the business judgment rule's

presumption that the directors and officers of the corporation acted on an informed basis, in good

faith and in the honest belief that the action was in the best interests of the company, (see Gantler,

965 A.2d at 705-06), a "decision has to be so grossly off-the-mark as to amount to reckless

indifference or a gross abuse of discretion."  Solash v. Telex Corp., 1988 WL 3587, at *9 (Del. Ch.

Jan. 19, 1988) (internal quotations omitted); see Tomczak v. Morton Thiokol, Inc., Civ. A. No. 7861,

1990 WL 42607, at *12 (Del. Ch. Apr. 5, 1990) ("[G]ross negligence means reckless indifference to

or a deliberate disregard of the whole body of stockholders or actions which are without the bounds

of reason." (internal quotations omitted)); Unocal Corp. v. Mesa Petroleum Co., 493 A.2d 946, 954

(Del. Supr. 1985) ("A hallmark of the business judgment rule is that a court will not substitute its

judgment for that of the board if the latter's decision can be attributed to any rational business

purpose." (internal quotations omitted)).  The gross negligence standard is an extremely stringent

one, and an argument that the officer or director did not make a prudent judgment about the

possibility of future success is "precisely the kind of argument precluded by the business judgment

rule." In re Lear Corp. Shareholder Litig., 967 A.2d 640, 651-52 (Del. Ch. 2008).

It is important to note that when analyzing allegations of breaches of fiduciary duties relating

to decisions made by corporate officers or directors, the sole focus is on the decision-making

process, not the substance of the decision itself:

"[C]ompliance with a director's duty of care can never appropriately be judicially determined by reference to the content of the board decision that leads to a corporate loss, apart from consideration of the good faith or rationality of the process employed. That is, whether a judge or jury considering the matter after the fact, believes a decision substantively wrong, or degrees of wrong extending through 'stupid' to 'egregious' or 'irrational', provides no ground for director liability, so long as the court determines that the process employed was either rational or employed in a good faith effort to advance corporate interests. To employ a different rule--one that permitted an 'objective' evaluation of the decision--would expose directors to substantive second guessing by ill-equipped judges or juries, which would, in the long-run, be injurious to investor interests. Thus, the business judgment rule is process oriented and informed by a deep respect for all good faith board decisions."

<u>Caremark</u>, 698 A.2d at 967-68.

Here, the Trustee's claims fail to overcome the business judgment rule because the Trustee has failed to allege any instance of gross negligence on the part of any of the Officer Defendants. In fact, rather than alleging that their decisions were uninformed, displayed reckless indifference or were "without the bounds of reason," the Trustee actually sets forth numerous rational business purposes that the decisions were meant to serve. Furthermore, she alleges and admits that they acted with the good faith and honest belief that their decisions were in the corporation's best interest. For example, the Trustee alleges that Linehan (and later Sabolik) was solely focused on a recapitalization plan, which he believed would cure the Soporex Debtors' financial and cash flow problems (Complaint at ¶ 129). She further alleges that Linehan pursued allegedly ill-fated marketing initiatives on behalf of Winmar because the inclusion of the sleep studies businesses would give a favorable impression in the offering memorandum prepared for the recapitalization plan. (<u>Id.</u>) She even faults Linehan and Sabolik for their "unduly optimistic views about the inevitable success of this [recapitalization] plan." (<u>Id.</u> at ¶ 130). A complaint fails to state a claim for which relief can be granted if the facts alleged show "an ostensibly legitimate business purpose for an allegedly egregious decision." <u>D'Aniello</u>, 2005 WL 3050611, at *12 (citations omitted) (complaint was self-defeating to the extent that it claimed that implementing a strategy to grow the company

was a breach of the duty of care, and "[e]ven if the strategy was unwise in retrospect, it is protected

in this case by the presumptions of the business judgment rule"); Kaye, 2011 WL 1548967, at *28 (a

plaintiff may not simply allege that a corporate fiduciary pursued a business strategy that failed and

expect the inference that the failure resulted from a breach of duty).  Because the Trustee does not

allege facts showing alleged failures and decisions to be so "grossly off-the-mark as to amount to

reckless indifference" or "without the bounds of reason," and, instead, makes allegations to the

contrary, these claims should be dismissed.

     Furthermore, the Trustee's criticisms of the content of the decisions made by the Officer

Defendants simply cannot serve to impose liability for breach of the duty of care.  See Caremark,

698 A.2d at 967-68.  For example, the Trustee's allegations with regard to CareCentric focus not on

the process undertaken by the Officer Defendants in making the decisions to hire CareCentric and

to execute the CareCentric Services Agreement, but rather on the substance of the decisions

themselves.  (See Complaint at ¶¶ 49-51 (criticizing the decision to hire CareCentric while at the

same time alleging that CareCentric was recommended by Soporex's chief information officer and

that Soporex's management relied on CareCentric's assurances that it had the expertise, software and

experienced staff to handle the services); 62 (criticizing the Officer Defendants' decision to

recommend that the Board approve the CareCentric Services Agreement while at the same time

alleging that they were well-informed regarding the decision); and 132 ("The decision to employ

CareCentric to perform [the billing and collection] tasks was disastrous . . . .")).  Simply put, the

Trustee fails to allege that the Officer Defendants' decision-making process was flawed in any way,

much less was uninformed, involved bad faith or amounted to "reckless indifference," and her

claims for breach of the duty of care should be dismissed.

     In addition, the Complaint is self-defeating in other respects, because the Trustee's

allegations of wrongdoing are contradicted by others made in the Complaint or contained in

materials incorporated or referred to in the Complaint.  For example, the Trustee alleges that the

Officer Defendants ignored suggestions in February 2007 to move the billing and collections

functions in-house and instead suggested Board approval of the CareCentric Services Agreement at

an April Board meeting, but she also alleges that by the time of that same April Board meeting, the

in-house transition had already begun. (See Complaint at ¶¶ 38, 60, 66).[21]  These and other

contradictory allegations appear throughout the entire Complaint, reveal the implausibility of the

Trustee's claims and mandate their dismissal.

      **C.**      **The Missouri Corporation – SRI.**

      Because SRI was a Missouri corporation, the claims against the Officer Defendants as it

relates to their alleged acts or omissions in their capacities as officers and/or directors of SRI should

be analyzed under Missouri law.  Because Missouri law is similar to Delaware law, the analysis above

applies also to the claims relating to alleged injury to SRI.

      In Missouri, the business judgment rule generally protects directors and officers from

liability for decisions made as long as their judgment is exercised fairly and honestly.  See Neidert v.

Neidert, 637 S.W.2d 296, 301 (Mo. App. 1982).  Courts will not interfere with decisions made by

officers and directors unless the matter complained of is *ultra vires*, illegal, fraudulent, dishonest or in

bad faith.  See McKnight v. Midwest Eye Institute of Kansas City, Inc., 799 S.W.2d 909, 913 (Mo.

App. 1990) ("The business judgment rule protects the directors and officers of a corporation from

liability for intra vires decisions within their authority made in good faith, uninfluenced by any other

consideration than the honest belief that the action sub-serves the best interests of the corporation.

It makes immune from court interference such an exercise of independent discretion."); Leggett v.

Missouri State Life Insurance Co., 342 S.W.2d 833, 851 (Mo. 1960) (courts will not interfere with

---

[21] See also discussion at pp. 13-14, 17-18, 20-22, *supra*, discussing other contradictory allegations.

internal management of a corporation except in cases of fraud, bad faith, breach of trust, gross

mismanagement, or *ultra vires* acts).

      **1.**      **Duty of Loyalty.**

      Under Missouri law, the duty of loyalty is a fiduciary duty owed to the corporation. <u>See</u>

<u>Nixon v. Lichtenstein</u>, 959 S.W.2d 854, 859 (Mo. App. E.D. 1997). A director or officer breaches

his fiduciary duty of loyalty when he "deal[s] with the property of a corporation for his own benefit

or profit at the expense of the shareholders." <u>Id.</u> (citing <u>Gieselmann v. Stegeman</u>, 443 S.W.2d 127,

136 (Mo. 1969)); <u>Ramacciotti v. Joe Simpkins, Inc.</u>, 427 S.W.2d 425, 431 (Mo. 1968); <u>Bromschwig v.</u>

<u>Carthage Marble & White Lime Co.</u>, 66 S.W.2d 889, 891-92 (1933).

      Here, the Trustee has not alleged that the Officer Defendants engaged in any self-dealing or

dealt with SRI's property for their own benefit or profit at the expense of the shareholders. The

Trustee alleges that Linehan breached his fiduciary duties by causing SRI to commence business

without a viable billing and collections system already in place, by failing to retain a financial advisor

and by approving the filing of a Chapter 7 case without considering filing a Chapter 11 case.

(Complaint at ¶ 178). As an initial matter, these allegations are contradicted by other allegations in

the Complaint, namely that (a) a billing and collections system was established with CareCentric at

the time SRI began operating, and CareCentric had been chosen after careful due diligence by

Soporex management (<u>id.</u> at ¶¶ 44, 49-51); and (b) bankruptcy counsel did discuss the option of

Chapter 11 with the Soporex Board, which after discussion and questions, chose to file Chapter 7

(<u>id.</u> at ¶¶ 155-156; Appx. at p. 53). The third allegation, that Linehan failed to retain a financial

advisor, is belied by the admission that Soporex had engaged an investment banking firm whose

efforts had led to a recapitalization commitment ( <u>id.</u> at ¶¶ 125-128). Furthermore, there is no

allegation that any of these decisions benefitted Linehan personally or were made in bad faith.

      The Trustee alleges that Sabolik breached his fiduciary duties by grossly mismanaging

financial affairs, failing to inform Outside Directors regarding the declining financial condition of

Soporex and the Operating Subsidiaries, failing to provide the Soporex Board and Soporex's officers

with timely and accurate financial information for Soporex and the Operating Subsidiaries, failing to

develop any plan to address the declining financial condition of Soporex and its subsidiaries, failing

to take any steps to preserve the operating assets of SRI and SRI II and transferring the assets for no

consideration.  (Complaint at ¶ 182).  Similar to the allegations against Linehan, most of these

allegations are contradicted by others in the Complaint, namely that (a) the Outside Directors were

informed (id. at ¶¶ 144-48, 150-51); (b) there were plans aimed at curing the financial problems

faced by the Soporex Companies (id. at ¶¶ 129-31, 142); and (c) the decision to file bankruptcy

under Chapter 7 was made after consultation with counsel and Board discussion (id. at ¶¶ 157, 159;

Ex. E).  Again, there is no allegation that any of these decisions personally benefitted Sabolik in any

way, nor that they were made in bad faith.

### 2.   Duty of Care.

The duty of care is not well defined in Missouri; however, as shown above, directors and

officers in Missouri will be protected by the business judgment rule unless there is a showing of

fraud, illegality, or *ultra vires* conduct.  See McKnight, 799 S.W. 2d at 913.  Under Missouri law,

"[d]irectors are presumed to have exercised their business judgment with due care and good faith

and in the honest belief that they were acting in the best interest of the corporation." Jackson v. St.

Regis Apartments, Inc., 565 S.W.2d 178, 183 (Mo. App. 1978).  The business judgment rule protects

the decisions of both officers and directors under Missouri law.  See McKnight, 799 S.W. 2d at 913;

see also Nixon, 959 S.W.2d at 859 (holding that "[w]hen a corporate director or officer's decision

falls within the business judgment rule, the court will not interfere with that decision").

As discussed above, the Trustee has failed to allege that Linehan, Sabolik or Smith had

anything other than the good faith, honest belief that their decisions were in the best interest of the

Soporex Debtors, including SRI.  Except for her admission that Soporex reasonably relied on

CareCentric's representations, the Trustee consistently fails to allege facts showing what information

the Officer Defendants considered or allegedly failed to consider in making their decisions or

otherwise challenge any of the elements of the business judgment rule.  They are thus protected by

the business judgment rule, and all the duty of care claims should be dismissed.

### D.        The North Dakota Corporation – Winmar.

The North Dakota Business Corporation Act imposes similar standards of conduct for

corporate officers and  directors.[22]  In Red River Wings, Inc. v. Hoot, Inc., the North Dakota

Supreme Court addressed the duties of corporate directors and held that "[u]nder the business

judgment rule, corporate directors are shielded 'from all liability except for self-dealing, willful

misconduct, or gross negligence.'"  751 N.W.2d 206, 222 (N.D. 2008) (quoting In re

Conservatorship of Sickles, 518 N.W.2d 673, 680-81 (N.D. 1994)); see Lonesome Dove Petroleum,

Inc. v. Nelson, 611 N.W.2d 154, 161 (N.D. 2000) (N.D.C.C. § 10-19.1 "imposes a duty upon

officers, directors, and those in control of a corporation to act in good faith, and affords remedies to

minority shareholders if those in control act fraudulently illegally, or in a manner unfairly prejudicial

toward any shareholder.").  The courts will not interfere with the business judgment of directors

unless their judgment is influenced by personal considerations.  Red River Wings, 751 N.W.2d at 22

(citing Dixon v. McKenzie County Grazing Ass'n, 675 N.W.2d 414 (N.D. 2004)); Lill v. Cavalier

Rural Elec. Co-op., 456 N.W.2d 527 (N.D. 1990).  Claims for breach of the duty of care under

---

[22]  N.D.C.C. § 10-19.1-50(1) provides that: "A director shall discharge the duties of the position of
director in good faith, in a manner the director reasonably believes to be in the best interests of the
corporation, and with the care an ordinarily prudent person in a like position would exercise under
similar circumstances.  A person who so performs those duties is not liable by reason of being or
having been a director of the corporation."

 N.D.C.C. § 10-19.1-60 states that "[a]n officer shall discharge the duties of an office in good
faith, in a manner the officer reasonably believes to be in the best interests of the corporation, and
with the care an ordinarily prudent person in a like position would exercise under similar
circumstances."

North Dakota law should thus be judged under the standard of gross negligence for both directors and officers.

North Dakota law also provides a statutory right of reliance for directors.  See N.D.C.C. § 10-19.1-50.  A director has the right to rely on corporate officers, employees, committees, and outside consultants so long as the director reasonably believes that the person is reliable and competent regarding the matters presented.  Id.  Here, the Trustee's allegations regarding the allegedly misguided marketing efforts are not even connected to the Officer Defendants other than in a conclusory allegation (see Complaint at ¶ 111 ("At Linehan's direction, Soporex, on behalf of Winmar, engaged in an aggressive marketing campaign.")), and there is nothing alleged that would show any knowledge by any of the Officer Defendants that anything was amiss, much less that they were personally involved in any way – i.e., liability simply because it occurred on their watch, for which there is no support under North Dakota law.  Further, the only allegations against Linehan regarding alleged breaches of duties owed to Winmar are that he allegedly failed to retain a financial advisor and approved the filing of a Chapter 7 case without considering Chapter 11.  Not only are these allegations flatly contradicted by others in the Complaint, but Linehan had the right to rely on the other officers and employees, and certainly to rely on the advice of qualified counsel in regard to these decisions.  There are simply no allegations that either Linehan or Sabolik acted in a grossly negligent manner in relation to Winmar.

III.    **The Trustee Has Failed to State a Claim for Corporate Waste**.

    A.    **Allegations of Waste**.

The Trustee alleges that Sabolik and Smith are liable for corporate waste under Delaware law for the transfer to Med 4 Home of the SRI Business and the Winmar Oxygen Business, the alleged abrupt termination of Winmar's business operations and alleged failure to take steps to preserve the value of the Operating Subsidiaries' accounts receivable.  (Complaint at ¶ 186).  The allegations go

back and forth on the identity of the allegedly injured parties.  In different paragraphs, the Trustee

alleges that Soporex and its creditors suffered damages (id. at ¶ 189), that SRI did not receive

adequate consideration for the sale of its business (id. at ¶ 187), and that Winmar's assets were

irrationally squandered by Sabolik and Smith (id. at ¶ 188).  Yet the Trustee specifically alleges that

all of the alleged acts constituted waste under Delaware law.  Similar to claims for breach of fiduciary

duties, corporate waste claims should be considered under the law of the state of incorporation of

the allegedly injured corporation.  The Trustee's specific allegation that Delaware law applies can

only be read to indicate that the Trustee is not asserting claims of waste on behalf of either SRI or

Winmar themselves.  Given that fact and the dearth of case law on corporate waste from North

Dakota and Missouri, this brief will address the Trustee's claims as pleaded and focus on corporate

waste claims under Delaware law.

> **B.**      **Elements of Claims of Waste.**

To state a claim for corporate waste under Delaware law, the complaint "must allege

particularized facts that lead to a reasonable inference that the director defendants authorized 'an

exchange that is so one sided that no business person of ordinary, sound judgment could conclude

that the corporation has received adequate consideration.'"  In re Citigroup Inc. Shareholder Deriv.

Litig., 964 A.2d 106, 136 (Del. Ch. 2009) (citations omitted).  This test is difficult to meet, and "[t]o

prevail on a waste claim . . . the plaintiff must overcome the general presumption of good faith by

showing that the board's decision was so egregious or irrational that it could not have been based on

a valid assessment of the corporation's best interests."  White v. Panic, 783 A.2d 543, 554 n.36 (Del.

2001).  "If under the circumstances any reasonable person might conclude that the deal made sense,

then the judicial inquiry ends."  Steiner v. Meyerson, 1995 WL 441999, at *1 (Del. Ch. July 19, 1995).

Thus, "[a] claim of waste will be sustained only in the rare, 'unconscionable case where directors

irrationally squander or give away corporate assets.'"  Kates v. Beard Research, Inc., 2010 WL

1644176, at *5 (Del. Ch. Apr. 23, 2010) (citations omitted).

Here, the Plaintiff is attempting to allege that Smith and Sabolik are liable for corporate waste because they "gave away" corporate assets by transferring the SRI Business and the Winmar Oxygen Business allegedly for little to no consideration.[23] Yet the Trustee's allegations do not give rise to a plausible right to relief because the Asset Purchase Agreement between SRI and Winmar and Med 4 Home, attached to the Complaint as Exhibit A, demonstrates a valid business purpose and shows the consideration obtained. See Simmons, 113 F.2d at 813 (where there is a conflict between allegations in a complaint and exhibits attached thereto, the exhibit controls). The business purpose is stated clearly in the recital that SRI and Winmar desired to meet their obligations under any and all applicable federal, state and local laws, regulations, codes or standards, and wanted to ensure continuity of patient care and service. (See Complaint, Ex. A, p. 1). It is clear from the Asset Purchase Agreement itself that Med 4 Home is assuming and agreeing to discharge SRI's and Winmar's obligations to patients on pending orders of medication – at a time when SRI and Winmar themselves were incapable of performing those obligations. (Id.). Thus, there is no question that Med 4 Home provided consideration for the purchase. See Baron v. Pressed Metals of Am., Inc., 123 A.2d 848, 853-54 (Del. Supr. 1956) (holding that it was "too clear for argument" that the Vice Chancellor was right in holding that the amount assumed in liabilities was part of the consideration of asset sale). The Trustee does not gainsay either of these facts, and the allegations in her Complaint once again fail to allege any facts regarding the circumstances of the decision, the negotiations and the resulting transaction that show the egregious conduct needed to support a

---

[23] The Complaint alleges, and Exhibit A to the Complaint evidences, that the purchase price for the SRI Business and assets and the Winmar Oxygen Business and assets together was $40,000. (See Complaint at ¶ 165). In a contradictory allegation, the Complaint states that "[g]iven that no consideration was received by Soporex for the transfers of SRI's patient list and data, no business person of ordinary, sound judgment could conclude that Soporex or SRI received adequate consideration." (Id. at ¶ 187).

waste claim.  She fails to allege that Smith or Sabolik did not make efforts to find other purchasers, that they were aware of any other buyer, or that they could have negotiated a higher price for the SRI Business and the Winmar Oxygen Business Med 4 Home purchased.  In fact, the Complaint makes it clear that August 2008 was the height of the "perfect storm" of challenges faced by the Soporex Companies culminating in the need to terminate the businesses because of lack of cash flow while at the same time continuing to provide life-sustaining medications to SRI's pharmacy patients.  (Complaint at ¶¶ 76-78, 85-86, 90-93, 97, 128, 131, 141-142).  Soporex was literally out of money.[24]  Because it is entirely implausible for concerns of patient welfare and legal and ethical obligations to constitute "egregious" or "irrational" reasons for Smith and Sabolik to transfer the SRI and Winmar Oxygen Businesses to a company that could continue to care for SRI's patients, these claims should be dismissed.

## IV.    The Trustee's Claims Fail for Lack of Proximate Cause.

In addition to having to overcome the business judgment rule's presumption and overcome the presumption of good faith as to her waste claims, the Trustee is also required to plead that the alleged breaches of duty proximately caused the alleged harm to the Soporex Debtors.  See Caremark, 698 A.2d at 971 (to show that corporate directors breached their duty of care, plaintiff must show, *inter alia*, that alleged failures proximately resulted in the losses complained of); Preston v. Preston, Civil Action No. 6049, 1981 WL 15086, at * (Del. Ch. Apr. 16, 1981) (to establish *prima facie* case of breach of fiduciary duty, plaintiff must demonstrate a legal duty, breach of the duty, a causal connection between defendant's conduct and plaintiff's injury and damage to plaintiff).  The Supreme Court in other settings has held that proximate cause is an issue that can be decided on a motion to dismiss. Dura Pharmaceuticals, Inc. v. Brouda, 544 U.S. 336, 347 (2005) (complaint was

---

[24]  The Trustee carefully avoids any reference to one of most serious recessions in the Nation's history, with its economic turmoil, the freezing of credit (including debtor-in-possession financing), the complete standstill of merger and acquisition activity and other investment banking business.

legally insufficient to provide fair notice of plaintiff's claims when there were no adequate allegations regarding economic loss or the causal connection between alleged misconduct and loss); accord Anza v. Ideal Steel Supply Corp., 547 U.S. 451 (2006) (RICO).

The Trustee's claims are rife with fatal causal gaps and obstacles between any specific alleged misconduct on the Officer Defendants' part and any of the Soporex Companies' losses -- the fact that the original CareCentric agreement contained the very limitation on liability that the Trustee later faults the Defendants for agreeing to after problems surfaced, the financial difficulties resulting from the change in secured lenders (from MLBFS to GEBFS) and a vendor's refusing to supply product (Harvard), the Trustee's own failure to use her right to convert the Soporex Debtors' Chapter 7 cases to Chapter 11, and the Trustee's failure to show that financial alternatives existed to the proposed recapitalization, that alternative pharmaceutical distributors would have provided credit, that there were other purchasers who would have paid more for SRI's patient list, or that there was anyone else with an interest in Winmar either before or after the petition was filed who would have purchased it on more favorable terms.  The Trustee's failure and inability to allege proximate cause also warrants dismissal.

## CONCLUSION

For the foregoing reasons, the Complaint as to the Officer Defendants should be dismissed in its entirety.

Respectfully submitted,

/s/ Keith M. Aurzada
Keith M. Aurzada
State Bar No. 24009880
John C. Leininger
State Bar No. 24007544
Bryan Cave LLP
2200 Ross Ave., Suite 3300
Dallas, Texas 75201
(214) 721-8000 (Telephone)
(214) 721-8100 (Facsimile)

40

Thomas S. Richey (*Admitted Pro Hac Vice*)
Ga. Bar No. 604525
Ann W. Ferebee (*Admitted Pro Hac Vice*)
Ga. Bar No. 431941
Bryan Cave, LLP
1201 West Peachtree Street, NW
Fourteenth Floor
Atlanta, Georgia 30309
(404) 572-6600  Telephone
(404) 572-6999  Facsimile

Attorneys for Defendants Stephen D. Linehan,
Richard J. Sabolik and Scott D. Smith

**<ins>Certificate of Service</ins>**

I hereby certify that a true and correct copy of the foregoing was served upon counsel of

record via electronic mail on this 1st day of June, 2011.

   /s/Keith M. Aurzada
Keith M. Aurzada