

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

*Barbara J. Houser*

**United States Bankruptcy Judge**

**Signed November 28, 2011**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **SOPOREX, INC., et al.** | § | **CASE NO. 08-34174-BJH-7** |
| | § | **Jointly Administered** |
| Debtor. | § | |
| | § | |
| **DIANE G. REED, as CHAPTER 7** | § | |
| **TRUSTEE OF SOPOREX, INC.,** | § | |
| **SOPOREX RESPIRATORY, INC.,** | § | |
| **d/b/a Independence Home Pharmacy,** | § | |
| **SOPOREX RESPIRATORY II, INC.,** | § | |
| **d/b/a Independence Home Pharmacy II,** | § | |
| **and WINMAR DIAGNOSTICS NORTH** | § | |
| **CENTRAL, INC.,** | § | |
| Plaintiff, | § | **ADV. PRO. 11-3306-BJH** |
| - against - | § | |
| | § | |
| **STEPHEN D. LINEHAN, RICHARD** | § | |
| **J. SABOLIK, SCOTT D. SMITH, JOHN** | § | |
| **DUDINSKY, JR., RONALD G. GEARY,** | § | |
| **THOMAS HANSEN, MICKEY LETSON,** | § | |
| **and DOYLE PRIVETT,** | § | |
| | § | |
| Defendants. | § | |

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Before the Court are several motions to dismiss the second amended complaint (the "Complaint") filed by Diane G. Reed as chapter 7 trustee (the "Trustee") of the estates of four related chapter 7 debtors (the "Debtors"). The Debtors, together with other affiliates, filed voluntary petitions for relief under chapter 7 on August 22, 2008. The four debtors on whose behalf the Trustee filed the Complaint are Soporex, Inc. ("Inc."), Soporex Respiratory, Inc. ("SRI"), Soporex Respiratory II, Inc. ("SRI 2"), and Winmar Diagnostics North Central, Inc. ("Winmar").[1] They are collectively defined in the Complaint as the "Soporex Debtors," and the latter three are further defined as the "Operating Subsidiaries." The defendants are eight individuals (collectively, the "Defendants"), each of whom held various director and/or officer positions with one of the Soporex Debtors. Stephen D. Linehan ("Linehan"), Richard J. Sabolik ("Sabolik"), and Scott D. Smith ("Smith") (collectively, the "Officers") were officers of Inc. during the times relevant to the allegations in the Complaint; Linehan was also chairman of Inc.'s board of directors (the "Board"). John Dudinsky, Jr. ("Dudinsky"), Ronald G. Geary ("Geary"), Thomas Hansen ("Hansen"), Mickey Letson ("Letson") and Doyle Privett ("Privett") (collectively, the "Outside Directors") were not officers of any of the Soporex Debtors, but served on the Board.

## I.      PROCEDURAL BACKGROUND

In very broad brush, the Complaint alleges the following claims: Count 1, against only Linehan, alleges breaches of the fiduciary duties of loyalty and due care. Count 2 alleges that same claim against Sabolik. Count 3, against Smith and Sabolik, alleges a claim for corporate waste.

---

[1] The other affiliates that filed petitions for relief under chapter 7 are Soporex Sleep Solutions, Inc., Soporex DME, Inc., Pediatric Sleep Solutions, Inc., Soporex Respiratory Holdings, Inc., Soporex Sleep Holdings, Inc., Soporex Wholesale, Inc. and Soporex Staffing, Inc. Their cases are jointly administered under Case No. 08-34174-BJH.

Count 4, against the Outside Directors, alleges breaches of the duties of loyalty and due care. Count 5 alleges that same claim against Letson. Count 6 constitutes an objection to proofs of claim filed in the Inc. case by Sabolik and Smith, which proofs of claim assert amounts allegedly owed for unpaid compensation for services rendered or unpaid benefits. Count 7 asserts that the Trustee is entitled to an award of attorneys' fees, expenses, and costs incurred by the Trustee in the prosecution of this adversary proceeding "to the extent allowed by applicable law." *Compl.*, ¶ 216.

Four of the Outside Directors have filed a motion to dismiss Count 4, which is the only claim asserted against them.[2] The fifth outside director, Letson, is separately represented and has filed his own motion to dismiss the Complaint, directed to Counts 4 and 5, which are the two claims asserted against him. Letson also joins in the motion filed by the other Outside Directors as to Count 4, and further asserts as to Count 4 that the Trustee, who specifically excludes Letson from some of the factual allegations in support of Count 4, fails to exclude Letson from other factual allegations, some of which complain of acts or omissions that occurred after Letson resigned his position on the Board, and Count 4 should be dismissed as against Letson for this additional reason. The Officers have filed a motion to dismiss as to Count 1 against Linehan, Count 2 against Sabolik, and Count 3 against Sabolik and Smith. These three motions to dismiss will be collectively referred to herein as the "Motions."

---

[2] The Outside Directors filed an appendix in support of their motion to dismiss. *See* Docket No. 40. On August 11, 2011, the Trustee moved to exclude from this Court's consideration the evidence contained in that appendix on the ground that it constituted evidence "outside the pleadings" under Fed. R. Civ. P. Rule 12(d). Docket No. 62. On September 19, 2011, this Court entered an agreed order granting in part the Trustee's motion to exclude that evidence. Docket No. 78. Accordingly, this Court only considers on the Outside Directors' Motion the Complaint, its attachments and the documents identified in the September 19, 2011 agreed order. *See* Outside Directors' appendix Tabs 1, 2, 4 and 5.

Each of the Motions is asserted under Fed. R. Civ. P. 12(b)(6), made applicable here by Fed. R. Bankr. P. 7012.  All of the Defendants contend that the Complaint fails to state a claim upon which relief can be granted with regard to the Counts 1 - 5.[3]

## II.    LEGAL ANALYSIS

### A.    Threshold Issue of Authority to Finally Determine the Trustee's Claims.

Although no party has raised an issue with respect to this Court's ability to hear and finally determine the claims asserted by the Trustee in the Complaint, and in fact the Trustee alleges that all of her claims against the Defendants are "core" claims, in light of the Supreme Court's recent decision in *Stern v. Marshall*, 131 S. Ct. 2594 (2011), this Court must consider whether it has the constitutional authority to finally determine the Trustee's claims as an Article I tribunal.  A brief discussion of *Stern* is necessary.

*Stern* concerned a bankruptcy court's authority to hear and finally determine a debtor's common-law counterclaim to a proof of claim filed against the bankruptcy estate.  The Supreme Court held that a bankruptcy court, as an Article I tribunal, may not constitutionally enter a final judgment over a debtor's counterclaim that would not necessarily be resolved by the resolution of

---

[3] The Outside Directors' (minus Letson) Motion also asserted that the Trustee's claims for breach of the duty of due care failed for another reason.  Specifically, they argued that under Delaware law, a corporation's certificate of incorporation may include a provision eliminating the personal liability of a director to the corporation for monetary damages for breach of the fiduciary duty of care except in certain circumstances, none of which were allegedly present here, and that Inc.'s articles of incorporation included such a provision and thus the Trustee's claims for breach of the duty of care were precluded.  The Court need not address this argument because Inc.'s articles of incorporation were excluded from this Court's consideration on the Outside Directors' Motion pursuant to the agreed order referenced in note 2 above.  The Court notes, however, that neither the Trustee nor the Outside Directors have alleged or established that Delaware law properly applies to all of the Trustee's claims, which are asserted on behalf of four separate bankruptcy estates involving four separate corporations, only two of which were incorporated in Delaware.  SRI is a Missouri corporation and Winmar is a North Dakota corporation.  As both the Trustee and the Outside Directors have failed to address any choice-of-law issues and both apply Delaware law to Count 4 of the Complaint, the Court will also apply Delaware law to assess the sufficiency of the Complaint under Rule 12(b)(6).

the debtor's objection to the claimant's proof of claim.[4] *Id*. at 2618. According to the Supreme Court, although "public rights" disputes may be decided by non-Article III tribunals, public rights disputes must involve rights "integrally related to a particular federal government action." *Id*. at 2613. The debtor's counterclaim in *Stern* did not constitute a "public rights" dispute. *Id*. at 2614. Thus, according to the Supreme Court, entering a final judgment with respect to the debtor's counterclaim, which would not have been decided by the allowance of the claimant's proof of claim, would be an impermissible exercise of the judicial power of the United States by a non-Article III tribunal. *Id*. at 2615. This was so notwithstanding the fact that (i) the relevant statute – 28 U.S.C. § 157(b)(1) – expressly authorized the bankruptcy judge to "hear and determine . . . all core proceedings . . . arising in a case under title 11," that were referred to it by the district court under 28 U.S.C. § 157(a), and (ii) "counterclaims by the estate against persons filing claims against the estate" are expressly defined to be a "core proceeding." 28 U.S.C. § 157(b)(2)(C). While Chief Justice Roberts stated in his majority opinion that the *Stern* holding was quite narrow and would have a limited practical impact,[5] many lower courts and commentators are struggling to understand

---

[4]Of significance, *Stern* clarified bankruptcy courts' constitutional power, not their subject matter jurisdiction. Subject matter jurisdiction over bankruptcy cases and proceedings remains in the district court pursuant to 28 U.S.C. § 1334. In contrast, 28 U.S.C. § 151 grants bankruptcy courts the power to "exercise" certain "authority" conferred upon the district courts by title 28, but bankruptcy courts are not granted their own independent subject matter jurisdiction over bankruptcy cases and proceedings. Moreover, 28 U.S.C. § 157 simply provides procedures pursuant to which the district court may refer bankruptcy cases and proceedings to the bankruptcy courts for either final determination or proposed findings and conclusions. The Court in *Stern* discussed this critical distinction at length, 131 S.Ct. at 2606-08, and expressly clarified that 28 U.S.C. § 157 is not jurisdictional. *Id*. at 2607. ("Section 157 allocates the authority to enter final judgment between the bankruptcy court and the district court. That allocation does not implicate questions of subject mater jurisdiction.").

[5]Specifically, in response to arguments that the decision would "create significant delays and impose additional costs on the bankruptcy process," the Chief Justice wrote that the Court did not believe that 'removal of counterclaims such as Vickie's from core bankruptcy jurisdiction meaningfully changes the division of labor in the current statute; we agree with the United States that the question presented here is a 'narrow' one." 131 S.Ct. at 2619-20. The opinion went on to explain why it was important to adhere strictly to Article III's requirements even if the decision in this case "does not change all that much." *Id*. at 2620. And the concluding paragraph of the opinion stated the "one isolated respect" in which the Count concluded that the Bankruptcy Act of 1984 exceeded the

its broader implications, if any. *See, e.g.*, Jonathan Azoff and Thomas Szaniawski, *Stern v. Marshall and the Limits of Consent*, 30 Am. Bankr. L. J. 28 (2011); Ralph Brubaker, *Article III's Bleak House (Part II): The Constitutional Limits of Bankruptcy Judges' Core Jurisdiction*, 31 No. 9 Bankr. L. Letter 1 (2011); *In re Extended Stay, Inc.*, No. 09-13764-JMP, 2011 WL 5532258 (S.D.N.Y. Nov. 10, 2011); *In re Davis*, No. 05-15794-GWE, 2011 WL 5429095 (Bankr. W.D. Tenn. Oct. 5, 2011); *In re Teleservices Group, Inc.*, 456 B.R. 318 (Bankr. W.D. Mich. 2011).

As relevant here and as noted previously, two of the Defendants – *i.e.*, Sabolik and Smith, filed proofs of claim in the Inc. case for amounts allegedly owed to them for unpaid compensation and benefits. Count 6 of the Complaint is the Trustee's objection to those proofs of claim. However, the Trustee is also asserting affirmative state law claims against them and is seeking to recover significant monetary damages from them. Specifically, and as noted previously, Count 2 of the Complaint contains a claim against Sabolik for breach of the fiduciary duties of due care and loyalty, while Count 3, against Smith and Sabolik, alleges a claim for corporate waste. In deciding whether Smith and Sabolik are owed unpaid compensation and benefits by Inc. as asserted in their proofs of claim, this Court will not be called upon to decide the Trustee's state law claims against them as pled in Counts 2 and 3. Thus, at least with respect to the Trustee's claims against Smith and Sabolik, *Stern* is directly implicated and, according to the Supreme Court, this Court lacks constitutional authority to finally determine the Count 2 and 3 claims as pled in the Complaint.

So, the question becomes, if this Court lacks constitutional authority to determine the

---

limitations of Article III – *i.e.*, "[t]he bankruptcy Court below lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." *Id*.

Trustee's counterclaims against Smith and Sabolik,[6] what, if anything, can this Court do with respect to the Count 2 and 3 claims? The starting point in answering this question must be the statute itself. Of course, and as noted previously, Congress expressly provided in 28 U.S.C. § 157(a) that bankruptcy courts could hear and finally determine all core proceedings and then Congress statutorily defined as core proceedings "counterclaims by the estate against persons filing claims against the estate." The *Stern* court found this statutory grant of authority unconstitutional. Congress also expressly provided in 28 U.S.C. § 157(c)(1) that bankruptcy courts could "hear a proceeding that is not a core proceeding but that is otherwise related to[7] a case under title 11," and thereafter submit "proposed findings of fact and conclusions of law to the district court," which would then enter any final order or judgment "after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected." Finally, Congress expressly provided in 28 U.S.C. § 157(c)(2), that with the consent of the litigants, the district court could refer a "related to" proceeding to a bankruptcy court to hear and finally determine subject to an appeal to the district court under section 158 of title 28.[8]

With this background in mind, the question remains – what can this Court do with respect

---

[6]The Trustee admits in the Complaint that "[t]his adversary proceeding involves counterclaims by the estate against persons that have filed claims in the Soporex Debtors' cases, and, thus, is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(C)." *Compl.*, ¶ 1.

[7] Related to proceedings are those that neither arise in nor arise under title 11, but otherwise "could conceivably affect the estate being administered in bankruptcy. *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383 (5th Cir. 2010); *In re Morrison*, 55 F.3d 473 (5th Cir. 2009).

[8] Whether consent works after *Stern* remains an open issue. *See, e.g., In re BearingPoint, Inc.*, 453 B.R. 486, 497 (Bankr. S.D.N.Y. 2011) (it's fair to assume that it will now be argued, that consent, no matter how uncoerced and unequivocal, will never again be sufficient for bankruptcy judges ever to issue final judgments on non-core matters. That huge uncertainty presages litigation over that issue with the potential to tie up this case, and countless others, in knots"); Jonathan Azoff and Thomas Szaniawski, *Stern v. Marshall and the Limits of Consent*, 30 Am. Bankr. L. J. 28 (2011).

to a statutorily defined "core" proceeding that the Supreme Court has held in *Stern* cannot be finally determined by a bankruptcy court? Can it issue proposed findings and conclusions to the district court as it is expressly authorized to do by statute with respect to those proceedings that are "related to" a bankruptcy case? For the reasons set forth below, this Court concludes the answer to this question is yes.

First, the Supreme Court itself at least implied in *Stern* that the effect of its decision was to "remove" certain claims from "core bankruptcy jurisdiction," and to relegate them to the category of claims that are merely "related to" bankruptcy proceedings and thus are subject to being heard, but not finally determined, by bankruptcy courts when it stated that

> the current bankruptcy system . . . requires the district court to review de novo and enter final judgment on any matters that are "related to" the bankruptcy proceedings, and permits the district court to withdraw from the bankruptcy court any referred case, proceeding, or part thereof. [Respondent] has not argued that the bankruptcy courts are barred from "hearing" all counterclaims or proposing findings of fact and conclusions of law on those matters, but rather that it must be the district court that finally decides them. We do not think the removal of counterclaims such as [Petitioner's] from core bankruptcy jurisdiction meaningfully changes the division of labor in the current statute; we agree with the United States [appearing as *amicus curiae*] that the question presented here is a "narrow" one.

*Id*. at 2620. And, as noted previously, this Court has statutory authority to issue proposed findings of fact and conclusions of law to the district court with respect to "related to" proceedings. 28 U.S.C. § 157(c)(1).

Second, the Supreme Court's analysis in *Stern* also provides strong authority for the proposition that there remain only two types of proceedings under 28 U.S.C. § 157: (1) "core" proceedings that arise "in" a bankruptcy case or "under" title 11, and (2) "non-core" proceedings that are "related to" a bankruptcy case. The *Stern* Court came to this conclusion after holding § 157(b)(1) "ambiguous," thus requiring an authoritative interpretation. 131 S. Ct. 2604-05. In short, the

Supreme Court concluded that there were "[t]wo options. The statute does not suggest that any other distinctions need be made." *Id*. at 2605.

Third, and in the alternative, if there is now a third type of proceeding not expressly addressed in 28 U.S.C. § 157 – *i.e.*, statutorily defined "core" proceedings over which a bankruptcy court lacks constitutional authority to finally determine – there is no constitutional impediment, and should be no other impediment, to a bankruptcy court hearing this type of proceeding and then issuing proposed findings of fact and conclusions of law to the district court for de novo review. Admittedly, there is no express statutory authority to do so in title 28. No doubt that is because Congress fully expected that the bankruptcy courts would hear and finally determine all core proceedings in accordance with 28 U.S.C. § 157(b)(1). From this Court's perspective, it is absurd to think that simply because Congress did not anticipate the Supreme Court's ruling in *Stern* when it enacted, in 1984, 28 U.S.C. §§ 1334 (which vests jurisdiction over bankruptcy cases and proceedings in such cases in the district courts) and 157 (which permits the district court to refer bankruptcy cases and all proceedings "arising under title 11 or arising in or related to a case under title 11" to the bankruptcy courts) that the bankruptcy courts can now do nothing with respect to these types of claims. Since Congress expressly provided for the issuance of proposed findings of fact and conclusions of law with respect to "related to" proceedings over which the bankruptcy court had no authority to issue a final judgment except if the litigants expressly consented, there is no reason to believe that any impediment exists to this Court issuing proposed findings and conclusions to the district court with respect to core proceedings of the type that the *Stern* court has now concluded may not constitutionally be finally determined by a bankruptcy judge. If this Court issues proposed findings of fact and conclusions of law to the district court with respect to the Trustee's

Count 2 and 3 claims, an Article III tribunal with jurisdiction over the Debtors' bankruptcy cases and all arising in, under and related to proceedings will actually decide the issues. *See* 28 U.S.C. § 1334(a) and (b). That passes both Constitutional muster and facilitates the expeditious resolution of bankruptcy cases and proceedings, over which the district court now must have greater involvement.

Finally, at least two other courts have come to the same conclusion – *i.e.*, that Stern did not strip the bankruptcy courts of the authority to hear these types of claims and to propose findings of fact and conclusions of law to the district court for de novo review. *See, e.g., Field v. Lindell (In re Mortgage Store, Inc.),* No. 11-00439 JMS/RLP, 2011 WL 5056990 at *5-6 (D. Hawaii Oct. 5, 2011) (concluding that under these circumstances it must "determine what 'Congress would have intended' in light of [*Stern*'s] constitutional holding" and that "Congress' intent in enacting 28 U.S.C § 157 is clear enough on its face – Congress intended that bankruptcy courts, to the extent possible, should adjudicate cases relating to Title 11. Thus, the court has little difficulty in finding that Congress, if faced with the prospect that bankruptcy courts could not enter final judgments on certain 'core' proceedings, would have intended them to fall within 28 U.S.C. § 157(c)(1) granting bankruptcy courts authority to enter findings and recommendations."); *Paloian v. American Express Co. (In re Canopy Financial, Inc.*), No. 09B 44943, 2011 WL 3911082 (N.D. Ill. Sept. 1, 2011).

For these reasons, this Court will issue proposed findings of fact and conclusions of law to the district court with respect to that portion of the Officers' Motion addressing the Trustee's Count 2 and 3 claims against Sabolik and Smith.[9]

---

[9] Whether the parties can remove the constitutional impediment identified in *Stern* by consent is unclear. *See supra* n.8. Given that uncertainty, and given the fact that the Defendants have not yet answered the Complaint, it is unclear whether the Defendants would consent to this Court finally determining the claims asserted against them by the Trustee (even assuming consent works). *See* Fed. R. Bankr. P. 7012(b)(requiring a defendant to state if he

With respect to the Trustee's Count 1, 4 and 5 claims against Linehan, the Outside Directors, and Letson (none of whom filed proofs of claim against the Debtors), the Trustee also asserts that these claims are "core" under 28 U.S.C. § 157(b)(2)(O) because they affect "the liquidation of the assets of the estate."  While it is true that the Trustee seeks to liquidate her claims against these defendants, which claims are assets of the Debtors' estates, it appears we have another statutorily defined "core" proceeding over which this Court lacks constitutional authority to finally determine based upon the Supreme Court's analysis in *Stern*, to which we now turn.

Many are debating the breadth of the Supreme Court's decision in *Stern*.  The arguments are interesting and, in some instances, mind-numbing.  For today, I leave those arguments to others because I believe that the issue before me can be more simply, and practically, decided.  It would be incredibly ironic for this Court to lack constitutional authority to finally determine the Trustee's breach of fiduciary duty and corporate waste claims against Smith and Sabolik (when they actually inserted themselves into Inc.'s bankruptcy case by filing a proof of claim) as the Supreme Court has clearly held in *Stern*, but to have constitutional authority to finally determine the Trustee's breach of fiduciary duty claims (arising from substantially the same acts or failures to act) against Linehan, the Outside Directors, and Letson, who chose not to involve themselves in the Debtors' bankruptcy cases at all until they were forced to do so by the Trustee's decision to sue them here.  As a practical matter, this Court concludes that such a result is irreconcilable with the Supreme Court's analysis in *Stern*.  If this Court lacks constitutional authority to finally determine one set of breach of

---

consents to the entry of final orders or judgment by the bankruptcy judge in non-core proceedings).  If a challenge is made to these proposed findings and conclusions such that the district court is required to review them *de novo*, guidance from the district court regarding whether it believes consent suffices to remove the constitutional impediment identified in *Stern* would be of great assistance to the bankruptcy judges of this district, the Defendants, and future litigants.

**Proposed Findings and Conclusions**                                                      **Page 11**

fiduciary duty claims against two former officers of certain of the Debtors, surely it lacks constitutional authority to finally determine substantially identical sets of breach of fiduciary duty claims against other former officers and/or directors of certain of the Debtors.

Accordingly, this Court concludes that it lacks the constitutional authority to finally determine the Trustee's claims against the remaining Defendants, who have not filed proofs of claims. As such, and for the reasons discussed above, this Court will also issue proposed findings of fact and conclusions of law to the district court with respect to the balance of the Officers' Motion and the other Motions addressing the Trustee's Count 1, 4, and 5 claims against Linehan, the Outside Directors, and Letson.

### B.    The Relevant Standard for Deciding the Motions

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While a complaint need not contain detailed factual allegations, it must contain "more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007); *Jebaco Inc. v. Harrah's Operating Co. Inc.*, 587 F.3d 314, 318 (5th Cir. 2009); *McCall v. Southwest Airlines Co.*, 661 F. Supp. 2d 647, 653 (N.D. Tex. 2009). A plaintiff must allege enough facts to state a claim for relief that is "plausible" on its face. *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. This plausibility standard is not a probability requirement, but does require more than mere possibility. If a complaint "pleads facts that are merely consistent with a defendant's liability, it stops short of

the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation marks omitted). Moreover, "a court is not to strain to find inferences favorable to the plaintiff and is not to accept [as true] conclusory allegations, unwarranted deductions, or legal conclusions." *St. Paul Commodities, LLC v. DB Fleet, LLC,* No. 3:09-CV-582-L, 2009 WL 3378598, at *2 (N.D. Tex. Oct. 21, 2009) (citing *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005)).

The Supreme Court held in *Iqbal* that the "plausibility" standard articulated in *Twombly* applies in all civil cases. *Morgan v. Hubert*, 335 Fed. Appx. 466 (5th Cir. 2009) (discussing *Iqbal*). The Supreme Court has set out a two-pronged approach for reviewing a motion to dismiss for failure to state a claim. *Iqbal,* 129 S. Ct. at 1949-50; *McCall*, 661 F. Supp. 2d at 653. First, the reviewing court may identify those statements in a complaint that are actually conclusions, even if presented as factual allegations. *Iqbal*, 129 S. Ct. at 1949-50; *McCall*, 661 F. Supp. 2d at 653. Such conclusory statements, unlike proper factual allegations, are not entitled to a presumption of truth. *Iqbal*, 129 S. Ct. at 1949-50; *McCall*, 661 F. Supp. 2d at 653. It is the conclusory nature of the statements rather than any fanciful or nonsensical nature "that disentitles them to the presumption of truth." *Iqbal*, 129 S. Ct. at 1951; *McCall*, 661 F. Supp. 2d at 653. Second, the reviewing court presumes the truth of any remaining "well-pled factual allegations," and determines whether these factual allegations and their reasonable inferences plausibly support a claim for relief. *Iqbal*, 129 S. Ct. at 1950; *McCall*, 661 F. Supp. 2d at 653.

### C.     The Duties of Loyalty and Due Care Under Delaware Law

The duty of loyalty is most classically invoked when a director stands on both sides of a transaction and it prohibits the director from deriving any personal benefit through self-dealing. *Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171 (Del. 1988). Until fairly recently,

the Delaware courts spoke in terms of a "triad" of fiduciary duties: that of good faith, loyalty and due care.  *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993), *modified on other grounds*, 636 A.2d 956 (Del. 1994).  In two decisions rendered in 2006, the Delaware Supreme Court both clarified that the duty of good faith is not a standalone, separate duty but rather is an element of the duty of loyalty, and defined its contours.  *See Stone v. Ritter*, 911 A.2d 362 (Del. 2006) and *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27 (Del. 2006).  Thus, the duty of loyalty now encompasses cases where the fiduciary fails to act in good faith.  *Stone v. Ritter*, 911 A.2d at 370 ("the fiduciary duty of loyalty is not limited to cases involving a financial or other cognizable fiduciary conflict of interest . . . a director cannot act loyally towards the corporation unless she acts in the good faith belief that her actions are in the corporation's best interest") (*quoting Guttman v. Huang*, 823 A.2d 492, 506 (Del. Ch. 2003)).[10]

However, also until fairly recently, the duty to act in good faith has been "relatively uncharted," *Disney*, 906 A.2d at 64, and it is has often been discussed, as in the *Disney* case itself, in the context of a discussion on the duty of care, although the Delaware Supreme Court has now made clear that it is a sub-set of the duty of loyalty.  The *Disney* court noted that at least "three different categories of fiduciary behavior are candidates for the 'bad faith' perjorative label."  *Id*.  The first category identified by the *Disney* court involves "'subjective bad faith,' that is, fiduciary conduct motivated by an actual intent to do harm.  That such conduct constitutes classic, quintessential bad faith is a proposition so well accepted in the liturgy of fiduciary law that it borders on axiomatic."  *Id*.  The second category, at the opposite end of the spectrum, is conduct which

---

[10] The Court therefore rejects the Outside Directors' argument that the Trustee must plead facts showing that the Outside Directors either stood on both sides of a transaction or that the Board's decision was motivated by extraneous considerations or influence, rather than the corporate merits of the decision.

involves a lack of due care – "that is, fiduciary action taken solely by reason of gross negligence and without any malevolent intent." *Id.* The *Disney* court concluded that such gross negligence, including a failure to inform oneself of available material facts, without more, cannot constitute bad faith. *Id.* at 65 - 66. The *Disney* court then discussed the third category, which lies between the first two on the spectrum - conduct involving "intentional dereliction of duty, a conscious disregard for one's responsibilities." *Id.* at 66. The *Disney* court held that such conduct is properly treated as a violation of the fiduciary duty to act in good faith, for two reasons:

> First, the universe of fiduciary misconduct is not limited to either disloyalty in the classic sense ( *i.e.,* preferring the adverse self-interest of the fiduciary or of a related person to the interest of the corporation) or gross negligence. Cases have arisen where corporate directors have no conflicting self-interest in a decision, yet engage in misconduct that is more culpable than simple inattention or failure to be informed of all facts material to the decision. To protect the interests of the corporation and its shareholders, fiduciary conduct of this kind, which does not involve disloyalty (as traditionally defined) but is qualitatively more culpable than gross negligence, should be proscribed. A vehicle is needed to address such violations doctrinally, and that doctrinal vehicle is the duty to act in good faith. The Chancellor implicitly so recognized in his Opinion, where he identified different examples of bad faith as follows:
>
> > The good faith required of a corporate fiduciary includes not simply the duties of care and loyalty, in the narrow sense that I have discussed them above, but all actions required by a true faithfulness and devotion to the interests of the corporation and its shareholders. A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties. There may be other examples of bad faith yet to be proven or alleged, but these three are the most salient.
>
> Those articulated examples of bad faith are not new to our jurisprudence. Indeed, they echo pronouncements our courts have made throughout the decades.

*Disney*, 906 A.2d at 66. Second, the *Disney* court noted that the Delaware legislature has recognized

this "intermediate category of fiduciary misconduct, which ranks between conduct involving subjective bad faith and gross negligence," *Disney* at 67, in section 102(b)(7)(ii) of the Delaware General Corporation Law, which authorizes a Delaware corporation to include a provision in its certificate of incorporation exculpating directors from monetary damage liability for a breach of the duty of care with certain exceptions, one of which is for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law. The *Disney* court noted that because the statute exculpates directors only for conduct amounting to gross negligence, its denial of exculpation for acts not in good faith must encompass the intermediate category of misconduct.

In *Stone v. Ritter*, 911 A.2d 362 (Del. 2006), the Delaware Supreme Court refined its analysis further, in the context of what has become known as a *Caremark* claim – *i.e.*, a claim predicated on a board's failure to exercise corporate oversight – which derives its name from *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996). The *Caremark* case itself involved the court's consideration of a settlement of a suit involving claims that the board of directors of Caremark International, Inc. ("Caremark") breached their fiduciary duty of care to Caremark in connection with alleged violations by Caremark employees of federal and state laws regulating health care providers. As the *Caremark* court noted, the complaint before it did not allege either director self-dealing or "the more difficult loyalty-type problems arising from cases of suspect director motivation." *Caremark*, at 967. Instead, the complaint alleged that Caremark's board "allowed a situation to develop and continue which exposed the corporation to enormous legal liability and that in so doing they violated a duty to be active monitors of corporate performance," which the *Caremark* court characterized as "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *Id*.

The *Caremark* court then noted that liability for a breach of the duty to exercise appropriate attention may arise in two distinct contexts: liability may arise from a board decision that results in a loss because that decision was ill-advised or negligent, or it may arise from an unconsidered failure of the board to act in circumstances in which due attention would have prevented the loss.   The *Caremark* court noted that the former cases are subject to review under the business judgment rule, so long as the decision made was the result of a process that was either deliberately considered in good faith or was otherwise rational.  *Id.*  In such cases, compliance with the duty of care is not judged by reference to *the content* of the board decision, but rather by the process employed in reaching the decision.   The second category of cases in which director liability is possible results from "unconsidered inaction." *Caremark*, at 968.  In such cases, the *Caremark* court held that "only a sustained or systematic failure of the board to exercise oversight – such as an utter failure to attempt to assure a reasonable information and reporting system exists - will establish the lack of good faith that is a necessary condition to liability.  Such a test of liability – lack of good faith as evidenced by a sustained or systematic failure of a director to exercise reasonable oversight – is quite high." *Caremark*, at 971.

As noted by the court in *In re Citigroup Shareholder Deriv. Litig.*, 964 A.2d 106, 122-23 (Del. Ch. 2009), although the *Caremark* decision, which articulated the standard for "oversight liability," involved a claim for breach of the duty of care, the Supreme Court in *Stone* (i) explicitly approved the *Caremark* standard for oversight liability cases,  (ii) made clear that the duty breached in such cases is the duty to act in good faith, and (iii) made clear that the duty of good faith is not a stand-alone liability, but rather is a subsidiary element – *i.e.*, a condition, of the duty of loyalty.  The *Stone* court further held that the necessary conditions predicate for director oversight liability are:

> (a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention.  In either case, imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations.  Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith.

*Stone*, 911 A.2d at 370.

Cases subsequent to *Caremark* and *Stone* have construed an oversight liability claim as one requiring "proof that a director acted inconsistent with his fiduciary duties and, most importantly, that the director *knew* that he was so acting."  *In re Massey Energy Co.,* C.A. No. 5430-VCS, 2011 WL 2176479 (Del. Ch. May 31, 2011).   In other words, a plaintiff must allege that "a director *knowingly* violated a fiduciary duty or failed to act in violation of a *known* duty to act, demonstrating a *conscious* disregard for her duties."  *In re Citigroup Shareholder Deriv. Litig.*, 964 A.2d 106, 125 (Del. Ch. 2009) (emphasis in original). As the Delaware Supreme Court has noted, "there is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties."  *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009).  A plaintiff must plead facts "suggesting that the board knew that internal controls were inadequate, that the inadequacies could leave room for illegal or materially harmful behavior, and that the board chose to do nothing about the control deficiencies that it knew existed."  *Desimone v. Barrows*, 924 A.2d 908, 940 (Del. Ch. 2007) (finding that complaint alleging abdication of the board's duty to monitor compliance with applicable laws and regulations governing issuance of stock options failed to state a claim).  In the transactional context, "an extreme set of facts is required to sustain a disloyalty claim premised on the notion that disinterested directors were intentionally disregarding their duties."  *Lyondell*, 970 A.2s at 243.

The typical *Caremark* claim involves a claim that the board is liable for damages that arise from a failure to properly monitor or oversee employee misconduct or legal violations. *In re Citigroup Shareholder Deriv. Litig.*, 964 A.2d 106, 122-23 (Del. Ch. 2009). However, in *Citigroup*, the plaintiffs attempted to state *Caremark* oversight liability claims where they alleged that the board ignored "red flags" respecting the impending financial crisis in the housing market and thus failed in their duty of oversight to prevent Citigroup's involvement in the subprime mortgage market, leading to inappropriate business risk. The *Citigroup* court found that this was a "bit of a twist" on the traditional *Caremark* claim, noting that:

> when one looks past the lofty allegations of duties of oversight and red flags used to dress up these claims, what is left appears to be plaintiff shareholders attempting to hold the director defendants personally liable for making (or allowing to be made) business decisions that, in hindsight, turned out poorly for the Company. Delaware courts have faced these types of claims many times and have developed doctrines to deal with them – the fiduciary duty of care and the business judgment rule. These doctrines properly focus on the decision-making process rather than on a substantive evaluation of the merits of the decision.

*Citigroup*, 964 A.2d at 124. While acknowledging a duty of oversight, the *Citigroup* court held that the obligation to implement and monitor a system of oversight

> does not eviscerate the core protections of the business judgment rule – protections designed to allow corporate managers and directors to pursue risky transactions without the specter of being held personally liable if those decisions turn out poorly. Accordingly, the burden required for a plaintiff to rebut the presumption of the business judgment rule by showing gross negligence is a difficult one, and the burden to show bad faith is even higher . . . the presumption of the business judgment rule, the protection of an exculpatory § 102(b)(7) provision, and the difficulty of proving a *Caremark* claim together function to place an extremely high burden on a plaintiff to state a claim for personal director liability for a failure to see the extent of a company's business risk.

*Citigroup*, 964 A.2d at 125 (finding that plaintiffs did not state a claim for failure of oversight). The *Citigroup* court held that to recognize the claims before it under a theory of director oversight

liability would

> undermine the long established protections of the business judgment rule.  It is well established that the mere fact that a company takes on business risk and suffers losses – even catastrophic losses – does not evidence misconduct, and without more, is not a basis for personal director liability.  That there were signs in the market that reflected worsening conditions and suggested that conditions may deteriorate even further is not an invitation for this Court to disregard the presumptions of the business judgment rule and conclude that the directors are liable because they did not properly evaluate business risk.  What plaintiffs are asking the Court to conclude from the presence of these 'red flags' is that the directors failed to see the extent of Citigroup's business risk and therefore made a 'wrong' business decision by allowing Citigroup to be exposed to the subprime mortgage market.

*Citigroup*, 964 A.2d at 130.

In sum, notwithstanding the plaintiff's attempts to plead their theory of the case as a *Caremark* claim, the *Citigroup* court declined to extend the oversight liability theory to a claim alleging a failure to monitor business risk in Citigroup's operations.  Instead, that court reviewed that claim under the duty of care and the business judgment rule.

Under Delaware law, the duty of care requires that in making business decisions, corporate directors must consider all material information reasonably available.  *San Antonio Fire & Police Pension Fund v. Amylin Pharmaceuticals, Inc.*, 983 A.2d 304 (Del. Ch. 2009).  The appropriate standard to establish a breach of the duty of care is one of gross negligence, which has been defined as "reckless indifference" or conduct beyond the "bounds of reason." *McPadden v. Sidhu,* 964 A.2d 1262 (Del. 2008). As one court has noted, the definition of gross negligence in Delaware corporate law is "extremely stringent."  *In re Lear Corp. Shareholder Litig.*, 967 A.2d 640, 652 (Del. Ch. 2008).  The challenged decision must be "so grossly off-the-mark as to amount to reckless indifference or a gross abuse of discretion." *Id. (quoting Solash v. Telex Corp.*, 1988 WL 3587 at *9 (Del. Ch. Jan. 19, 1988)).  The standard for judging the informational component of the directors'

decision-making "does not mean that the board must be informed of every fact. The board is responsible for considering only material facts that are reasonably available, not those that are immaterial or out of the board's reasonable reach." *San Antonio Fire & Police Pension Fund*, 983 A.2d at 318.[11]

With these principles firmly in mind, the Court turns to an analysis of the Motions.

### D.    The Outside Directors' (minus Letson) Motion

As against the Outside Directors, the Trustee alleges that at all relevant times, each was a member of the Board and, as such, each owed the fiduciary duties of loyalty and due care to Inc. and its shareholders. Further, the Trustee alleges that Inc. was insolvent no later than May 2008, and upon its insolvency, the Outside Directors' fiduciary duties extended to Inc.'s creditors. The Trustee alleges that each of the Outside Directors breached those duties, individually and collectively, as follows:

(i) They knowingly failed to make informed decisions critical to the ongoing business operations of Inc. and the Operating Subsidiaries.

(ii) By their total lack of active involvement in the business operations of Inc. and the Operating Subsidiaries, they demonstrated a conscious disregard and indifference for their fiduciary duties with respect to the management of Inc.'s business operations, and this reckless disregard and indifference to their fiduciary duties constitutes bad faith.

---

[11] Most commonly, the standards governing fiduciary obligations in the corporate context are discussed with respect to directors, who are most often the targets of shareholder litigation. Therefore, much of the language used by the Delaware courts focuses on the standards applicable to directors. However, "Delaware fiduciary duties are based in common law and have been carefully crafted to define the responsibilities of directors *and managers*, as fiduciaries, to the corporation. In defining these duties, the courts balance specific policy considerations such as the need to keep directors *and officers* accountable to shareholders and the degree to which the threat of personal liability may discourage beneficial risk taking. These common law standards thus govern the duties that directors *and officers* owe the corporation as well as claims such as those for "reckless and gross mismanagement," even if those claims are asserted separate and apart from claims of breach of fiduciary duty." *In re Citigroup Shareholder Litig.*, 964 A.2d 106, 115, n. 6 (Del. Ch. 2009) (emphasis added). Delaware law does not recognize an independent cause of action against corporate officers and directors for reckless and gross mismanagement; such claims are treated as claims for breach of fiduciary duty. *Id.*

(iii)   They failed to provide oversight in the management of Inc.'s business during the critical period of December, 2007 through August 22, 2008 and failed to employ a financial crisis manager to operate the businesses of the Operating Subsidiaries.

(iv)   They failed to ensure that Inc. and the Operating Subsidiaries established and maintained proper financial accounting methods for their ongoing operations.

(v)   They failed to perform any of their duties as members of Board committees, including the operations committee that was responsible for overseeing the business operations of Inc.

(vi)   They failed to develop a plan, process or procedure to address the declining financial condition of Inc. and the Operating Subsidiaries.

(vii)   They improperly delegated decision-making authority for Inc. and the Operating Subsidiaries to Sabolik and Smith following Linehan's involvement in a car accident on July 18, 2008.

(viii)   They improperly delegated to Sabolik and Smith decision-making authority for terminating the business operations of Inc. and the Operating Subsidiaries and for the "orderly liquidation" of their operating assets.

(ix)   They failed to take any steps to preserve the going concern value of the Operating Subsidiaries' business operations and to preserve the value of SRI and SRI 2's accounts receivable.

The Complaint does not identify which of these nine items the Trustee contends constitute a breach of the fiduciary duty of care, and which she contends constitute a breach of the fiduciary duty of loyalty.  The Trustee simply alleges that as a direct and proximate result of these acts and omissions, Inc. and the Operating Subsidiaries and their respective creditors suffered substantial damages and the assets of Inc. were impaired.  For these alleged breaches, the Trustee seeks damages consisting of at least the total amount of unpaid creditors' claims, which is estimated to be in excess of $21.5 million.  The Trustee further alleges that the damages sustained relate to (i) the loss of payments due to SRI and SRI 2 from Medicare and other insurers, (ii) the loss of value of SRI's and Winmar's businesses, which were allegedly fraudulently transferred to Med 4 Home, Inc. ("Med 4

Home");[12] (iii) the loss of the full going concern value of Winmar, (iv) the loss of funds preferentially and/or fraudulently transferred by Inc. to Inc.'s insiders and to certain of Inc.'s creditors; and (v) the administrative fees and expenses incurred by the bankruptcy estates of Inc. and the Operating Subsidiaries to administer these bankruptcy estates, to liquidate their assets, and to prosecute the claims and causes of actions arising from the Defendants' gross negligence.

The Complaint is lengthy. The Outside Directors note that with respect to the claims pled against them, the Trustee essentially complains of the Outside Directors' acts/omissions in four factual areas, and the Trustee agrees, for the most part, with this characterization.[13] First, the Outside

---

[12] The Trustee's fraudulent transfer action against Med 4 Home is pending in this Court as Adv. Pro. No. 10-3061-BJH.

[13] With respect to the nine alleged acts or omissions pled in paragraph 201 of the Complaint and summarized above, the Outside Directors point out that there are no factual allegations pled that would support any claim arising from their alleged failure to hire a financial crisis manager to operate the businesses of the Operating Subsidiaries or their alleged failure to ensure that Inc. and the Operating Subsidiaries established and maintained proper financial accounting methods for their ongoing operations. They further point out that the Trustee has not, in her opposition to their motion to dismiss, pointed to any factual allegations that support those claims. The Court agrees with the Outside Directors. To the extent the Trustee relies upon those alleged failures to establish the Outside Directors' liability for breach of fiduciary duty, the Complaint fails under *Twombly* to state a plausible claim for relief.

The Outside Directors further argue that the Trustee has not pled sufficient facts supporting her claim as it relates to the Outside Directors' alleged failure to perform any of their duties as members of Board committees, including the operations committee, and argue that the Trustee has not responded to their arguments regarding the sufficiency of the allegations supporting this alleged failure, such that the Trustee has abandoned this basis of liability. While the Court agrees that the Trustee's opposition to the Outside Directors' Motion did not address this issue, the Trustee's counsel argued at the hearing on the Motions that she has not abandoned this basis for imposing liability.

Here, to the extent that the Trustee has not abandoned this basis for liability, the Court concludes that insufficient facts are pled in the Complaint to state a plausible claim. First, Geary is not alleged to have even served on any committee. Second, while Dudinsky is alleged to have served on the "reimbursement and lobbying" committee, the Complaint fails to allege what functions that committee was supposed to perform or that it did not perform those functions. Privett is alleged to be the sole member of an "audit" committee; but again, the Complaint does not allege what functions that committee was supposed to perform or that it did not perform them. Hansen is alleged to have served on the "operations" committee. The Complaint does not allege what that committee was supposed to do other than to "assist in the operations of the Soporex business." *Compl.*, ¶ 20. The only other allegation about the operations committee is that it did not meet and that it never did anything to assist the Board. The Court agrees with the Outside Directors that "merely alleging that Hansen was a member of a committee and that such committee did not meet falls far short of establishing a plausible [breach of fiduciary duty] claim against Hansen." *Br. In Supp. Of First Amended Mot. To Dismiss filed by John Dudinsky, Jr., Ronald G. Geary, Thomas Hansen and Doyle Privett*, p. 22.

---

**Proposed Findings and Conclusions**                                                                                   **Page 23**

Directors note that the Trustee's allegations appear to take issue with the Board's decision to enter into an agreement with Carecentric National, LLC ("Carecentric") for billing services (the "Carecentric Allegations"). *See Compl.*, ¶¶ 49-77. Specifically, the Trustee alleges that when Inc. and SRI acquired a respiratory pharmaceutical business with 26,000 active patients in 2006, it did not have a billing and collection system in place to service those patients and therefore hired an outside vendor, Carecentric, to perform that function pursuant to a letter agreement signed in March, 2006. The Trustee alleges that the letter agreement called for the execution of a more formal and detailed contract within a month, but negotiations "dragged on" and the formal agreement was not signed until May 2007. *Compl.*, ¶ 52. The Trustee alleges that Carecentric performed very poorly under the letter agreement, which resulted in millions of dollars of uncollected accounts receivable, and notwithstanding that alleged fact, the Board "rubber-stamped" the officers' request to approve the more formal agreement with Carecentric following an April 25, 2007 Board meeting. *Compl.*, ¶¶ 64-65.

Second, the Outside Directors note that the Trustee appears to contend that the Board did not sufficiently address the continuing financial decline of Inc. and the Operating Subsidiaries (the "Financial Decline Allegations"). Specifically, the Trustee alleges that in the first quarter of 2008, Inc.'s primary lender under a revolving credit facility was acquired by GE Business Financial Services, Inc. ("GE"). At that time, funds had been over-advanced under the credit facility, such that GE sent a default letter in May, 2008, *Compl.*, ¶ 88, stating that GE would not be making any further advances. Although the Trustee concedes that the Outside Directors were not told of a forebearance agreement with GE or that the Operating Subsidiaries lacked the cash needed to operate beyond July, 2008, the Trustee alleges that the Outside Directors had been informed that Inc. had committed a

"major breach" of its credit agreement, and thus the Outside Directors were on notice of Inc.'s and the Operating Subsidiaries' "dire" financial condition, and that despite this knowledge, "the Outside Directors took no action to remedy Soporex's financial crisis and they failed to investigate the financial consequences of Soporex's breach." *Compl.*, ¶ 91. The Trustee further alleges that the Outside Directors were aware of the significant billing and collection problems, the write-offs of bad debt due to Carecentric's poor performance, a decrease in the reimbursement rate for Albuterol (a respiratory medication), GE's notice of default letter, and the termination of credit by one of Soporex's primary pharmaceutical suppliers, and yet the Board held no meetings. *Compl.*, ¶¶ 150-151.

Third, the Outside Directors note that the Trustee alleges some facts attempting to plead that the Board's decision to file a bankruptcy petition for relief under chapter 7 rather than one under chapter 11 was a breach of their fiduciary duties (the "Bankruptcy Decision Allegations"). *See Compl.*, ¶¶ 159-174.

Fourth and finally, the Outside Directors note that the Trustee alleges some facts that attempt to plead that the Board approved a corporate resolution authorizing chapter 7 filings which constituted an improper delegation of decision-making authority for Inc. and the Operating Subsidiaries to Sabolik and Smith, and an abdication of their duties (the "Corporate Resolution Allegations"). *See Compl.* ¶¶ 169-180.

The parties have thus focused their attention primarily upon the Carecentric Allegations, the Financial Decline Allegations, the Bankruptcy Decision Allegations and the Corporate Resolution Allegations. The Court will analyze these allegations in detail after addressing a threshold matter in dispute between the parties as explained below.

In short, the parties disagree about the proper application of the business judgment rule at the pleading stage. The Trustee asserts that the business judgment rule is an affirmative defense, such that her complaint need not "plead around" the business judgment rule or negate this affirmative defense, citing to *Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229 (3rd Cir. 2005). In *Tower Air*, the Third Circuit noted that

> [g]enerally speaking, we will not rely on an affirmative defense such as the business judgment rule to trigger dismissal of a complaint under Rule 12(b)(6). A complaint may be dismissed under Rule 12(b)(6) where an unanswered affirmative defense appears on its face, however. Stanziale's Amended Complaint declares that the business judgment rule does not vitiate any of his claims. He thus must plead that he overcomes the presumption created by that rule – that Tower Air's directors and officers acted in good faith and on an informed basis.

*Tower Air*, 416 F.3d at 238. The Trustee asserts that since she did not reference the business judgment rule in her Complaint, she is not required to plead facts to overcome the presumption it creates.

The *Tower Air* decision has been criticized. *See, e.g., In re IT Group, Inc.*, No. 02-10118, 2005 WL 3050611 at *8, n. 10. More importantly, it has been rejected in this district.[14] United States District Judge Barbara Lynn recently had this issue squarely before her in *Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645 (N.D. Tex. 2011). In the *Kaye* case, the defendant corporate directors argued that the plaintiff liquidating trustee must "plead around" the presumption created by the business judgment rule in order to survive a motion pursuant to Rule 12(b)(6). The plaintiff, citing *Tower Air*, argued that he need not allege facts from which the court could reasonably infer that the presumption was rebutted. The district court in *Kaye* first recognized that Delaware's courts have held unambiguously that *the plaintiff* bears the burden of proof to rebut the business judgment

---

[14] The Court also notes that *Tower Air* was decided pre-*Twombly*.

rule's presumption.[15]  The district court then noted:

> [b]y definition, an affirmative defense is a defense that "[t]he defendant bears the burden of proving." *Black's Law Dictionary* (9th ed. 2009). Thus, describing the presumption created by the business judgment rule as an affirmative defense is, at best, a dubious characterization of the rule.  In *Tower Air,* the court observed that "Delaware courts consider Chancery Rule 8's specificity requirements as consonant with notice pleading, but such notice pleading bears scant resemblance to the federal species." *Tower Air,* 416 F.3d at 236–37. This led the Third Circuit to hold that "[t]he District Court [had] erred by assuming that Delaware's notice pleading cases are interchangeable with federal notice pleadings cases." *Id.* at 237. Even if this Court were to accept the conclusion that Delaware and federal courts interpret their textually identical notice pleading rules differently, a difference regarding the level of detail each requires of a plaintiff's factual allegations does not warrant relegating the business judgment rule to a defense that corporate directors and officers may successfully assert only after discovery. As one Delaware district court concluded, "[The] protections [of the business judgment rule] are a substantive point of law that ... stands largely independent ... of ... the notice purpose inherent in procedural rules of pleading." *In re IT Group, Inc.,* No. 02–10118, Civ. A. 04–1268–KAJ, 2005 WL 3050611, at *8 n. 10 (D.Del. Nov. 15, 2005) (citations omitted).
>
> An examination of *Tower Air's* practical consequences further justifies not applying it here. Allowing plaintiffs to avoid the business judgment rule's effects by omitting any mention of it from their pleadings provides plaintiffs "a powerful and perverse incentive to 'dummy-up' about the obvious implications of the business judgment rule when drafting their complaints in the first instance." *Id.* Thus, "because [*Tower Air*] sees a problem not when facts are omitted but only when they are presented, the predictable and unfortunate result will be deliberately obtuse allegations." *Id.* Such an outcome "truly bears scant resemblance to the operation of the business judgment rule in Delaware courts." *Id.* Therefore, the Court declines to apply *Tower Air* here.

*Kaye*, 453 B.R. at 679-80.

Instead, the district court held that in order to state a claim for breach of fiduciary duty under

Delaware law that is plausible on its face, a plaintiff must plead factual content that allows the court

to draw the reasonable inference that in making the challenged decision, the directors or officers

---

[15] As the district court noted, Delaware courts require plaintiffs to plead "facts sufficient to rebut the presumption.  On a motion to dismiss, the pled facts must support a reasonable inference that in making the challenged decision, the board of directors breached either its duty of loyalty or duty of care." *Gantler v. Stephens*, 965 A.2d 695, 705-06 (Del. 2009).

breached their duties of loyalty or care, and a plaintiff may not simply allege that a fiduciary "undertook a business strategy that was all consuming and foolhardy and that turned out badly and thereby seek to have the court infer that the later failure resulted from [a breach of the duties of care or loyalty]." *Id*. at 680 (quoting *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 197 (Del. Ch. 2006), *aff'd* 931 A.2d 438 (Del. 2007)). As the district court pointed out, such allegations "are merely consistent with wrongdoing, and often have an obvious alternative explanation – that sometimes business strategies and decisions do not pan out despite the best intentions and the most exacting care." *Kaye*, 453 B.R. at 680.

This Court finds *Kaye* persuasive, and thus concludes that the Trustee must plead factual content sufficient to rebut the presumption afforded the Outside Directors by Delaware's business judgment rule. Under that rule, the business decisions of a company's board are insulated by a presumption that in making a business decision, the directors acted "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Gantler v. Stephens*, 965 A.2d 695, 705-06 (Del. 2009). The party challenging the directors' decision bears the burden of rebutting the presumption afforded by the business judgment rule. *Id.* at 706. To rebut the presumption, the plaintiff must show that the board breached the duty of loyalty or the duty of care. *Id*. If the plaintiff fails to rebut the presumption, the decisions of the directors will not be disturbed unless they acted in a manner that cannot be attributed to a rational business purpose. *Brehm v. Eisner*, 746 A.2d 244, 264 (Del. 2000). Therefore, to withstand a 12(b)(6) motion, the Trustee must have alleged facts plausibly showing that the Outside Directors' actions were the result of disloyalty or lack of due care, or that their conduct cannot be attributed to a rational business purpose. *Kaye*, 453 B.R. at 679.

The Court will address the Carecentric Allegations, the Financial Decline Allegations, the Bankruptcy Decision Allegations, and the Corporate Resolution Allegations in turn.

### 1. The Carecentric Allegations

The Trustee alleges that when they acquired the pharmacy business in 2006, Inc. and SRI had only 15 business days to prepare for operations involving over 26,000 patients, and that SRI could not establish its own billing and collection system because the majority of patients were Medicare or Medicaid patients, so collections had to be processed electronically through the Medicare and Medicaid reimbursement programs and no one initially hired by Inc. had the requisite expertise to set up these systems. *Compl.*, ¶ 44-47. Therefore, according to the Trustee, (i) Inc. had to use an outside vendor, and Carecentric was chosen, *Compl.*, ¶ 49, and (ii) Carecentric and Inc. entered into a letter agreement in March of 2006, which agreement called for the execution of a more extensive written contract within a month. *Compl.*, ¶¶ 51-52. As noted previously, the Trustee alleges that negotiations for the written contract "dragged on," such that the formal written contract was not signed until May, 2007. *Compl.*, ¶ 52. The Trustee further alleges that (i) almost immediately under the letter agreement, SRI experienced problems with Carecentric's performance resulting in hundreds of claims being rejected by insurers, *Compl.*, ¶ 54, (ii) in November of 2006, Inc. hired Teresa Camfield ("Camfield") to oversee Carecentric's billing and collection activities, *Compl.*, ¶ 55, (iii) later that month, Camfield prepared a report detailing the problems with Carecentric's performance and recommending corrective action and sent the report to Linehan and Sabolik, *Compl.*, ¶¶ 56- 57, (iv) despite Camfield's report, Carecentric's poor performance continued and, as a result, SRI's aged receivables continued to increase, *Compl.*, ¶ 58, (v) Inc.'s Chief Operating Officer sent an email to various corporate officers in February of 2007 expressing alarm, *Compl.*,

¶ 59, (vi) in response, Camfield also emailed those same officers, recommending that billing and collections systems be moved "in house," *Compl.*, ¶ 60, and (vii) despite those warnings, Linehan, Sabolik and Smith failed to immediately bring collections in-house and instead recommended to the Board in April, 2007 that it approve the formal contract between Soporex and Carecentric. *Compl.*, ¶ 61.

According to the Trustee, the contract that the Board approved at the April, 2007 Board meeting contained a limitation of liability provision that limited Carecentric's liability for damages to the total amount of fees paid to it by Inc. *Compl.*, ¶ 62-63. The Trustee alleges that at the time of the April, 2007 Board meeting, Linehan, Sabolik and Smith were aware that Carecentric had negligently performed under the initial letter agreement, that SRI would have to write off nearly $3 million in bad debt due to Carecentric's failure to perform, and that they knew or should have known that the total fees paid to Carecentric as of the date of the Board meeting was approximately $900,000, such that Inc. would not be able to recover the full amount of damages it had already sustained as a result of Carecentric's poor performance. *Compl.*, ¶¶ 64 - 65. The Trustee further alleges that despite this knowledge and "with no apparent discussion about the fact that (i) CareCentric had materially breached the CareCentric Letter Agreement, (ii) SRI had already sustained over $3 million in damages as a result of such breach, and (iii) Soporex would not be able to recover these damages based upon the contractual limitation on damages contained in the CareCentric Services Agreement, the Soporex Board 'rubber-stamped' Linehan's and Smith's request to approve the CareCentric Services Agreement." *Compl.*, ¶ 65.

However, at that same April, 2007 Board meeting, the Trustee alleges that the Board also approved an agreement between Inc. and Convergent Media Network, Ltd. ("CMAEON") to provide

the software and data processing systems necessary to bring the billing and collection functions in-house, although the Trustee alleges that decision was made without "appropriate due diligence" to determine whether CMAEON could provide the necessary services. *Compl.*, ¶ 68-69. The Trustee alleges that unbeknownst to Inc., CMAEON had to write and construct the software system from scratch. *Compl.*, ¶ 70. The Trustee also alleges that (i) it was not until November, 2007 that Inc.'s officers finally instructed others to transfer SRI's billing and collections systems to in-house systems. *Compl.*, ¶ 67, and at a December, 2007 Board meeting, the Board was told that the transition of the systems from Carecentric to an in-house system was not yet complete, *Compl.,* ¶ 71, (ii) Inc. was not able to use the in-house system until February, 2008, *Compl.*, ¶ 72, and (iii) when Carecentric learned that Inc. was moving its systems in-house, Carecentric denied Inc. access to its data, which was stored on Carecentric's servers, so Inc. was unable to bill and collect, and had to hire Med Staff Plus, Inc. ("Med Staff") at a cost of $100,000 per month to try to collect its accounts. *Compl.*, ¶ 75. The Trustee further alleges that (i) in July, 2008, Inc. also brought its "re-billing" functions in-house, because it could no longer afford to pay Med Staff, *Compl.*, ¶ 76, (ii) the re-billing process was terminated in August of 2008, when Inc. shut its doors, and (iii) SRI had to write off bad debt of in excess of $7 million, and a substantial portion of this loss could have been avoided if SRI's billing and collection functions had been brought in-house in February, 2007. *Compl.*, ¶ 77.

Next, the Trustee alleges that (i) the Outside Directors "never took any kind of affirmative action to address Soporex's operational and financial problems, even after significant adverse financial events were brought to their attention, such as the significant problems with the billing and collection of the SRI accounts receivable, the multimillion dollar write offs of pharmacy bad debt due to CareCentric's negligent performance . . .," *Compl.* at ¶ 150, (ii) despite being told at their

April, 2007 Board meeting of the problems with Carecentric's performance, the Outside Directors nevertheless approved the Carecentric contract, and also the agreement with CMAEON, *Compl.*, ¶ 153, and (iii) at their September, 2007 Board meeting, the Outside Directors were informed that SRI was not collecting its accounts, had written off over $2 million in bad debt, but took no corrective action. *Compl.*, ¶ 154.

As it relates to the Outside Directors' (minus Letson) Motion and stripped to their essence, all of these allegations are tantamount to a complaint that (i) the Outside Directors approved the Carecentric agreement when they shouldn't have, (ii) the Outside Directors' decision constituted a "rubber stamp" of the officers' recommendations, and (iii) the Outside Directors didn't move quickly enough to move the billing functions in-house. The Complaint contains no allegations of self-dealing with respect to the Carecentric transaction, and thus to the extent the Trustee contends that the Outside Directors' conduct breached their duty of loyalty, the Trustee must be relying on a lack of good faith.[16] The Complaint fails to allege subjective bad faith, and thus the Trustee's theory appears to be that the Outside Directors' conduct constitutes an intentional dereliction of duty or conscious disregard of their responsibilities. *Disney*, 906 A.2d at 66. At most, however, the Complaint alleges negligence (arguably, not even gross negligence), which the *Disney* court has held

---

[16] In Plaintiff's Brief in Support of Her Response in Opposition to First Amended Motion to Dismiss Filed by [the Outside Directors], the Trustee discusses the Carecentric Allegations under the "Duty of Care" sub-heading in the brief. Paragraph 201(a), (b) and (c) of the Complaint are very general, and recite largely repetitive, conclusory language which seems to relate at least in part to the Carecentric Allegations, and which use language which arguably implicates both the duty of care and the duty of loyalty. Paragraph 201(a) complains that the Outside Directors' "knowingly failed to make informed decisions critical to the ongoing business operations," which implicates the duty of care. Paragraph 201(b) complains that the Outside Directors "demonstrated a conscious disregard and indifference for their fiduciary duties with respect to the management of Soporex's business operations, and this reckless disregard and indifference to their fiduciary duties constitutes bad faith," which implicates the duty of loyalty. Paragraph 201(c) complains that the Outside Directors "failed to provide oversight in the management of Soporex's business during the critical period of December, 2007 through August 22, 2008," which implicates a *Caremark*, and thus a duty of loyalty, claim.

is insufficient to constitute bad faith for purposes of a breach of the duty of loyalty under Delaware law.

To the extent that the Trustee is attempting to assert a director oversight liability claim, the Carecentric Allegations do not rise to the level required by the decisions in *Caremark* and *Stone*. The Trustee has not alleged a "sustained or systematic failure of the board to exercise oversight." *Caremark*, 698 A.2d at 968. Moreover, the Court notes that the Trustee, like the plaintiff in *Citigroup*, is attempting to stretch the oversight liability cases beyond the factual contexts in which they have been decided. The Trustee does not allege a failure to monitor or oversee employee misconduct or legal violations. Rather, the Trustee here alleges a claim similar to that in *Citigroup* – that the Outside Directors failed to generally monitor the operations of the business and so exposed it to losses. That type of claim is most properly analyzed under a duty of care theory. Moreover, the Carecentric Allegations plead no facts supporting any inference that the Outside Directors *knew* they were acting inconsistently with their fiduciary obligations such that a director oversight liability claim would lie. *Lyondell*, 970 A.2d at 243.

Lastly, the Court notes that the Trustee's theory is somewhat undercut by her own allegations. While alleging that the Outside Directors "rubber stamped" the decision to proceed with the Carecentric agreement at their April, 2007 Board meeting, the Trustee also alleges that the Board approved the hiring of CMAEON to replace Carecentric once the needed software was constructed and that the Board received a status report on CMAEON's progress at a later Board meeting. The Trustee does *not*, tellingly, allege that Inc. had any alternative to approving the Carecentric agreement in April of 2007, that there were other outside vendors who could have provided the same service better or on more favorable terms, or that the billing and collections functions could have

been brought in-house any earlier than they were.

For all of these reasons, the Court concludes that the Trustee has not stated a plausible breach of the duty of loyalty claim against the Outside Directors to the extent she relies upon the Carecentric Allegations.

The Trustee fares no better to the extent she relies upon a breach of the duty of care claim. The Carecentric Allegations do not rise to the level of "reckless indifference" or conduct "beyond the bounds of reason," *McPadden v. Sidhu*, 964 A.2d 1262 (Del. 2008), or conduct so "grossly off-the-mark as to amount to reckless indifference or a gross abuse of discretion." *In re Lear Corp. Shareholder Litig.*, 967 A.2d 640, 652 (Del. Ch. 2008). And, as noted earlier, claims seeking to impose liability for a board decision that results in a loss because that decision was ill-advised are reviewed under the business judgment rule, without reference to the *content* of the decision but rather the process employed in reaching it. While the Trustee does allege that the Outside Directors "rubber stamped" the decision to enter into the Carecentric agreement, that conclusory statement is unsupported by any factual content and thus does not meet a plausibility standard.

Thus, the Court concludes that the Trustee's breach of fiduciary duty claim against the Outside Directors, to the extent it relies on the Carecentric Allegations, must be dismissed.

### 2. The Financial Decline Allegations

The Trustee alleges that in the first quarter of 2008, GE acquired Merrill Lynch Business Financial Services, Inc., which had entered into a revolving credit facility with Inc., SRI and two other subsidiaries of Inc. *Compl.*, ¶ 87. According to the Trustee, those borrowers were out of compliance with borrowing base covenants under the credit facility and were over-advanced at the

time of GE's acquisition. The Trustee further alleges that GE sent Inc. a default letter on May 14, 2008, *Compl.*, ¶ 88, and informed Inc. that GE would not be making any further advances. Then, according to the Trustee, Linehan and Sabolik, after receiving this default letter, sent a memo to the Outside Directors that painted too rosy a picture and told the Outside Directors that "we will be able to utilize the credit facility to meet our working capital needs through the closing of our recapitalization." *Compl.*, ¶ 89. The Trustee alleges that although Inc. entered into a forbearance agreement with GE, the Outside Directors were not informed of this development or that the Operating Subsidiaries would lack the funds necessary to operate the businesses by mid-July.

Nevertheless, the Trustee alleges that the Outside Directors had been informed that Inc. had committed a "major breach" of its credit agreement, and thus the Outside Directors were on notice of Inc.'s and the Operating Subsidiaries' "dire" financial condition, and that despite this knowledge, "the Outside Directors took no action to remedy Soporex's financial crisis and they failed to investigate the financial consequences of Soporex's breach." *Compl.*, ¶ 91. The Trustee alleges that in part due to Linehan's constant assurances that venture capital money was just around the corner, the Outside Directors never addressed the continuing financial decline of Soporex and the Operating Subsidiaries. *Compl.*, ¶ 136. The Trustee further alleges that the Outside Directors were aware of the significant billing and collection problems, the write-offs of bad debt due to Carecentric's poor performance, a decrease in the reimbursement rate for Albuterol (a respiratory medication), GE's notice of default letter, and the termination of credit by one of Soporex's primary pharmaceutical suppliers, and yet the Board held no meetings. *Compl.*, ¶¶ 150-151.

However, the Trustee also alleges that when Inc. determined in mid-May of 2008 that it lacked sufficient cash to operate past July, Linehan and Sabolik failed to inform the Outside

Directors of Inc.'s dire financial situation. *Compl.*, ¶ 147.  The Trustee concedes that "the Outside Directors were misled and kept in the dark about the Soporex Debtors' ever-worsening financial condition," but she alleges that the Outside Directors were provided with sufficient information from which they could and should have concluded that Linehan's and Sabolik's reports on the financial status of the Soporex Debtors were false and misleading, *Compl.*, ¶ 152, yet they took no corrective action. *Compl.*, ¶ 154.  The Trustee alleges that despite clear signs of Soporex's financial distress presented to the Outside Directors in December, 2007, none of the Outside Directors sought to convene a subsequent meeting of the Board and no meeting was held until late July, 2008. *Compl.*, ¶¶ 151, 157.

The Complaint does not specifically identify the theory upon which the Trustee contends that the Financial Decline Allegations constitute a breach of fiduciary duty.[17]  The Complaint contains no allegations of self-dealing with respect to the Financial Decline Allegations, and thus to the extent the Trustee contends that the Outside Directors' conduct breached their duty of loyalty, the Trustee must be relying on a lack of good faith.  The Complaint fails to allege subjective bad faith, and thus the Trustee's theory appears to be that the Outside Directors' conduct constitutes an intentional dereliction of duty or conscious disregard of their responsibilities. *Disney*, 906 A.2d at 66.  At most, however, the Complaint alleges negligence (arguably, not even gross negligence as defined by Delaware law), which the *Disney* court has held is insufficient to constitute bad faith for purposes of a breach of the duty of loyalty.

---

[17]In Plaintiff's Brief in Support of Her Response in Opposition to First Amended Motion to Dismiss Filed by [the Outside Directors], the Trustee discusses the Financial Decline Allegations under the "Duty of Loyalty" sub-heading in the brief.  However, as noted earlier, *see supra* n. 16, paragraph 201(a), (b) and (c) of the Complaint are general, conclusory allegations of misconduct which arguably include facts relating to the Financial Decline Allegations, yet the language used in those paragraphs arguably implicates both of the fiduciary duties of loyalty and due care.

To the extent that the Trustee is attempting to assert a director oversight liability claim, the Financial Decline Allegations do not rise to the level required by the decisions in *Caremark* and *Stone*. The Trustee has not alleged a "sustained or systematic failure of the board to exercise oversight." *Caremark*, 698 A.2d at 968.

While at first blush the Complaint contains allegations that the Board did not meet between December, 2007 and July, 2008, when it was allegedly aware of the "dire" and "critical" financial decline of Inc. and the Operating Subsidiaries, that allegation, upon closer scrutiny of the Trustee's other factual allegations (or lack thereof), is largely unsupported as to the Outside Directors' knowledge of the "dire" or "critical" financial decline; and therefore, cannot support a plausible claim that the Outside Directors knowingly and consciously disregarded known duties to act or systematically and sustainably failed to exercise oversight. The Trustee essentially points to four "red flags" that the Trustee alleges were flying and ignored by the Outside Directors, notwithstanding the fact that the Trustee concedes that "the Outside Directors were misled and kept in the dark about the Soporex Debtors' ever-worsening financial condition. . . ." *Compl.*, ¶ 152. First, the Trustee points to the "significant problems with the billing and collection of the SRI accounts receivable [and] the multimillion dollar write-offs of pharmacy bad debt due to Carecentric's negligent performance...." *Compl.*, ¶ 150. Second, the Trustee points to the "significant decrease in the Albuterol reimbursement rate...." *Id*. Third, the Trustee points to GE's "notice of default letter dated May 14, 2008...." *Id.* Fourth, the Trustee points to "the termination of available credit with Soporex's primary pharmaceuticals supplier, Harvard." *Id.*

As to the first "red flag," the Trustee alleges that the Outside Directors were informed at the April, 2007 Board meeting of problems with Carecentric's performance and that Soporex would

have to write off bad debt. The Trustee also alleges that at the September, 2007 Board meeting, the Outside Directors were again told that SRI was not collecting its accounts receivable and that SRI had written off $2.1 million in bad debt.

However, the Trustee also alleges that (i) at the April, 2007 Board meeting, the Board approved a contract with CMAEON to write software to bring the billing and collection functions in-house, *Compl.*, ¶ 69, and (ii) the Board was provided a status report about the transition of those functions to an in-house system at its December, 2007 Board meeting. *Compl.*, ¶ 71. According to the Trustee, (i) at some point (the Complaint is not clear as to when) Soporex hired a third party vendor, Med Staff, to re-submit to insurers the claims that Carecentric had failed to property submit, *Compl.*, ¶ 75, (ii) the Board was aware of this hiring by December, 2007, *Compl.*, ¶ 156, (iii) on February 1, 2008, Soporex was using its in-house system for new pharmacy orders, *Compl.*, ¶ 72, (iv) in February, 2008, Soporex sued Carecentric, *Compl.*, ¶ 74, (v) by July of 2008, Soporex had also brought the re-billing process, for which it had hired Med Staff, in-house. *Compl.* ¶ 76. These factual allegations undercut the Trustee's conclusory statements that the Outside Directors did nothing to address the problems with Carecentric. While the Trustee complains of the lack of Board meetings between December, 2007 and July, 2008, it appears that the Board had already taken corrective actions before December, 2007 – *i.e.*, a contract with CMAEON had already been signed to develop software that would allow the billing and collections system to be brought in-house and the writing of the software was underway.

As to the second "red flag," – the decrease in the Albuterol reimbursement rate – the entirety of the Trustee's factual allegations respecting this issue is as follows:

One of the significant business challenges that faced Soporex and SRI was the

change in Medicare reimbursement for AIbuterol, a respiratory medication which represented approximately 35% of SRI's sales in 2006 - 07. During the third and fourth quarters of 2007 and the first quarter of 2008, Soporex enjoyed a relatively high Medicare reimbursement rate for Albuterol. In July, 2007 the Centers for Medicare & Medicaid Services increased the Medicare reimbursement rate for Albuterol from $0.21 to $1.31 per vial, or an increase of more than 600%. At the time of this increase in the Albuterol reimbursement rate, Hewlett and Camfield warned Linehan and Sabolik that the increase in the reimbursement rate for Albuterol was a temporary increase, and that Albuterol would eventually return to its historically low reimbursement rate. As Hewlett and Camfield predicted, in the fall of 2007 federal healthcare officials proposed revised reimbursement guidelines for Albuterol and other medications which substantially decreased the Albuterol reimbursement rate. These revised guidelines were approved and implemented through legislation which was enacted on December 29, 2007.

*Compl.*, ¶¶ 78-81. The Trustee fails to allege how this change impacted Inc. or the Operating Subsidiaries, if at all. She simply alleges a change. The Trustee also fails to allege that the Board (specifically, the Outside Directors) was aware of this change. Moreover, the Trustee does not allege what the Board could have done by having a meeting to change Medicare's reimbursement rates for Albuterol or mitigate its impact, if any.

The third "red flag," – GE's notice of default letter – also requires some discussion. Of significance, there is no allegation that the Outside Directors saw this letter prior to May 22, 2008. *Compl.*, ¶ 89. Moreover, the Trustee alleges that the memo sent by Linehan and Sabolik to the Outside Directors on May 22, 2008 "portrayed a much different picture concerning Soporex's credit default than was evidenced by the May 14th letter." *Compl.*, ¶ 89. The Trustee also alleges that notwithstanding the default letter, Linehan and Sabolik told the Outside Directors that "we expect that we will be able to utilize the credit facility to meet our working capital needs through the closing of our recapitalization." *Id.* The Outside Directors were *not* told that Soporex would lack funds to operate past mid-July. *Compl.*, ¶¶ 90, 147. The Trustee further alleges that throughout 2007 and

2008, Linehan aggressively pursued what the Trustee characterizes as a "pie in the sky" business plan, which called for the acquisition of several other companies, to be funded through new capital investments by outside investors, and hired an investing banking firm to assist in that process. *Compl.*, ¶ 131. The Trustee also alleges that Linehan viewed additional acquisitions as a means to cure financial and cash flow problems. *Compl.*, ¶ 135. In addition, the Trustee alleges that Linehan sought to recapitalize Inc. and between May, 2008 and July, 2008, Inc. was discussing a $49 million investment package with Capital Resource Partners. *Compl.*, ¶ 134. According to the Trustee, the Outside Directors were assured that "venture capital money was just around the corner." *Compl.*, ¶ 136.

These allegations, taken as whole and viewed in the light most favorable to the Trustee, show that notwithstanding the GE default notice, the Outside Directors were aware of other facts that mitigated its effects. The Trustee does not allege that any of this was unreasonable.

Moreover, there are no factual allegations supporting the Trustee's "pie in the sky" characterization of the efforts to turn around what the Trustee alleges was a deteriorating financial condition. The Trustee does not allege that the Outside Directors were, or should have been, aware that these efforts would prove unsuccessful. While the Trustee's further allegation that the Outside Directors did not ask for financial reports could be consistent with the Outside Directors' liability, when taken as a whole and viewed in the light most favorable to the Trustee, the Financial Decline Allegations are just that – merely consistent with liability – and such allegations "stop[] short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 129 S.Ct. at 1949.

The fourth "red flag," – the termination of credit by a principal supplier – does not tip the scales to plausibility. Most importantly, there are simply no factual allegations that the Outside

Directors (except for Letson, who will be addressed separately below) were, or should have been, aware of this circumstance. *Compl.* ¶¶ 95-103.

For these reasons, these "red flags" do not support a claim that the Outside Directors consciously disregarded their duties by acting inconsistently with those duties with knowledge that they were so acting. Moreover, in the context of the Financial Decline Allegations, the Trustee is, once again, like the plaintiff in *Citigroup*, trying to stretch the oversight liability cases beyond the factual contexts in which they have been decided. The Trustee does not allege a failure to monitor or oversee employee misconduct or legal violations. Rather, the Trustee here alleges a claim similar to that in *Citigroup* – that the Outside Directors failed to generally monitor the operations of the business and so exposed it to losses. That type of claim is most properly analyzed under a duty of care theory. Moreover, the Financial Decline Allegations plead no facts supporting any inference that the Outside Directors *knew* they were acting inconsistently with their fiduciary obligations. *Lyondell*, 970 A.2d at 243.

The Trustee fares no better to the extent she relies upon a breach of the duty of care claim. In light of the Court's analysis above, the Financial Decline Allegations do not rise to the level of "reckless indifference" or conduct "beyond the bounds of reason," *McPadden v. Sidhu*, 964 A.2d 1262 (Del. 2008), or conduct so "grossly off-the-mark as to amount to reckless indifference or a gross abuse of discretion." *In re Lear Corp. Shareholder Litig.*, 967 A.2d 640, 652 (Del. Ch. 2008).

Thus, the Court concludes that the Trustee's breach of fiduciary duty claim against the Outside Directors, to the extent it relies on the Financial Decline Allegations, must be dismissed.

### 3. The Bankruptcy Decision Allegations

The Trustee alleges that in late July, 2008, Sabolik and Smith contacted a bankruptcy attorney, Mark Chevallier ("Chevallier") to discuss "bankruptcy options." *Compl.*, ¶ 159. According to the Trustee, although a Board meeting was held on July 28, 2008, a quorum of the Board was not present and no action was taken, although Chevallier was present. *Compl.,* ¶ 160. The Trustee alleges that additional Board meetings were held on August 6, 14 and 19, 2008. *Compl.*, ¶ 162. The Trustee further alleges that the minutes from the August 6 Board meeting show that the Board discussed having another meeting with Chevallier but that there was no discussion of what type of bankruptcy might be filed. *Compl.*, ¶ 162. According to the Trustee, Chevallier attended the August 14 Board meeting and informed the Board of its "bankruptcy options," but the Trustee alleges that there was no discussion about how Inc. or the Operating Subsidiaries might finance their operations in chapter 11 through the use of cash collateral. *Compl.*, ¶ 163. The Trustee alleges that despite the fact that Winmar was operating profitably (before being burdened with Inc.'s overhead), the Outside Directors made no effort to (i) sell Winmar as a going concern prior to filing bankruptcy, (ii) contact the people who had sold the business to Winmar to see if they would be interested in re-acquiring it, or (iii) preserve its going concern value by continuing its operations during a chapter 11 case. *Compl.*, ¶ 164.

The Trustee further alleges that the Outside Directors failed to consult with GE to see if GE would permit the use of cash collateral or would provide financing in a potential chapter 11 case, *Compl.*, ¶ 165, but "in the very last hours before the Chapter 7 cases were filed," GE contacted Sabolik and Smith and discussed the possibility of a liquidating chapter 11 case. *Compl.*, ¶ 167. The Trustee alleges that although Chevallier told the Outside Directors (other than Letson, who had

already resigned from the Board) that they could sell the Operating Subsidiaries as going concerns in chapter 11, the Outside Directors "rejected this approach and chose instead to file Chapter 7 cases . . ." and that they "never once considered the alternative of filing Chapter 11 cases to preserve the going concern value . . . ." *Compl.*, ¶ 166.

According to the Trustee, (i) on August 14, 2008, the Board deferred its consideration of a resolution authorizing a bankruptcy filing until it could meet with Linehan (who had been in a serious car accident) to seek his counsel, *Compl.*, ¶ 168, and (ii) the Board requested that Sabolik and Smith meet with Linehan in his hospital room, and thereafter, at their August 19 Board meeting, the Board adopted a resolution authorizing the filing of chapter 7 bankruptcy petitions for the debtors. *Compl.*, ¶ 169. According to the Trustee, by failing to consider or act on a chapter 11 option, the Outside Directors "wantonly disregarded their fiduciary duties of due care and loyalty . . . ." *Compl.*, ¶ 166.

Again, the Trustee does not identify whether she seeks to challenge the decision to file chapter 7 petitions rather than chapter 11 petitions under a theory of a breach of the duty of loyalty or under a theory of breach of the duty of care.[18] As noted earlier, because the Trustee has not alleged either self-dealing in the classic sense nor subjective bad faith, the only theory upon which this decision could constitute a breach of the duty of loyalty is if the Trustee pleads factual content showing plausibly that this conduct involved an intentional dereliction of duty or a conscious disregard for their responsibilities, and the Trustee must allege that the Outside Directors *knew* that they were acting inconsistently with their fiduciary duties. The Court concludes that the Complaint

---

[18] In Plaintiff's Brief in Support of Her Response in Opposition to First Amended Motion to Dismiss Filed by [the Outside Directors], the Trustee discusses the Bankruptcy Decision Allegations under both the "Duty of Care" and "Duty of Loyalty" sub-headings in the brief.

falls short.

Essentially, the Trustee argues that the Outside Directors improperly rejected chapter 11 filings. The Trustee alleges that the Outside Directors were informed of their "bankruptcy options," but rejected the idea of selling the Operating Subsidiaries as going concerns while in chapter 11.

Notably, however, the Complaint does not allege that there was any ability to finance operations in chapter 11. Nor does the Complaint allege that any higher price could have been obtained for the assets of the Operating Subsidiaries in chapter 11. The Trustee does allege that GE contacted Sabolik "in the very last hours before" the cases were filed to discuss "the possibility of a liquidating Chapter 11 case," but the Trustee alleges nothing else with respect to the companies' ability to function as going concerns in chapter 11. The Trustee's argument that the companies could have sustained operations and could have been sold as going concerns is purely speculative, devoid of factual support.[19] Moreover, the Trustee fails to allege sufficient facts showing that the Outside Directors, who had consulted with bankruptcy counsel and management, had any reason to know that a decision to file under chapter 7 instead of chapter 11 would violate their fiduciary obligations. In these circumstances, the Court cannot conclude that the Trustee has pled a plausible claim for relief on a breach of the duty of loyalty claim.

The Trustee fares no better with respect to a breach of the duty of care claim. The Trustee has not pled facts sufficient, even when viewed in the light most favorable to the Trustee, to state

---

[19] The Trustee's arguments in her brief that a chapter 11 filing would have been supported by the debtors' secured creditors is completely unsupported by her Complaint, as is her argument that Chevallier recommended a chapter 11 filing. The paragraph of the Complaint which the Trustee points to in her brief which purportedly supports her contention that she has alleged that Chevallier recommended a chapter 11 filing simply states that the defendants "were informed by Chevallier that they could sell the Operating Subsidiaries' businesses as going concerns during a Chapter 11 proceeding." *Compl.*, ¶ 166.

a plausible claim under the "extremely stringent" *In re Lear Corp Shareholder Litig.*, 967 A.2d at

652, definition of gross negligence in Delaware – *i.e.*, that the decision to file under chapter 7 rather

than under chapter 11 was beyond "the bounds of reason," *McPadden v. Sidhu*, 964 A.2d at 1262,

or "so grossly off-the-mark" as to amount to reckless indifference or a gross abuse of discretion. *Id.*

Moreover, as noted by the *Caremark* court, compliance with a director's duty of care

> can never be appropriately judicially determined by reference to *the content of the board decision* that leads to a corporate loss, apart from consideration of the good faith *or* rationality of the process employed. That is, whether a judge or jury considering the matter after the fact, believes a decision substantively wrong, or degrees of wrong extending through "stupid" to "egregious" or "irrational," provides no ground for director liability, so long as the court determines that the process employed was either rational or employed in a good faith effort to advance corporate interest. . . . the core element of any corporate law duty of care inquiry [is] whether there was good faith effort to be informed and exercise judgment.

*Caremark*, 698 A.2d at 967, 969.

Here, the Trustee's own allegations show that the Outside Directors conferred, several times,

with bankruptcy counsel, were informed of their "bankruptcy options," and consulted with Linehan

before making any decision. The Trustee has not alleged factual content from which, even

presuming its truth, the Court can reasonably infer that the process employed in reaching the decision

to file under chapter 7 rather than chapter 11 was either employed in bad faith or was irrational.

Thus, the Court concludes that the Trustee's breach of fiduciary duty claim against the

Outside Directors, to the extent it relies on the Bankruptcy Decision Allegations, must be dismissed.

### 4. The Corporate Resolution Allegations

The Trustee alleges that the corporate resolution authorizing the chapter 7 filing for Inc.

provided:

WHEREAS, as a result of [Soporex's] financial condition, it is necessary, appropriate and desirable for [Soporex] to seek protection under the United States bankruptcy laws; specifically, Chapter 7 of the U. S. Bankruptcy Code (the "Code") for the orderly liquidation of the Company. NOW, THEREFORE, BE IT RESOLVED, that [Soporex] is hereby authorized and directed to file a petition under Chapter 7 of the Code and to take any and all actions necessary, appropriate and desirable in connection with such filing and the orderly liquidation of [Soporex]. BE IT FURTHER RESOLVED, that the officers of [Soporex], or anyone of them acting alone, are hereby authorized and directed to take any and all other actions, and to negotiate, execute, deliver and file, for and on behalf of [Soporex], any and all certificates, consents and other documents, instruments and agreements as any such officer may deem necessary, appropriate or advisable in order to file such petition or otherwise carry out the purposes of these resolutions. BE IT FURTHER RESOLVED, that all actions heretofore taken by such officers of the Company in furtherance of the actions contemplated in these resolutions be, and they hereby are, ratified, adopted, and approved in all respects.

*Compl.*, ¶ 169.  The Trustee further alleges that Sabolik and Smith unilaterally determined what should be done to terminate the business operations of Inc. and the Operating Subsidiaries and used the resolutions to fraudulently transfer to Med 4 Home "Soporex's most valuable assets, namely, SRI's patient lists, files and patient records."  *Compl.*, ¶ 172.  According to the Trustee, SRI's and Winmar's businesses were sold to Med 4 Home for $40,000 hours before the bankruptcy filings, *Compl.*, ¶ 172, in part based on Sabolik's and Smith's "incorrect belief that they could face personal civil or criminal liability for 'patient dumping' if they did not transfer the patient list and patient data to some third party before ceasing SRI's business operations."  *Compl.*, ¶ 173.  The Trustee alleges that no such sanctions exist, *id.*, but their actions nevertheless were motivated by "selfish concern for their own personal welfare" and were otherwise reckless and in bad faith.  *Id.*

The Trustee's primary complaint about the Outside Directors, as opposed to Sabolik and Smith, is that they did not request any documents to determine the value of the assets of Soporex and the Operating Subsidiaries and failed to obtain a business valuation before adopting the resolution quoted above.  *Compl.*, ¶ 174.  From these facts, the Trustee alleges that the Outside Directors

improperly delegated decision-making authority for terminating the business operations and for the orderly liquidation of the assets of the Operating Subsidiaries and failed to take steps to preserve the going concern value of the Operating Subsidiaries. *Compl.*, ¶ 201.

The Trustee argues in her brief that the resolution essentially authorized Sabolik and Smith to proceed with the orderly liquidation of Winmar and SRI, and under section 271(a) of the Delaware General Corporation Law, a board of directors cannot authorize the sale of all or substantially all of the assets of the corporation without approval of the majority of shareholders, and the board cannot delegate to the officers responsibility for liquidating a corporation's assets. Thus, the Trustee argues that the Outside Directors' adoption of the resolution quoted above was an *ultra vires* act under Delaware law, which is not protected by the business judgment rule.

The first problem with the Trustee's argument is that the resolution does not constitute "carte blanche" authority to the officers to liquidate all of the assets of Inc. and the Operating Subsidiaries. Rather, the Court reads the resolution as authorizing a bankruptcy filing for the purpose of conducting an orderly liquidation. The second problem with the Trustee's argument is that even assuming the resolution is read as broadly as the Trustee suggests, the Complaint fails to allege that the Board did not obtain shareholder approval.

For the same reasons the Court has concluded that the Trustee has not pled a plausible claim for either a breach of the duty of loyalty or a beach of the duty of care with respect to the Bankruptcy Decision Allegations, *see supra* at pp. 43-45, the Court also concludes that the Trustee has not plead a plausible claim for relief against the Outside Directors for breach of either fiduciary duty with

respect to the Corporate Resolution Allegations.[20]  The Court does not read the resolution as broadly as the Trustee does.  The *sole* factual allegation against the Outside Directors is that they did not request documents to determine the value of the assets or obtain a business valuation.  This sole fact, without more, is insufficient to state a plausible claim for relief as it does not show that the Outside Directors were either intentionally derelict in their duties or were consciously aware that their adoption of the resolution authorizing the bankruptcy filings was giving the officers *carte blanche* authority with respect to the liquidation of the companies' assets.  The Trustee does not allege that the Outside Directors were otherwise unaware of the value of the assets, or were aware that the assets were worth more than could be obtained for them in chapter 7, or any non-speculative facts showing that other alternatives were available and consciously disregarded.  Nor does the Trustee allege facts showing that the adoption of this corporate resolution was "so grossly off the mark as to amount to reckless indifference or a gross abuse of discretion." *In re Lear Corp. Shareholder Litig.*, 967 A.2d 640, 652 n. 45 (Del. Ch. 2008) (*quoting Solash v. Telex Corp.*, 1988 WL 3587 (Del. Ch. Jan. 19, 1988)).

Thus, the Court concludes that the Trustee's breach of fiduciary duty claim against the Outside Directors, to the extent it relies on the Corporate Resolution Allegations, must be dismissed.

For all of these reasons, the Court concludes that Count 4 of the Complaint must be dismissed against the Outside Directors.

---

[20] In Plaintiff's Brief in Support of Her Response in Opposition to First Amended Motion to Dismiss Filed by [the Outside Directors], the Trustee discusses the Corporate Resolution Allegations under the "Duty of Loyalty" sub-heading in the brief.

E.  **Letson's Motion**

Letson has joined in the other Outside Directors' Motion with respect to Count 4, and therefore asserts all of the same bases for dismissal.  *Br. In Supp. Of Def. Mickey Letson's Mot. To Dismiss Trustee's Second Amended Compl.*, ¶ 9.  Letson also asserts an additional ground for dismissal of Count 4 – *i.e.*, the Trustee alleges that Letson resigned from the Board on July 16, 2008, *Compl.*, ¶¶ 17, 181, and thus Letson cannot be liable for alleged improper acts or omissions by the Board after that date.  The Trustee concedes that Letson is not liable for acts/omissions by the Board after July 16, 2008.  *Pltf's Br. In Supp. Of Her Resp. In Opp. To Def. Mickey Letson's Mot. To Dismiss Second Amended Compl.*, p. 9.  As applied to the Carecentric Allegations, the Financial Decline Allegations, the Bankruptcy Decision Allegations, and the Corporate Resolution Allegations, this concession alone results in the dismissal of Count 4 as to Letson to the extent Count 4 relies upon the Bankruptcy Decision Allegations and the Corporate Resolution Allegations.

With respect to the Carecentric Allegations, the Court concludes that Letson's Motion should be granted, for all of the reasons set forth above in the Court's discussion of these allegations as they apply to the other Outside Directors.  *See supra* at 32-34.  With respect to the Financial Decline Allegations, the Court concludes the same – but further discussion is required.

Since the Trustee has not pled, with respect to the Financial Decline Allegations, Letson's subjective bad faith, the Trustee must premise her duty of loyalty claim on what the *Disney* court referred to as the intermediate category of conduct – intentional dereliction of duty or a conscious disregard for one's responsibilities.  *Disney*, 906 A.2d at 66.  In its *Stone* decision, the Delaware Supreme Court held that the imposition of liability "requires a showing that the directors knew that they were not discharging their fiduciary obligations."  *Stone*, 911 A.2d at 370; *In re Massey Energy*

*Co.*, C.A. No. 5430-VCS, 2011 WL 2176479 (Del. Ch. May 31, 2011); *In re Citigroup Shareholder Deriv. Litig.*, 964 A.2d 106, 125 (Del. Ch. 2009) (emphasis in original). In such cases, "an extreme set of facts is required to sustain a disloyalty claim premised on the notion that disinterested directors were intentionally disregarding their duties." *Lyondell*, 970 A.2s at 243. The Court concludes that the one "red flag" specifically applicable to Letson – *i.e.*, that one of the Soporex Debtors' suppliers had refused to extend further credit – is insufficient, even when viewed in the light most favorable to the Trustee, to state a claim under the stringent standard that must be met in order to state a breach of the duty of loyalty claim. This is so for the following reasons.

The Trustee alleges that Letson was aware as of May 16, 2008 that Inc. was in default of its obligations to The Harvard Drug Group ("Harvard"), and that Letson was involved in the negotiation of an agreement made on May 22, 2008 to repay Harvard in accordance with a payment schedule. *Compl.*, ¶ 95.[21] The Trustee further alleges that on June 6, 2008, Letson was involved in negotiations for an exclusive purchase agreement with Harvard. Lastly, the Trustee alleges that Letson was copied on a July 8, 2008 email sent by Harvard to Inc.'s Chief Financial Officer, Joe Gaudio ("Gaudio"), notifying Gaudio that Harvard was not going to ship any product to SRI until the invoices that were more than 30 days past due were paid in full, and that under the exclusive purchase agreement with Harvard, SRI could not purchase medications from any other supplier. *Compl.*, ¶ 97. These allegations, taken as true and viewed in the light most favorable to the Trustee, allege that Letson was (i) aware of Inc.'s difficulties with its principal pharmaceutical supplier, Harvard, and (ii) involved in efforts to make payments to Harvard and restructure the debt due to

---

[21] The allegations about this agreement and an exclusive purchase agreement between Inc. and Harvard are discussed in more detail in connection with the Court's analysis of the Count 5 claims against Letson. *See infra* at pp. 52-54.

Harvard. These facts are insufficient to state a claim for an intentional dereliction of duty by Letson or that Letson acted in conscious disregard of his responsibilities to Inc. In other words, this singular red flag - that Inc. was behind on payments to its principal supplier and Letson knew it and was involved in efforts to restructure the debt owed to that supplier, is insufficient for the Court to draw a plausible inference that Letson knew he had to take unidentified steps to address Inc.'s financial decline and intentionally disregarded that duty.

Moreover, to the extent the Trustee is attempting to assert a director oversight liability claim, the Trustee once again attempts to stretch a *Caremark* claim beyond its boundaries. As discussed above, the classic *Caremark* claim involves a claim that the directors are liable for damages that arise from a failure to properly monitor or oversee employee misconduct or legal violations. Here, the alleged facts more closely resemble those before the court in *In re Citigroup Shareholder Deriv. Litig.*, 964 A.2d 106, 122-23 (Del. Ch. 2009), where the plaintiffs alleged that the *Citigroup* directors ignored "red flags" respecting the impending financial crisis in the housing market and thus failed in their duty of oversight to prevent Citigroup's involvement in the subprime mortgage market, leading to inappropriate business risk. This type of claim, as the *Citigroup* court noted, is most appropriately reviewed under a duty of care/business judgment rule standard.

As discussed previously, the appropriate standard under Delaware law to establish a breach of the duty of care is one of gross negligence, which has been defined as "reckless indifference" or conduct beyond the "bounds of reason." *McPadden v. Sidhu,* 964 A.2d 1262 (Dec. 2008). As one court has noted, the definition of gross negligence in Delaware corporate law is "extremely stringent." *In re Lear Corp. Shareholder Litig.*, 967 A.2d 640, 652 (Del. Ch. 2008). The challenged decision must be "so grossly off-the-mark as to amount to reckless indifference or a gross abuse of

discretion." *Id. (quoting Solash v. Telex Corp.*, 1988 WL 3587 at *9 (Del. Ch. Jan. 19, 1988)). In short, the Financial Decline Allegations against Letson do not rise to these levels.

Thus, the Court concludes that the Trustee's breach of fiduciary duty claim against Letson in Count 4, to the extent it relies on the Financial Decline Allegations, must be dismissed. However, Letson is also sued in Count 5 of the Complaint. Count 5, solely against Letson, alleges a breach of the fiduciary duty of loyalty premised upon Letson's "dual roles" with Inc. and Harvard. *Compl.*, ¶ 206. Letson has moved to dismiss Count 5 in the Letson Motion.

The Trustee has numerous factual allegations in support of her Count 5 claims. The Trustee alleges that at the time SRI commenced its operations in 2006, Letco Medical ("Letco") , which had been founded by Letson and his father in 1983, was SRI's principal supplier of medications. *Compl.*, ¶ 92. The Trustee further alleges that Letson was appointed to the Board due to this relationship. *Compl.*, ¶ 181. According to the Trustee, (i) Letco was acquired by Harvard in 2007, *Compl.*, ¶ 93, and (ii) Letson continued as president of Letco (as a division of Harvard) until he resigned in 2009. *Id*. The Trustee next alleges that (i) due to cash flow problems at Inc. and SRI, the debt owed to Letco (as a division of Harvard) exceeded $1.9 million by May of 2008, *Compl.*, ¶ 94, (ii) on May 16, 2008, Harvard advised Inc.'s management that it would no longer extend credit to Inc. for the purchase of medications due to the past due balance, *Compl.*, ¶ 95, and (iii) thereafter, discussions took place between Harvard and Inc. that resulted in a letter agreement dated May 22, 2008 (the "Harvard Letter Agreement") under which Inc. agreed to pay the outstanding debt under a payment schedule that included a "balloon payment" in the amount of $1,318,152.90 that was to be made on July 28, 2008, or when Soporex closed on its recapitalization. *Id*.

The Trustee further alleges that on June 6, 2008, at Harvard's insistence, Inc. entered into an

Exclusive Purchase Agreement with Harvard (the "Harvard EPA") pursuant to which Inc. agreed to buy seven medications, which represented over 95% of the medications sold by SRI, exclusively from Harvard. *Compl.*, ¶ 96. The medications and their prices, which the Trustee alleges were determined by Letson, were set forth in Exhibit A to the Harvard EPA (the "Exhibit A Medications"). *Id.*; *Compl.* ¶ 182. According to the Trustee, except for the medication Brovana, the prices for these medications under the Harvard EPA were all higher than the prices set by other suppliers. *Id.* The Trustee alleges that (i) as a result, SRI paid approximately $119,000 more for these medications than it would have paid if it had purchased them from other suppliers, *id.*, (ii) "upon information and belief, when Letson set the prices for the Exhibit A Medications, he knew that the prices he selected were in excess of the amounts Soporex was paying for these same medications (except Brovana) from other suppliers," *id,* and (iii) "as an officer of Harvard, Letson personally benefited [sic] from this unfair pricing and the excessive cost of Soporex." *Compl.*, ¶ 182.

The Trustee next alleges that the Harvard EPA required Inc. to pay Harvard within 30 days from the invoice date. *Compl.*, ¶ 97. According to the Trustee, on July 8, 2008, Harvard told Gaudio (Inc.'s CFO) that Inc. was in default under the Harvard EPA and that Harvard was not going to ship any product to SRI until the invoices that were more than 30 days past due were paid in full. *Id.* The Trustee alleges that Gaudio was also reminded that the Harvard EPA prohibited Inc. from purchasing the Exhibit A Medications from any other supplier, and that Letson was copied on the e-mails sent to Gaudio. *Id.* Premised on these emails, the Trustee alleges that "upon information and belief," Letson was directly involved in the negotiations of the Harvard Letter Agreement and the Harvard EPA. *Compl.* ¶ 100.

The Trustee further alleges that as a result of the Harvard EPA, Inc. made a payment to Harvard in the amount of $404,052.12, which was in addition to the weekly $75,000 "preferential" payments that Inc. was required to make to Harvard, which, as of July 11, 2008, totaled $525,000. *Compl*., ¶ 98. The Trustee also alleges that by virtue of its leverage under the Harvard EPA, Harvard forced Inc. to make "preferential" payments to Harvard of $1,229,052.l2 within the 90 days before its bankruptcy filing. Of this sum, the Trustee alleges that $929,052.12 was paid from May 30, 2008 to July 8, 2008, while Letson was a director of Inc. and was actively involved in Harvard's efforts to collect the debt SRI owed to it. *Compl*., ¶ 99.

The Trustee also alleges that Harvard's CEO directed Letson to resign from the Board due to a conflict of interest between Letson's positions as an officer of Harvard and as a director of Inc. *Compl*., ¶ 101, 181. According to the Trustee, (i) Letson resigned from the Board on July 16, 2008, *Compl*., ¶ 181, (ii) on July 24, 2008, Inc. and Harvard entered into a First Amendment to the Harvard EPA whereby Inc. was required to pay in advance by wire transfer for each purchase from Harvard, *Compl*., ¶ 102, and (iii) on August 19, 2008, Harvard demanded immediate payment of all outstanding invoices which, according to Harvard, totaled $2,503,435.16. *Compl*., ¶ 103.

With respect to his Count 5 claim for breach of fiduciary duty against Letson, the Trustee alleges that from March 31, 2006 to July 16, 2008, Letson was one of the Outside Directors of Inc., and was also an officer of Harvard. *Compl*., ¶ 204. In addition, the Trustee alleges that for a portion of this time period, Letson was in charge of Harvard's account relationship with Inc. *Id*. The Trustee also alleges that Letson's dual roles with Inc. and Harvard enabled him to obtain confidential and proprietary business information, such as information relating to the prices SRI paid to suppliers for the medications it bought, and "upon information and belief, Letson provided to Harvard this

confidential and proprietary business information which Harvard then used to its advantage and to the business detriment of Soporex and SRI." *Compl.*, ¶ 206. The Trustee further alleges that Letson used his position with Inc. to "further his own financial and professional interests as an employee and officer of Harvard." *Id*. Specifically, the Trustee alleges that Letson participated in the negotiations and drafting of (i) the Harvard Letter Agreement, which resulted in Inc. making preferential payments to Harvard in the sum of $825,000, and (ii) the Harvard EPA, which caused Inc. to overpay for medications by $119,000 and which was used by Harvard as leverage to extract additional preferential payments from Inc. *Compl.* ¶ 206. The Trustee alleges that by engaging in these activities on behalf of Harvard, Letson abused the position of trust and confidence that he was given as a director of Inc. and thereby breached his duty of loyalty; and as a result, Inc. suffered damages in excess of $1,000,000 and Inc.'s assets were impaired. *Compl.*, ¶ 207.

In this context, the duty of loyalty requires that a fiduciary act with undivided and unselfish loyalty to the corporation and that there is no conflict between that duty and self-interest. *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983). The classic examples that implicate the duty of loyalty are instances in which a director appears on both sides of a transaction or receives a personal benefit not received by the shareholders generally. *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693 (Del. Ch. 2005); *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 245 (Del. 1993), *modified on other grounds*, 636 A.2d 956 (Del. 1994). Thus, a plaintiff may plead a violation of the duty of loyalty by pleading that the defendant "either (1) 'stood on both sides of the transaction and dictated its terms in a self-dealing way,' or (2) 'received in the transaction a personal benefit that was not enjoyed by the shareholders generally.'" *Midland Grange No. 27 Patrons of Husbandry v. Walls*, 2008 WL 616239 (Del. Ch. Feb. 28, 2008) (quoting *In re Coca-Cola Enters . Inc. Shareholders*

*Litig.*, No. 1927-CC, 2007 WL 3122370 at *4 (Del. Ch. Oct. 17, 2007)). [22]

However, conclusory allegations of an unfair benefit from a transaction are insufficient to state a claim that directors acted in bad faith, thereby breaching their duty of loyalty. *Pfeffer v. Redstone*, 965 A.2d 676 (Del. 2009). In addition, the alleged personal benefit must "be so significant that it is improbable that a director could perform her fiduciary duties . . . without being influenced by her overriding personal interest." *Id.* at 690 (*quoting Hokanson v. Petty,* No. 3438-VCS, 2008 WL 5169633 at *7 (Del. Ch. Dec. 10, 2008). In other words, to be disqualifying, the nature of the director interest must be substantial, not merely incidental. *McGowan v. Ferro*, 859 A.2d 1012, 1029 (Del. Ch. 2004).

Applying these legal principals here, the Court concludes that the Complaint fails to state a claim, as the Trustee has not alleged facts showing that Letson was on both sides of the challenged transactions or received any personal benefit from those transactions not conferred on shareholders generally.[23] First, Letson is not alleged to have done anything on behalf of Inc. with respect to the Harvard Letter Agreement or the Harvard EPA, other than having been copied on emails. To the contrary, the Trustee alleges that the Board never met during the time these agreements were entered

---

[22] In order to state a claim for breach of the duty of loyalty, the plaintiff must plead facts from which the court can reasonably infer that either a majority of the director defendants either stood on both sides of the transaction or were dominated by someone who did, or failed to act in good faith. *In re NYMEX Shareholder Litig.*, No. 3621-VCN, 3835-VCN, 2009 WL 3206051 at *6 (Del. Ch. Sept. 30, 2009) (stating that the plaintiff must plead facts to show "that *a majority of the Board of Directors* breached the fiduciary duty of loyalty; whether they otherwise would have stated a claim against [one or two directors] would not be controlling. That two directors may have been conflicted does not, by itself, impinge upon the independence of the remaining members of the board . . ."); *In re Frederick's of Hollywood, Inc.*, 2000 WL 130630 (Del. Ch. Jan. 31, 2000) (where the pleaded facts show that only one of four directors was interested, the duty of loyalty claim failed for lack of a valid premise).

[23] The Complaint does not even allege that Letson was a shareholder of Harvard. It alleges that Harvard's predecessor, Letco Medical, was founded by Letson and his father in 1983, *Compl.*, ¶ 92, and that in July of 2007, Letco was acquired by and later merged into Harvard. *Compl.*, ¶ 93. It simply alleges that Letson continued as president of Letco (as a division of Harvard) until he resigned in January of 2009. *Id.*

into. *See, e.g., In re John Q. Hammons Hotels Inc. Shareholder Litig.*, No. 758-CC, 2011 WL 227634 (Del. Ch. Jan. 14, 2011) (controlling shareholder was not on both sides of a merger where he did not participate in approval of the merger as a director); *In re Tri-Star Pictures Inc. Litig.*, No. Civ. A. 9477, 1995 WL 106520 (Del. Ch. Mar. 9, 1995); *compare Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645 (N.D. Tex. 2011) (complaint stated claim where complaint alleged that defendant was director, President and CEO of one company, and acted to approve a spin-off, and that same defendant was also a director, President and CEO of the other company during the spin-off). There are simply no factual allegations that Letson acted on behalf of Inc. with respect to approval of either the Harvard Letter Agreement or the Harvard EPA.

Second, Letson isn't alleged to have received a benefit not received by shareholders generally. The Trustee simply alleges that Letson benefitted from pricing favorable to Harvard "as an officer of Harvard." *Compl.*, ¶ 182. There are *no* other facts alleged in the Complaint with respect to any personal benefit to Letson from Inc.'s entry into the Harvard Letter Agreement or the Harvard EPA, and no facts showing how Letson's status as an officer or employee of Harvard conferred any benefit upon him from these transactions.

In her response to Letson's Motion, the Trustee contends that "the amounts Soporex paid to Harvard Drug obviously benefited [sic] Letson because, as the person in charge of the Soporex vendor relationship, he had responsibility for ensuring that Soporex paid its account obligations to Harvard Drug." *Pltf's Br. In Supp. Of Her Resp. In Opp. To Def. Mickey Letson's Mot. To Dismiss the Second Amended Compl.*, p. 7. However, the Trustee has failed to cite any cases, in Delaware or elsewhere, concluding that this type of benefit – presumably, a compliment by his employer for a job well done – is sufficient, and the Court's research has revealed none.

From this Court's perspective, the Trustee's alleged personal benefit to Letson is not "so significant that it is improbable that a director could perform [his] fiduciary duties without being influenced by [his] overriding personal interest." *Pfeffer v. Redstone*, 965 A.2d at 690.  The Trustee has not alleged any personal *financial* benefit to Letson at all.  She has not alleged that his compensation, or position at Harvard, was in any way improved due to Harvard's success in collecting the amounts owed to it.  Although the Trustee appears to complain that Harvard used its agreements as leverage to extract what the Trustee characterizes (without factual support) as preferential payments, the Trustee does not allege that Letson had any hand in that particular conduct.  Nor does the Trustee allege that Letson was involved on Harvard's behalf in the decision to (i) refuse to extend Inc. further credit, (ii) enter into a short payment schedule, or (iii) enter into or enforce the Harvard EPA.

Further, although the Trustee alleges (upon information and belief) that Letson provided confidential pricing information obtained in his capacity as an Inc. director to Harvard, who then used it to set prices under the Harvard EPA, the Trustee does not allege that Letson had any hand in Inc.'s decision to enter into the Harvard EPA, which Inc. must have known set prices higher than Inc. normally paid for its medications.[24]  In short, even taken as true, this allegation does not establish that Letson acted on both sides with regard to the Harvard EPA or obtained any benefit therefrom.  Nor does the Trustee allege that Letson acted with the actual intent to harm Inc., which could support

---

[24] The Trustee's allegation that Letson provided "specific advice to Harvard regarding the pricing of the medications that were sold to Soporex, and this pricing was on terms more favorable to Harvard, but unfavorable to Soporex," is pled "upon information and belief." *Compl.*, ¶ 182.  While the *Twombly* plausibility standard does not prevent a plaintiff from pleading facts "upon information and belief" where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible, *Arista Records LLC v. Doe 3*, 604 F.3d 110 (2nd Cir. 2010), the Trustee does not allege any facts that make the inference plausible here.  Moreover, Inc. itself must have known what prices it paid to other suppliers, and it entered into the Harvard EPA anyway, apparently without any influence from Letson.

a breach of the duty of loyalty premised upon subjective bad faith. Similarly, the Trustee has not alleged that Letson intentionally acted with a purpose other than that of advancing the best interests of Inc. *Disney*, 906 A.2d at 66.

For these reasons, the Court concludes that Count 5 fails to state a claim for breach of fiduciary duty against Letson and must be dismissed.

### F.  The Officer Defendants' Motion

As noted earlier, Count 1 of the Complaint, asserted against only Linehan, alleges breaches of the fiduciary duties of loyalty and due care. Count 2 alleges those same claims against Sabolik. Count 3, against Smith and Sabolik, alleges a claim for corporate waste. The Court will address the Count 3 claim first, followed by the Count 1 claim and the Count 2 claim.

#### 1.  The Trustee's Claim for Corporate Waste Against Smith and Sabolik

The Trustee complains of, essentially, four acts by Sabolik and Smith that allegedly constitute corporate waste: (i) the fraudulent transfer of the "SRI Business;" (ii) the fraudulent transfer of the "Winmar Oxygen Business;" (iii) the abrupt termination of the Winmar sleep-study business operations; and (iv) the abrupt termination of the SRI billing and collection functions when there were, according to Sabolik, in excess of $6.3 million in outstanding accounts receivable. *Compl.*, ¶ 193. The factual allegations respecting the transfer of the "SRI Business" and the termination of SRI's billing and collections functions are generally set forth in ¶¶ 73-76, 172- 180 of the Complaint. The factual allegations respecting the transfer of the "Winmar Oxygen Business" and the termination of the Winmar sleep-study business operations are generally set forth in ¶¶ 172-180 of the Complaint.

### a.      Choice of Law

The Court first notes that the parties disagree, to some extent, about which state's law governs the Trustee's claim for corporate waste.  Neither party has briefed the choice-of-law issue in any detail.  The four acts complained of, however, involve SRI and Winmar.  Citing nothing, the Officers assert that corporate waste claims are determined by reference to the law of the state of incorporation, which, in the case of SRI and Winmar, are Missouri and North Dakota, respectively.  However, the Trustee's original complaint contended that the acts complained of constituted waste under Delaware law, and thus the Officers argued that since the Trustee cited to Delaware law, she must not be asserting her claims on behalf of SRI and Winmar and thus the Officers briefed the corporate waste claim under Delaware law.

When the Trustee amended her complaint as of right following the filing of the Motions, she deleted the reference to Delaware law and instead asserted that the conduct constitutes waste under "applicable state law."  *Compl.*, ¶ 195.  In their brief in support of their Motion, the Officers do not address the choice of law issue at all.  Therefore, the Officers, while contending that the waste claim should be assessed under Missouri and North Dakota law, have not filed any briefing respecting the allegations that would suffice to state a claim under those states' law.  Rather, the Officers look only to Delaware law in their brief.[25]

The Trustee, while conceding that the waste claim is governed by Missouri law (in the case

---

[25] The Officers cite to a single Missouri case in their reply brief, which is cited for the proposition that the Court should reject the Trustee's attempts to plead around the business judgment rule by arguing that the complained-of transfers of assets were ultra vires acts because they lacked shareholder approval.  The single case cited by the Officers holds that the statute requiring shareholder approval does not apply when the corporation is insolvent and the shareholders have no equity to protect.  The Court need not reach this issue, because as the Officers point out, the Complaint fails to allege lack of shareholder approval.

**Proposed Findings and Conclusions**                                                                                           **Page 60**

of SRI) and North Dakota law (in the case of Winmar), asserts (citing to nothing) that "Delaware law is also implicated and must be considered because [those entities are] a wholly-owned subsidiary of Soporex, a Delaware corporation . . . ." *Pltf's Br. In Supp. Of Her Resp. In Opp. To Defs' Mot. To Dismiss the Second Amended Compl.*, p. 22.[26] The Trustee therefore also briefed the corporate waste claim under Delaware law only.

Thus, in sum, both sides appear to agree that the relevant law is, at least in part, the law of North Dakota and Missouri, although neither have briefed the waste claim under the legal standards applicable in those states. Moreover, the Trustee appears to argue, at least in part, for the application of Delaware law to her waste claims, although citing nothing to support her argument. Sadly, the Court is forced to analyze the choice of law issues without any real input from the parties and then, to the extent the Court agrees that North Dakota and Missouri law control, determine what the law of North Dakota and Missouri is without any assistance from the parties.

In deciding which state's substantive law governs the issues before the Court, the Court must first determine which choice-of-law rules should be applied. *Schmermerhorn v. Centurytel, Inc. (In re Skyport Global Commc'n, Inc.)*, No 10-3150, 2011 WL 111427 (Bankr. S.D. Tex. Jan. 13, 2011). It is well-settled that a federal court sitting in diversity must apply the choice of law rules of the forum state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941). However, neither the United States Supreme Court nor the Fifth Circuit has ruled upon whether a bankruptcy court, which sits not in diversity but by virtue of 28 U.S.C. §§ 1334 and 157, is required to apply federal choice of law rules or is instead to apply the choice of law rules of the forum state with

---

[26] Corporations are separate legal entities. As the Trustee has not provided any argument or briefing respecting her contention that this Court should apply the law of the state of incorporation of the corporate parent, this Court declines to address her argument any further.

respect to state law claims. *Skyport*, 2011 WL 111427 at *14. In *Tow v. Rafizadeh (In re Cyrus II P'ship)*, 413 B.R. 609 (Bankr. S.D. Tex. 2008), the bankruptcy judge applied federal choice of law rules to a cause of action under 11 U.S.C. § 544, because it was a federal cause of action rooted in federal bankruptcy law and policy. However, the *Skyport* court distinguished *Tow* because the *Skyport* court was asked to assess whether certain claims were direct claims or were instead derivative claims, which would be barred under a confirmed chapter 11 plan. The *Skyport* court held that "issues regarding the internal affairs of corporations do not implicate the same federal bankruptcy policies addressed in *Tow*. Accordingly, this Court applies forum state choice of law rules to determine which law governs...." *Skyport*, 2011 WL 111427 at *15.

This Court finds the *Skyport* court's analysis persuasive, and thus will similarly apply Texas choice of law rules to determine which states' laws govern the Trustee's claim for corporate waste. As noted in *Skyport*, under Texas choice of law rules, the internal affairs of a foreign corporation are governed by the law of the state of incorporation. Tx. Bus. Org. Code § 1.102 (Vernon's 2011). Therefore, the Court concludes that the Trustee's claim of corporate waste with respect to Winmar's assets is governed by North Dakota law, while her claim of corporate waste with respect to SRI's assets is governed by Missouri law. The Court will therefore assess the sufficiency of the Trustee's allegations under the laws of those states.

### (1)    North Dakota Law

The Court's own research has failed to reveal a single case in North Dakota that discusses the elements of a claim for corporate waste. The Court notes, however, that North Dakota courts appear to look for guidance in corporate matters to one of the leading treatises on corporate law, William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations (hereafter, *Fletcher's*

*Cyclopedia*). *See, e.g.*, *Aurora Medical Park, LLC v. The Kidney and Hypertension Center, PLC*, 784 N.W.2d 151 (N.D. 2010) (citing treatise for the proposition that a president may have presumptive authority to institute and defend suits in the corporate name); *Thompson v. Schmitz,* 774 N.W.2d 263 (N.D. 2009) (citing treatise for the proposition that a shareholder's loan to a corporation may, in certain circumstances, be deemed a contribution of capital); *Erickson v. Brown*, 747 N.W.2d 34 (N.D. 2008) (citing treatise for the proposition that a corporation may retain authorized, but unissued, shares). Section 1102 of that treatise provides:

> directors and other corporate officers are liable for misappropriation, diversion or conversion of corporate assets . . . the essence of a claim of waste is the diversion of corporate assets for improper or unnecessary purposes. Corporate waste has been defined as an exchange of corporate assets so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade. Thus, a board's decisions do not constitute corporate waste unless they are exceptionally one-sided . . . it has been stated that to recover on a claim of corporate waste, a plaintiff bears the burden of proving the exchange was so one sided that no business person of ordinary, sound judgment could conclude the corporation has received adequate consideration. Thus, a claim of corporate waste will arise only in a rare, unconscionable case where directors irrationally squander or give away corporate assets.

*Fletcher's Cyclopedia*, § 1102.[27]

### (2) Missouri Law

Similarly, there is a dearth of case law in Missouri respecting corporate waste claims. Nevertheless, it is clear that directors of a corporation have no right to convert corporate assets to their own use, or give them away, or to make any self-serving disposition of them against the

---

[27] The payment of a contractually obligated amount cannot constitute waste unless the contractual obligation is itself wasteful. If all shareholders of a corporation consent and it is not detrimental to creditors, directors/officers may give away corporate property where the rights of creditors are not impaired. To show the impairment of creditor rights by such appropriation, intent to harm or harm resulting to the corporate creditors must be demonstrated. *Fletcher's Cyclopedia*, § 1104. Where all the directors either join or consent to a misappropriation of corporate funds, each is liable for the entire amount diverted, without regard to the degree of dereliction of which each is guilty. *Fletcher's Cyclopedia*, § 1114.

interests of the corporation. *Zakibe v. Ahrens & McCarron, Inc.*, 28 S.W.3d 373 (Mo. App. 2000); *Emergency Patient Services, Inc. v. Crisp*, 602 S.W.2d 26 (Mo. App. 1980). Missouri courts have similarly looked to *Fletcher's Cyclopedia* for guidance in corporate matters. *See, e.g., 66, Inc. v. Crestwood Commons Redevelopment Corp.*, 998 S.W.2d 32 (Mo. 1999) (citing treatise for the proposition that the phrase 'inadequate capitalization' means assets that are very small in comparison to known risks associated with the planned corporate enterprise); *K.C. Roofing Center v. On Top Roofing, Inc.*, 807 S.W.2d 545 (Mo. App. 1991) (citing treatise for the proposition that the corporate veil may be pierced to prevent injustice or inequitable consequences).

The concept of corporate waste as outlined in *Fletcher's Cyclopedia* is substantially similar to the concept of waste under Delaware law. Delaware courts have described the standard for corporate waste as "onerous, stringent, extremely high, and very rarely satisfied," *Kates v. Beard Research, Inc.*, No. Civ. A. 1480-VCP, 2010 WL 1644176 at *5 (Del. Ch. Apr. 23, 2010), and to recover, the plaintiff has the burden to prove that a transaction was so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration, and such a claim will be sustained only in the rare, unconscionable case where directors irrationally squander or give away corporate assets. *Id.*

Because the parties have *both* cited to Delaware law, there is a dearth of case law in both North Dakota and Missouri, and Delaware law appears to be substantially similar, at least with respect to corporate waste claims, to the standard set forth in *Fletcher's Cyclopedia*, the Court will apply the standard for waste as set forth in *Fletcher's Cyclopedia* and under Delaware law.

### b. Corporate Waste Claim Against Smith

The Trustee alleges that Smith was an officer of SRI from April 25, 2007 through the petition

date.  *Compl.*, ¶ 36.  Smith is not alleged to have been an officer or director of Winmar.  Absent that allegation, the Trustee's claims against Smith for corporate waste relating to the assets of Winmar fail to state a claim under *any* state's law.  Although the Trustee alleges that Smith was an officer of Inc., *Compl.*, ¶ 23, and that the Board (of Inc.) made decisions on behalf of Winmar's non-functioning board, *Compl.*, ¶ 113, the Trustee does not allege that Smith was on the Board.  Accordingly, the Trustee's corporate waste claim against Smith with respect to Winmar's assets fails and must be dismissed.

As to Smith's involvement in the acts allegedly constituting waste with respect to SRI's assets, there are relatively few factual allegations that support this claim.  There are some factual allegations respecting Smith's involvement in the decision to enter into the Carecentric contract, *see, e.g.*, *Compl.*, ¶¶ 52, 59, 61, 64, 65, 69, 140, but that conduct is not alleged to constitute an act of waste.  Similarly, there are some factual allegations respecting Smith's involvement in discussions with GE, *see, e.g.*, *Compl.*, ¶¶ 85, 88, and 90, but that conduct is not alleged to constitute an act of waste.  As noted earlier, the conduct that allegedly constitutes waste with respect to SRI's assets is (i) the fraudulent transfer of the "SRI Business;" and (ii) the abrupt termination of the SRI billing and collection functions when there were in excess of $6.3 million in outstanding accounts receivable.  *Compl.*, ¶ 193.

As to the termination of SRI's billing and collection functions when there were millions of dollars in outstanding accounts receivable, the Trustee alleges that (i) in February, 2008, when Carecentric learned that Soporex had brought SRI's billing and collection functions in-house, Carecentric wrongfully cut off Inc.'s access "to its own pharmacy data and its own billing and

collection data,"[28] *Compl.*, ¶ 73; (ii) Inc. thereafter sued Carecentric, *Compl.*, ¶ 74; (iii) Smith (and

others) "failed to take any steps to make or obtain copies of SRI's pharmacy data nor SRI's billing

and collection data," *Compl.*, ¶ 75; (iv) Inc. then hired Med Staff to re-submit claims to insurers that

Carecentric had improperly submitted (resulting in their rejection), *Compl.*, ¶ 76; and (v) "when

Soporex could no longer afford to pay Med Staff," the re-billing process was also brought in-house

"but was abruptly terminated on August 20, 2008, when all Soporex employees were terminated."

*Compl.*, ¶ 76. According to the Trustee, (i) at that point, the "billing and collection effort was

abandoned and millions of dollars of unbilled or improperly billed claims were lost forever," *Compl.*,

¶ 76; and (ii) the cessation of operations preceded the chapter 7 bankruptcy filings by two days,

*Comp.*, ¶ 172. The Trustee also alleges that the decision to file for relief under chapter 7 rather than

under chapter 11 to preserve the going concern value of the Operating Subsidiaries was hastily,

unadvisedly and improperly made, *Compl.*, ¶¶ 162, 166, although the chapter 7 filing is not alleged

to have resulted in an inability to collect any accounts receivable. In fact, there are no facts alleging

that a chapter 7 trustee could not, despite the chapter 7 filings, collect accounts receivable. And, to

the extent that such an inference can arise from the facts that are alleged, these factual allegations

suggest that the inability to collect accounts receivable was caused by *Carecentric*, not by Smith.

    The Court concludes that these allegations, even when viewed in the light most favorable to

the Trustee, fail to state a claim for corporate waste against Smith. At most, the Trustee alleges that

Smith was negligent in failing to make a copy of SRI's billing and collections data in order to assist

in the future collection of accounts receivable. The Trustee alleges that Carecentric had cut off Inc.'s

---

[28] The Court notes that while the corporate waste claim appears to be asserted on SRI's behalf and the Trustee complains of the termination of *SRI's* billing and collection functions, *Compl.*, ¶ 194, the Complaint also alleges, somewhat inconsistently, that Carecentric cut off *Inc.'s* access to *"its own* billing and collection data." *Compl.*, ¶ 73.

(or SRI's, it is not clear which) ability to access its data, and that Inc. had to hire a third party to re-submit claims that had previously been rejected, but that Inc. terminated its efforts when it could "no longer afford to pay" for that service, and had determined to file for relief under chapter 7. Even taken as true, these factual allegations do not plausibly suggest that Smith "irrationally squander[ed] or [gave] away corporate assets." *Fletcher's Cyclopedia*, § 1102; *Kates*, 2010 WL 1644176 at *5. Thus, this claim against Smith must be dismissed.

As for Smith's hand in the alleged "fraudulent transfer of the 'SRI Business,'" the Complaint alleges that the Board, Sabolik and Smith were presented with their "bankruptcy options" by Chevallier at a Board meeting, and were told that they could sell the Operating Subsidiaries' businesses as going concerns during a chapter 11 proceeding, but that they "rejected this approach and chose instead to file Chapter 7 cases. . . ." *Compl.*, ¶ 166. The Trustee also alleges that Smith (and others) failed to consult with GE about the possibility of financing or the use of cash collateral in chapter 11, *Compl.*, ¶ 165, and failed to contact any potential purchasers for SRI's mail-order pharmacy business. *Compl.*, ¶ 175.[29] According to the Trustee, (i) sometime between August 14 - 19, 2008, Smith met with Linehan to obtain his consent to a bankruptcy filing, *Compl.*, ¶ 168; (ii) Sabolik and Smith thereafter "unilaterally determined what should be done to terminate the business operations of Inc. and the Operating Subsidiaries," *Compl.*, ¶ 171; and (iii) Smith and Sabolik "used the bankruptcy resolutions as justification to fraudulently transfer to Med 4 Home Inc.'s most valuable asset, namely, SRI's patient lists, files and patient records." *Compl.*, ¶ 172. The Trustee further alleges that (i) the purchase price for SRI's "respiratory medications business" and

---

[29] The Court notes that this allegation is somewhat inconsistent with the pled fact that Med 4 Home purchased "the SRI Business." *Compl.*, ¶¶ 195, 196.

"Winmar's Oxygen Business" was $40,000, *id.*; and (ii) Sabolik and Smith arranged the sale of SRI's patient list and patient files to Med 4 Home "based upon the incorrect belief that they could face personal civil or criminal liability for 'patient dumping' if they did not transfer the patient list and patient data to some third-party before ceasing SRI's business operations. In fact, there are no criminal or civil sanctions for 'patient dumping' for failing to fill patient orders. Nevertheless, Sabolik and Smith believed there were, and this selfish concern for their own personal welfare caused them to act recklessly and in bad faith in disposing of the business assets of SRI and Winmar." *Compl.*, ¶ 173. Then, according to the Trustee, Smith directed Camfield to allow Med 4 Home to take the patient files, despite Camfield telling him that SRI should retain copies of the files. *Compl.*, ¶ 179. The Trustee alleges that since "no consideration was received by Soporex for the transfer of SRI's business[30] which Soporex had purchased for $7,000,000, no business person of ordinary, sound judgment could conclude that Soporex or SRI received adequate consideration." *Compl.*, ¶ 196. The Trustee therefore alleges that Smith "irrationally squandered the going concern value" of SRI's assets. *Compl.*, ¶ 197.

There are no factual allegations in the Complaint respecting the value of SRI as a going concern at the time of the transfer of a portion of its assets to Med 4 Home. Nor are there any facts alleged that plausibly show that SRI could continue to operate as a going concern. A copy of the agreement with Med 4 Home is attached to the Complaint, and it contains the following recitals:

> Whereas, the Sellers [SRI and Winmar] have ceased operations of the Business, and Sellers desire to meet their obligations under federal, state, and local laws, regulations, codes or standards, including Medicare, Medicaid, State Board of Pharmacy and such other rules and regulations regarding patient care and continuity

---

[30] The allegation that Inc. received no consideration for the transfer of the SRI business is inconsistent with the allegation that Med 4 Home paid a purchase price of $40,000. *Compl.*, ¶ 172.

of service to provide for the continuity of care of their patients;

Whereas, to ensure continuity of patient care, the Sellers desire to transfer the Business to Buyer for the consideration set forth below, and Buyer desires to accept such Business and continue servicing the patients of the Business.

*Ex. A to Complaint*, p. 1. The agreement then provides for the sale of certain of SRI's assets to Med 4 Home, including SRI's patient files, certain inventory, equipment and supplies, phone numbers, and the right to any billings for any equipment, products, supplies, or services provided by the business after the effective date of the agreement. *Id.* at ¶ 1. The agreement also provides, however, that SRI did not sell its cash on hand or its accounts receivable to Med 4 Home. *Id.* at ¶ 2.

The Court concludes that even taken as true, these factual allegations do not plausibly suggest that Smith "irrationally squander[ed] or [gave] away corporate assets." *Fletcher's Cyclopedia*, § 1102). The concept of corporate waste is "a rigorous test designed to smoke out shady, bad faith deals . . . ." *In re Lear Corp. Shareholder Litig.*, 967 A.2d 640, 656 (Del. Ch. 2008). The plaintiff must plead facts showing that no reasonable person of ordinary sound business judgment could view the benefits received [or conferred] in the transaction as a fair exchange for the consideration paid [or received] by the corporation. *Id.* The test for waste is stringent, and if given the facts pled in the complaint, any reasonable person might conclude that the deal made sense, then the judicial inquiry ends. *In re Lear Corp. Shareholder Litig.*, 967 A.2d 640, 656 (Del. Ch. 2008).

Here, a reasonable person of ordinary sound business judgment could conclude that SRI, which had ceased operations, was concerned about the continuity of care of its patients and needed a third party to take over its patient files immediately upon its cessation of operations. There are no factual allegations showing that the assets sold – *i.e.*, the patient lists, certain inventory and SRI's

phone numbers – were worth more than the price paid for them.[31]  The Trustee's incantation of the words "fraudulent transfer" does not add any factual content to the Complaint.  The Court therefore concludes that the Complaint fails to state a claim for corporate waste as to Smith with respect to the transfer of SRI's business and/or assets and must be dismissed.[32]

### c.    Corporate Waste Claim Against Sabolik

As is the case with the allegations against Smith, the Trustee complains of, essentially, four acts by Sabolik that allegedly constitute corporate waste: (i) the fraudulent transfer of the "SRI Business;" (ii) the fraudulent transfer of the "Winmar Oxygen Business;" (iii) the abrupt termination of the Winmar sleep-study business operations; and (iv) the abrupt termination of the SRI billing and collection functions when there were in excess of $6.3 million in outstanding accounts receivable. ¶ 193.

For the same reasons discussed above with respect to Smith, the Court concludes that the Complaint fails to state a claim against Sabolik based upon his alleged conduct with respect to SRI's billing and collection functions and assets and must be dismissed.  *See supra* at pp. 66-69.

---

[31]  The Trustee does allege that Inc. and SRI paid $7 million for the patient lists and related assets in March of 2006, some two years earlier.  *Compl.*, ¶ 43.  However, it is "well-settled that courts are ill-fitted to attempt to weigh the 'adequacy' of consideration under the waste standard or, *ex post*, to judge appropriate degrees of business risk."  *In re The Limited, Inc. Shareholders Litig.*, No. Civ. A. 17148-NC, 2002 WL 537692 at *8 (Del. Ch. 2002). The standard for corporate waste is a corollary of the proposition that where the presumption of the business judgment rule applies, the decision of a corporate board will be upheld unless it cannot be attributed to any rational business purpose. *Kates v. Beard Research, Inc.*, No. Civ. A. 1480-VCP, 2010 WL 1644176 at *5 (Del. Ch. Apr. 23, 2010); *In re Walt Disney Deriv. Litig.*, 906 A.2d 27 (Del. 2006).  The agreement with Med 4 Home, which is attached to the Complaint, also shows that Med 4 Home agreed to "assume responsibility for patient care from and after the" effective date of the agreement, and that it warranted that it would provide patient care to "Buyer's" [sic] nebulizer and oxygen patients from and after the effective date and that it possessed the necessary governmental supplier numbers, licensure, and other permits to operate the businesses and to provide patient care to "Seller's" patients.  *Ex. A to Compl.*, ¶¶ 4 and 7.

[32]  The Court rejects the Trustee's argument in her brief that the transfers of certain assets of SRI and Winmar to Med 4 Home were *ultra vires* acts because there was no shareholder approval as required by statutes in Missouri and North Dakota, *see Pltf's Br. In Supp. Of Her Resp. In Opp. To Defs . . . Mot. To Dismiss the Second Amended Compl.*, pp. 23-24, 26-27, for the simple reason that the Complaint does not allege that SRI or Winmar lacked shareholder approval for the transfers.

As to Winmar, the Trustee alleges that (i) Sabolik was a director of Winmar from December 28, 2006 through the petition date, *Compl.*, ¶ 112, although the Trustee also alleges that the Winmar board never met, and the Board (of Inc.), of which Sabolik was not a member, acted as the board for Winmar and made all decisions for the Winmar board, *Compl.*, ¶ 113; and (ii) Sabolik was an officer of Winmar at all relevant times. *Compl.*, ¶ 114. Therefore, according to the Trustee, Sabolik can be held liable for corporate waste with respect to Winmar's assets. Thus, the Court must assess the sufficiency of the Complaint as it relates to that waste claim.

The factual allegations respecting the abrupt termination of the Winmar sleep-study business operations are generally set forth in ¶¶ 176-177, 194, 195, 197 of the Complaint. The factual allegations respecting Inc.'s acquisition of Winmar are generally set forth in ¶¶ 105-111 of the Complaint, and the factual allegations respecting Winmar's profitability are set forth in ¶¶ 129-130 of the Complaint.

With respect to the termination of Winmar's sleep-study business, the Trustee alleges only that on August 20, 2008, Sabolik told Winmar's other officers that Winmar (among other companies) would be filing for relief under chapter 7 and that it would therefore cease operations immediately, and that at that time, Winmar's employees were performing sleep studies at small hospitals and medical clinics in the upper Midwest. *Compl.*, ¶¶ 176-177. The studies, which were terminated, were being conducted pursuant to approximately 60 contracts between Winmar and various hospitals and clinics. The Trustee alleges that Sabolik (and Smith) made the decision to terminate the sleep-study operations without taking any steps to preserve the going concern value of Winmar's business, which was operating profitably were it not for being burdened with Inc.'s excessive corporate overhead. *Compl.*, ¶ 194. The Trustee further alleges that Winmar's gross profit

in 2007 was approximately $2.2 million, but that Winmar also had significant general and administrative expenses due to "exorbitant marketing costs and related personnel expenses" that resulted in net operating income that year of only $541,000. *Compl.*, ¶ 129. The Trustee also alleges that during the eight months that Winmar operated in 2008, it had a gross profit of $1.2 million, but had "excessive" general and administrative expenses of approximately the same amount, leading to net operating income of only $31,000. *Compl.*, ¶ 130. According to the Trustee, after considering interest, depreciation and amortization costs, Winmar's operating loss for 2008 was just north of $400,000. *Compl.*, ¶ 130.

The Trustee does *not* allege, however, that Winmar's sleep study business could have continued as a going concern in light of the other financial problems identified in the Complaint. Moreover, the Trustee does *not* allege that there were buyers ready, willing and able to purchase the sleep-study business as a going concern, or any other factual content supporting an inference that the decision to terminate operations was tantamount to a decision to irrationally squander Winmar's assets – *i.e.*, the going concern value of the sleep study business.[33]

---

[33] None of the cases cited by the Trustee in support of this claim involve factual allegations or a theory similar to that advanced here – *i.e.*, that a decision to terminate business operations rather than sell a business as a going concern constitutes corporate waste of the going concern value of that business. The Court's research has also failed to reveal any cases espousing this theory. The Court supposes that it is theoretically possible that shutting down a business instead of selling it as a going concern could be tantamount to squandering assets, because in the ordinary situation the liquidation value of a business will be less than its going concern value. However, the typical corporate waste case involves a transaction, such as a sale or other transaction in which consideration passes hands - such as the payment of excessive compensation to an executive or something of that ilk. *See, e.g., In re Goldman Sachs Group, Inc. Shareholder Litig.*, No. 5215-VCG, 2011 WL 4826104 (Del. Ch. Oct. 12, 2011) (allegations involving approval of executive compensation program); *In re Citigroup Inc. Shareholder Deriv. Litig.*, 964 A.2d 106 (Del. Ch. 2009) (allegations that directors committed waste (1) by approving a corporate stock repurchase program which resulted in corporation purchasing its shares at allegedly inflated price, and (2) approving a letter agreement which allegedly resulted in excessive compensation); *Orloff v. Shulman*, No. Civ. A. 852-N, 2005 WL 3272355 (Del. Ch. Nov. 23, 2005) (allegations involving approval of below-market transactions between corporation and its insiders); *President and Fellows of Harvard College v. Glancy*, No. Civ. A. 18790, 2003 WL 21026784 (Del. Ch. Mar. 21, 2003) (allegations involving the issuance of stock options).

The Trustee's factual allegations with respect to the "the fraudulent transfer of the Winmar Oxygen Business" are generally set forth in ¶¶ 172-180 of the Complaint, and they essentially mirror those with respect to the transfer of SRI's patient lists and certain other assets to Med 4 Home, except that with respect to Winmar, what was sold to Med 4 Home was its "oxygen business" (which presumably differs from Winmar's sleep-study business), and also excluded from the sale (along with cash and accounts receivable) were those assets of Winmar's oxygen business that were encumbered by a security interest in favor of State Bank and Trust, Fargo, North Dakota. *Ex. A to Complaint*, ¶ 2. As is true with respect to the allegations about the transfer of SRI's assets, there are no factual allegations showing that the assets sold – *i.e.*, the patient lists, certain inventory and Winmar's phone numbers – were worth more than the price paid for them.[34]

The Court concludes that even taken as true, these factual allegations do not plausibly suggest that Sabolik "irrationally squander[ed] or [gave] away corporate assets." *Fletcher's Cyclopedia*, § 1102. As noted previously, the concept of corporate waste is "a rigorous test designed to smoke out shady, bad faith deals . . . ." *In re Lear Corp. Shareholder Litig.*, 967 A.2d 640, 656 (Del. Ch. 2008). The plaintiff must plead facts showing that no reasonable person of ordinary sound business judgment could view the benefits received [or conferred] in the transaction as a fair exchange for the consideration paid [or received] by the corporation. *Id.* The test for waste is stringent, and if given the facts pled in the complaint, any reasonable person might conclude that the deal made sense, then the judicial inquiry ends. *In re Lear Corp. Shareholder Litig.*, 967 A.2d 640, 656 (Del. Ch. 2008).

Based upon the allegations in the Complaint, the Court concludes that a reasonable person

---

[34] The Trustee does allege that the outstanding stock of Winmar was acquired in 2006 for several million dollars. *Compl.*, ¶ 106-107. There is no factual content from which this Court can conclude that the oxygen business alone was worth any particular amount, however.

of ordinary sound business judgment could conclude that Winmar, which had ceased operations, was concerned about the continuity of care of its patients and needed a third party to take over its patient files immediately upon its cessation of operations. Accordingly, the Court also concludes that the Complaint fails to state a claim for corporate waste as to Sabolik.

For all of these reasons, Count 3 of the Complaint must be dismissed.

### 2.    The Trustee's Claim for Breach of Fiduciary Duty against Linehan

The Trustee alleges that Linehan was chairman of the Board from 2005 through the petition date, *Compl.*, ¶ 17, was President of Inc. from 2005 until July 21, 2008, and was its CEO from 2005 through the petition date. *Compl.*, ¶ 21. According to the Trustee, Linehan was also (i) chairman of SRI's board from February 9, 2006 through August 20, 2008, *Compl.*, ¶ 35, (ii) President of SRI until March 31, 2006, *Compl.*, ¶ 36, (iii) chief executive officer ("CEO") of SRI from March 31, 2006 through the petition date, *id*., (iv) chairman of SRI 2's board and its CEO from April 13, 2007 through the petition date, *Compl.*, ¶¶ 40, 41, (v) chairman of Winmar's board from December 28, 2006 through August 20, 2008, *Compl.*, ¶ 112, and (vi) Winmar's President and Secretary from December 28, 2006 through the petition date. *Compl.*, ¶ 114.

The Trustee complains of nine specific acts or failures to act that the Trustee contends constituted a breach of Linehan's fiduciary duties of care and loyalty:[35]

>    (i)    as the CEO of Inc. and as the president of SRI, causing SRI to commence business operations without a tested, viable billing and collection system;

>    (ii)   as the CEO of SRI, failing to confer or consult with SRI's president, Hewlett, regarding the

---

[35] The Trustee does not specify which acts are alleged to constitute a breach of the duty of care and which acts are alleged to constitute a breach of the duty of loyalty.

business operations of SRI, and by failing to consult with Hewlett concerning important business decisions that Linehan unilaterally made on behalf of SRI;

(iii)  as the CEO of SRI,[36] failing to confer or consult with the vice-president of Winmar, Nelson,[37] regarding the business operations of Winmar, and by failing to consult with Nelson concerning important business decisions that Linehan unilaterally made on behalf of Winmar;

(iv)  as the chairman of the Board, failing to call meetings of the Board when events involving Inc. required that the Board exercise its powers and duties to oversee and conduct the business and affairs of Inc. and its Operating Subsidiaries;

(v)  as the chairman of the Board, failing to insure that the committees of the Board carried out their functions as intended under Inc.'s bylaws;

(vi)  as the CEO of Inc. and the chairman of the Board, failing to take any action to correct or address the material adverse financial conditions affecting the business operations of Inc. and the Operating Subsidiaries, including but not limited to SRI's billing and collection problems, SRI's bad debt write-offs, the significant reduction in Inc.'s borrowing base after GE sent the May 14, 2008 notice of default letter, the restrictions on SRI's ability to purchase inventory imposed by Harvard, and Inc.'s insolvency which Linehan knew or had reason to know of by no later than mid-May 2008;

(vii)  as the CEO of Inc. and chairman of the Board, failing to develop any plan, process, or procedure to address the steady financial decline of Inc. and the Operating Subsidiaries;

(viii)  as the CEO of Inc., Winmar and SRI 2, and as chairman of the Board, and as an officer and director of SRI and Winmar, failing to retain a financial crisis manager to advise the Board and the boards of the Operating Subsidiaries on the actions that could have been taken to address the declining financial condition of Inc. and the Operating Subsidiaries and, upon insolvency, actions that could and should have been taken to maintain the going concern value of the assets of the Operating Subsidiaries for the benefit of their creditors; and

(ix)  as the CEO of Inc. and SRI 2, as an officer and director of SRI, and as an officer and director of Winmar, approving the filing of chapter 7 cases for Inc. and the Operating

---

[36] The Court assumes this is a typographical error, and that the Trustee intends to allege that this conduct was done in Linehan's capacity as CEO of Winmar.

[37] The Court is unsure whether this is a typographical error, as Nelson is alleged to have been the president of Winmar in one place in the Complaint, *Compl.*, ¶ 13, but is alleged to have been vice-president in others. *Compl.*, ¶¶ 114, 115.

Subsidiaries without giving any consideration to the orderly wind down of the business operations of the Operating Subsidiaries.

### a.      Choice of Law

Once again, neither party has briefed the choice of law issues in any detail.  As should be clear from the recital of the foregoing nine instances of conduct that allegedly constitute a breach of Linehan's fiduciary duties, some of the conduct occurred on behalf of one corporation only, and some occurred on behalf of two or more corporations, which complicates the legal analysis slightly. Applying the same choice of law analysis as discussed above, *see supra* pp. 60-62, the Court concludes, since this breach of fiduciary duty claim against Linehan does not implicate any bankruptcy policy, that it should apply the choice of law rules of the forum state (Texas) which, as noted above, point to the law of the state of incorporation of these foreign corporations as the appropriate law governing this claim.  Therefore, the Court will look to the law of Delaware to the extent the claim is asserted on behalf of Inc. or SRI 2, to the law of Missouri to the extent the claim is asserted on behalf of SRI, and to the law of North Dakota to the extent the claim is asserted on behalf of Winmar.  The Court concludes that the nine instances of conduct summarized above should be analyzed as follows: item (i) implicates the law of both Delaware and Missouri; item (ii) implicates only Missouri law; item (iii) implicates only North Dakota law; items (iv)-(vii) implicate only Delaware law; and items (viii) and (ix) implicate the law of all three states.

The Court has discussed the legal standards for breach of fiduciary duty under Delaware law at length above.  *See supra* pp.13-21.  A brief discussion of the relevant legal standards under both Missouri law and North Dakota law follows.

### (1)    Missouri Law

Missouri recognizes the business judgment rule, and "courts will not interfere with or attempt to control the internal management or policy of a corporation except in cases of fraud, bad faith, breach of trust, gross mismanagement, or ultra vires acts on the part of the officers and directors." *Leggett v. Missouri State Life Ins. Co.*, 342 S.W.2d 833, 851 (Mo. 1961).  Or, stated another way, under the business judgment rule, a board decision will not be disturbed unless the judgment is "exercised in an arbitrary and capricious manner or contrary to by-laws or majority stockholders' action."  *Saigh v. Anheuser-Busch, Inc.*, 396 S.W.2d 9, 18 (Mo. App. 1965).  Similarly, a derivative complaint will be dismissed for failure to state a claim where it fails to allege that the directors or officers performed or perpetrated ultra vires, illegal or fraudulent acts.  *Id.*

A more recent formulation of the rule is that officers and directors of a corporation are protected by the business judgment rule from liability for intra vires acts within their authority made in good faith, uninfluenced by any other consideration than the honest belief that the action subserves the best interests of the corporation; and thus, the business judgment rule precludes courts from interfering with corporate decisions (or substituting their judgment as to the proper management of a corporation) absent a showing of fraud, illegal conduct, an ultra vires act, or an irrational business judgment.  *Sutherland v. Sutherland*, 348 S.W.3d 84 (Mo. App. 2011); *Broski v. Jones*, 614 S.W.2d 300 (Mo. App. 1981); *Jackson v. St. Regis Apartments, Inc.*, 565 S.W.2d 178 (Mo. App. 1978).  The rationale behind the rule requiring illegal, ultra vires or fraudulent acts, or that the business judgment of the board be exercised unfairly or in a dishonest manner, is that such acts cannot be ratified by shareholders.  *Niedert v. Neidert*, 637 S.W.2d 296 (Mo. App. 1982).

Directors and officers in Missouri owe fiduciary duties to the corporation and its

shareholders, although those duties have not been neatly categorized in the corporate context. *Fitch v. J.A. Tobin Constr. Co.*, 829 S.W.2d 497, 504 (Mo. App. 1992). However, a fiduciary duty has been recognized in the context of due care, without referring to the duty as such. *Boulicault v. Oriel Glass Co.*, 223 S.W. 423 (Mo. 1920). As to the duty of loyalty, at least one court has held that a corporate officer or director's duty to a corporation is governed by the same rules that apply to trustees and agents, *Zakibe v. Ahrens & McCarron, Inc.*, 28 S.W.3d 373 (Mo. App. 2000), and Missouri courts have recognized the fiduciary duty of loyalty in the trustee context. *Nixon v. Lichtenstein*, 959 S.W.2d 854, 859 (Mo. App. 1998) ("a trustee is a fiduciary of the highest order and is required to exercise a high standard of conduct and loyalty"). Therefore, it is fair to conclude that Missouri recognizes the fiduciary duties of loyalty and due care.

The duty of due care has not been as precisely defined under Missouri law as it has been under Delaware law. As noted earlier, Missouri courts have looked to *Fletcher's Cyclopedia* for guidance in corporate law matters. As to the duty of due care, sections 1029 and 1031 of that treatise provide:

> In addition to their duties of loyalty and disclosure . . . directors and officers of a corporation are required by law to perform their obligations in accordance with a minimum standard of care. Courts generally apply the duty of care in cases involving alleged negligence, mismanagement, or intentional decisions to commit unlawful acts. Cases involving fraud, self-dealing, and conflicts of interest generally are covered under the duty of loyalty. The standard of care for directors and officers of business corporations is derived from common law and state business corporations codes. This standard is tempered by the business judgment rule, a common-law doctrine under which courts generally refuse to second-guess a business decision, so long as management made a reasonable effort to make an informed decision.
>
> * * *
>
> Generally, a corporate director or officer will not be held liable for mere negligent mismanagement untainted by self-dealing. The primary reason for this is the protection afforded to directors and officers by the business judgment rule, which generally insulates them from negligence liability. Of course, there are a number of

situations where the business judgment rule does not apply—as, for example, where no decision was made, or where directors have a conflict of interest or where directors failed to take sufficient care to inform themselves before making a decision. However, these cases generally involve conduct substantially worse than ordinary negligence—indeed, that is often why the business judgment rule did not apply in the first place.. . . Even where the business judgment rule controls, a director is liable for gross negligence in attending to his or her duties. Director liability for good faith error is generally confined to gross negligence . . .  most courts now agree that the degree of care required of a director is the degree of care an ordinarily prudent person would exercise in a like position under similar circumstances. An ordinarily prudent person "in a like position" has been interpreted to mean an ordinarily prudent person who was director of the particular corporation. The phrase "under similar circumstances" has been interpreted to mean that a court should take account of the director's responsibilities in the particular corporation, the information available at the time, and the special background knowledge or expertise the director has.

*Fletcher's Cyclopedia*, §§ 1029, 1031.

As to the duty of loyalty in Missouri, it has been recognized in certain cases of self-dealing or unfair profit, although the courts have not used a "duty of loyalty" nomenclature.  For example, directors and officers breach their fiduciary duty where they profit by virtue of their position at the expense of the corporation or the rights of the stockholders.  *Bromschwig v. Carthage Marble & White Lime Co.*, 66 S.W. 2d 889 (Mo. 1933).  "If by dealing with the property of the corporation or its business for their own purposes, directly or indirectly, they derive a personal profit from it, they may be held trustees ex maleficio, as to such profits, for the benefit of the corporation and those stockholders who have suffered injury or deprivation by their conduct, and be compelled to restore what they have thus converted to their own use."  *Bromschwig*, 66 S.W. 2d at 892; *Ramacciotti v. Joe Simpkins, Inc.*, 427 S.W.2d 425 (Mo. 1968).  In such a circumstance, "it is immaterial whether the company or stockholder has been damaged, and it is not essential to the liability of the director that the company has suffered a loss from what he has done; it is sufficient that he has gained a profit through it."  *Id.*  A director will not be permitted to retain any secret profits made by him in breach,

or in disregard, of his fiduciary relation.  *Id.*  A director may not deal with the property of the corporation for his own personal benefit or advantage, profit at the expense of the shareholders, or cause the issuance of stock for his own personal aggrandizement to the detriment of other shareholders or for the purpose of obtaining control of the corporation.  *Gieselmann v. Stegeman*, 443 S.W.2d 127 (Mo. 1969).  The Missouri Supreme Court has noted that the duty of loyalty generally imposes an obligation on officers and directors to avoid conflict of interest transactions. *Peterson v. Continental Boiler Works, Inc.*, 783 S.W.2d 896 (Mo. 1990).  The Missouri Supreme Court, quoting Ruder, *Duty of Loyalty- a Law Professor's Status Report*, 40 Bus. Law 1383, 1384 (1985) noted that ten substantive areas have been identified in which the duty of loyalty is subject to breach:

> [S]elf-dealing, dealings by a corporate parent with its subsidiaries, majority shareholder injury to minority shareholders in corporate acquisition and reorganization transactions, excessive compensation, use of corporate funds to perpetuate control, sale of control at a premium, insider trading, corporate opportunities, competition by corporate officers and directors with their corporation, and fiduciary obligations in bankruptcy.

*Peterson*, 783 S.W.2d at 905.

Thus, this Court concludes that Missouri law applies the business judgment rule and recognizes the fiduciary duties of loyalty and due care, although they are not as precisely defined as they are in Delaware.

### (2)    North Dakota Law

North Dakota has statutes that govern the standard of conduct for directors and officers. The statute that governs the standard of conduct for officers provides:

> An officer shall discharge the duties of an office in good faith, in a manner the officer reasonably believes to be in the best interests of the corporation, and with the care an ordinarily prudent person in a like position would exercise under similar

circumstances.

N.D. Cent. Code, § 10-19.1-60 (West 2011).  In turn, the statute that governs the standard of

conduct for directors provides, in relevant part:

> 1. A director shall discharge the duties of the position of director in good faith, in a manner the director reasonably believes to be in the best interests of the corporation, and with the care an ordinarily prudent person in a like position would exercise under similar circumstances. A person who so performs those duties is not liable by reason of being or having been a director of the corporation.
>
> * * *
>
> 5. A director's personal liability to the corporation or its shareholders for monetary damages for breach of fiduciary duty as a director may be eliminated or limited in the articles. The articles may not eliminate or limit the liability of a director:
>> a. For any breach of the director's duty of loyalty to the corporation or its shareholders;
>> b. For acts or omissions not in good faith or that involve intentional misconduct or a knowing violation of law;
>> c. Under section 10-19.1-95 [relating to illegal distributions] or 10-04-17 [relating to issuance and sale of securities];
>> d. For any transaction from which the director derived an improper personal benefit; or
>> e. For any act or omission occurring prior to the date when the provision in the articles eliminating or limiting liability becomes effective.
>
> 6. In discharging the duties of the position of director, a director may, in considering the best interests of the corporation, consider the interests of the corporation's employees, customers, suppliers, and creditors, the economy of the state and nation, community and societal considerations, and the long-term as well as the short-term interests of the corporation and its shareholders, including the possibility that these interests may be best served by the continued independence of the corporation.

N.D. Cent. Code, § 10-19.1-50 (West 2011).  As used in the statute, the term "good faith" is defined

as "honesty in fact in the conduct of an act or transaction." N.D. Cent. Code, § 10-19.1-01(29) (West

2011).

As these statutes demonstrate, North Dakota recognizes that directors and officers owe

fiduciary duties of good faith, loyalty, and due care to the corporation.  Brian Winrow, *Director*

*Liability: A Cliche in North Dakota*, 84 N.D. L. Rev. 1109, 1111 (2008) ("*Winrow*").  According to

Winrow, the North Dakota statute has "provide[d] directors greater freedom in executing their fiduciary duties by incorporating a range of statutorily sanctioned factors in the decision-making process.  The effect has been to provide the directors with additional justification for pursuing a course of action, thus thwarting the shareholder's attempt to hold a director monetarily culpable for breaching the fiduciary duty of good faith . . . [the statute] expand[s] the traditional notion and understanding of the best interest of the corporation by incorporating extrinsic factors." *Winrow*, at 1113.

There are few reported decisions in North Dakota regarding claims for breach of fiduciary duties by corporate officers and directors.  Nevertheless, it is clear that North Dakota courts apply the business judgment rule, *Red River Wings, Inc. v. Hoot, Inc.*, 751 N.W.2d 206 (N.D. 2008), which prohibits judicial inquiry into the actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes. *Id.* at 221-222.  Corporate directors are shielded from all liability except for self-dealing, willful misconduct or gross negligence. *Id.*; *In re Conservatorship of Sickles*, 518 N.W.2d 673, 680-81 (N.D. 1994). Courts will not interfere with the judgment of directors unless their judgment is influenced by personal considerations.  When a challenge is made to an action, absent claims of fraud, self-dealing, unconscionability or other misconduct, the court should apply the business judgment rule and should limit its inquiry to whether the []action was authorized and whether it was taken in good faith and in furtherance of the legitimate interests of the [corporation]." *Agassiz West Condominium Assoc. v. Solum*, 527 N.W.2d 244, 248 (N.D. 1995) (applying business judgment rule to decision of a condominium board).  Courts will not interfere with the decisions of directors in the reasonable and honest exercise of their judgment where that judgment is uninfluenced by personal

considerations. *Dixon v. McKenzie County Grazing* Assoc., 675 N.W.2d 414 (N.D. 2004); *Lill v. Cavalier Rural Elec. Co-Op., Inc.*, 456 N.W.2d 527 (N.D. 1990).

With the relevant standards of conduct in Delaware, Missouri and North Dakota in mind, the Court turns to its analysis of the Trustee's breach of fiduciary duty claim as against Linehan.

### b.    Breach of Fiduciary Duty Claim Against Linehan

The Trustee first complains, on behalf of Inc. and SRI, that Linehan breached his fiduciary duty[38] by causing SRI to begin operations without tested, viable billing systems in place. To the extent the claim is asserted on behalf of Inc., it is governed by Delaware law. The Trustee has not alleged any facts suggesting subjective bad faith or self-dealing; and thus, to the extent the Trustee contends that Linehan's decision to hire an outside vendor (here, Carecentric) to provide these services breached his duty of loyalty, the Trustee must be relying on a lack of good faith, apparently on the theory that Linehan's decision was an intentional dereliction of duty or was made in conscious disregard of his responsibilities. *Disney*, 906 A.2d at 66. However, there are no factual allegations plausibly suggesting that Linehan was either intentionally derelict or consciously disregarded the need to have a billing and collections system in place. In fact, the Trustee alleges that a third party vendor was hired to perform these functions. Therefore, the Court concludes that the Trustee has failed to state a claim for breach of the duty of loyalty under Delaware law.

The *real* thrust of the Trustee's allegations is that "the selection of CareCentric to perform these tasks" was a "poor" one. *Compl.*, ¶ 138. This claim is most properly analyzed as a duty of care claim in light of the business judgment rule. As noted earlier, *see supra* pp. 20-21, under Delaware law, the duty of care requires that in making business decisions, corporate directors must consider

---

[38] Again, the Trustee does not identify *which* fiduciary duty was allegedly breached.

all material information reasonably available. *San Antonio Fire & Police Pension Fund v. Amylin Pharmaceuticals, Inc.*, 983 A.2d 304 (Del. Ch. 2009). The appropriate standard to establish a breach of the duty of care is one of gross negligence, which has been defined as "reckless indifference" or conduct beyond the "bounds of reason." *McPadden v. Sidhu,* 964 A.2d 1262 (Dec. 2008). As one court has noted, the definition of gross negligence in Delaware corporate law is "extremely stringent." *In re Lear Corp. Shareholder Litig.*, 967 A.2d 640, 652 (Del. Ch. 2008). The challenged decision must be "so grossly off-the-mark as to amount to reckless indifference or a gross abuse of discretion." *Id. (quoting Solash v. Telex Corp.*, 1988 WL 3587 at *9 (Del. Ch. Jan. 19, 1988)).

Here, the Trustee alleges that "Linehan signed the CareCentric Letter Agreement without doing any due diligence on CareCentric's ability to perform the billing and collection functions that CareCentric agreed to provide." *Compl.*, ¶ 52; *see also Compl.*, ¶ 138. The Trustee's allegation that Linehan did no due diligence is conclusory and devoid of factual support. *Iqbal*, 129 S. Ct. at 1949-50; *McCall*, 661 F. Supp. 2d at 653. It is thus not entitled to a presumption of truth under *Iqbal*, and the Court concludes that the Trustee has failed to allege factual content that would allow the Court to draw a reasonable inference that the decision to hire CareCentric was grossly off-the-mark or beyond the bounds of reason. Instead, the facts as pled are merely consistent with Linehan's liability, and thus the allegations stop "short of the line between possibility and plausibility of entitlement to relief," *Iqbal*, 129 S. Ct. at 1949, such that the Court concludes that the Complaint fails to state a claim for breach of the fiduciary duty of care as to Linehan under Delaware law.[39]

---

[39] The Trustee's conclusory allegation that Linehan did no due diligence before selecting Carecentric is also somewhat undercut by the Trustee's allegation that Inc.'s management met with Carecentric representatives in early March, 2006, before SRI commenced operations, and "CareCentric's management assured Soporex's management that CareCentric had the expertise, the necessary software, and the experienced staff needed to perform the data processing and the billing and collection functions." *Compl.*, ¶ 50.

To the extent this claim is advanced on behalf of SRI, it is governed by Missouri law. Missouri law has identified ten substantive areas in which an officer or director may breach his duty of loyalty, none of which apply here. *See supra*, p. 80. In addition, for the same reasons discussed above, the Court concludes that the Trustee's allegations with respect to the decision to hire Carecentric are properly analyzed under the duty of care. Given the business judgment rule, Missouri courts will not substitute their judgment for that of the officers/directors unless there are illegal, ultra vires, fraudulent or otherwise dishonest acts or the judgment is wholly irrational. *Sutherland v. Sutherland,* 348 S.W.3d 84 (Mo. App. 2011). The Trustee has not alleged any factual content that would plausibly support such an inference here. Thus, the Court concludes that the Trustee has failed to state a claim against Linehan for breach of fiduciary duty in connection with the hiring of Carecentric under Missouri law. In addition, the Court notes that there are no facts from which the Court could infer that it was irrational to hire an outside vendor to perform services that SRI could not itself perform.

The Trustee next complains that Linehan failed to confer with SRI's president, Hewlett, on important business decisions (a claim governed by Missouri law) and failed to confer with Winmar's vice-president, Nelson, concerning important business decisions (a claim governed by North Dakota law). The factual allegations regarding Hewlett are that he managed SRI's day-to-day operations in Murray, Kentucky, was named president of SRI on March 31, 2006, remained in that position through the petition date, but he "was president of SRI in name only." *Compl*., ¶ 12, 36. The Trustee further alleges that Hewlett was supposed to exercise the powers and authority commonly incident to the office of the president of a corporation, but he did not perform those functions "because he was never given the authority to do so by Linehan and Sabolik," he "never had an opportunity to

effectively manage SRI's business operations since he was out of the loop on all important operational decisions," and he was "denied access to financial information," including financial statements "so had no way to effectively manage the day-to-day operations or to ensure SRI's profitability." *Compl.*, ¶ 37.  In addition, the Trustee alleges that Hewlett warned Linehan and Sabolik that SRI ought to more aggressively market to increase its patient base, *Compl.,* ¶ 46, warned Linehan and Sabolik that Medicare would likely lower its reimbursement rate for the drug Albuterol, *Compl.*, ¶ 80, and he possessed "extensive knowledge of the markets and market opportunities based on [his] extensive knowledge of the industry through [his] business experience." *Compl.*, ¶ 135.

Similarly, the Trustee alleges that Linehan should have conferred with Nelson concerning important business decisions for Winmar.  Nelson is alleged to have been president of Winmar "in name only," *Compl.*, ¶ 13, and was one of Winmar's owners prior to its acquisition by Inc. in December, 2006. *Compl.*, ¶ 104.  The Trustee alleges that Nelson was never consulted respecting important operational and financial decisions, such as "the excessive amounts expended by Soporex for ill-advised sleep study marketing initiatives," *Compl.*, ¶ 115, and was never provided financial statements. *Compl.*, ¶ 115.  The Trustee also alleges that Nelson operated Winmar profitably despite many failed marketing and sleep study program initiatives, *Compl.*, ¶ 129, and Nelson had "extensive knowledge of the markets and market opportunities based on [her] extensive knowledge of the industry through [her] business experience." *Compl.* ¶ 135.  The Trustee further alleges that Nelson was never asked to re-acquire Winmar. *Compl.*, ¶ 164.

The Complaint does not specify which "important business decisions" are at issue, what advice Nelson and Hewlett could have offered, or how any of the outcomes of any of these business

decisions would have been different and better had Linehan consulted with either Hewlett or Nelson. The Trustee has not alleged how or why one officer had a fiduciary duty to consult with another or any facts suggesting that Linehan acted in conscious disregard of any such duty, so as to implicate the duty of loyalty. The Trustee does not allege any facts showing that the failure to confer with Nelson and/or Hewlett, which is tantamount to a complaint that Linehan acted unilaterally for Winmar and SRI, constituted an irrational decision so as to take that decision outside of the business judgment rule in either Missouri or North Dakota. As a result of these failures, the Complaint fails to state a claim against Linehan.

The Trustee next alleges that Linehan, as chairman of the Board, failed to call meetings of the Board when events involving Inc. required that the Board exercise its powers and duties to oversee the business of Inc. and the Operating Subsidiaries. The facts that support this contention overlap with those supporting the contentions that Linehan failed to (i) insure that the Board committees functioned, (ii) take any action to address material adverse financial conditions affecting the operations of Inc. and the Operating Subsidiaries, and (iii) develop a plan to address the steady financial decline of Inc. and the Operating Subsidiaries. As each of these acts/omissions were allegedly done by Linehan on behalf of Inc. and their factual predicates overlap, Delaware law governs and they will be discussed together.

The Trustee made similar allegations against the Outside Directors, but the Court concluded that those allegations were insufficient to state a claim against the Outside Directors. *See supra* pp. 36-41 (addressing the Financial Decline Allegations). The Court did so largely because the Trustee (i) did not allege facts plausibly showing that the Outside Directors either consciously disregarded their duties or acted in intentional dereliction of a known duty, and (ii) conceded that the Outside

Directors had been misled about the companies' "ever-worsening" financial condition.

Here, however, the Trustee *does* allege sufficient factual content from which the Court can plausibly infer that Linehan consciously disregarded his fiduciary obligations. The Trustee alleges that Linehan was aware that (i) Carecentric was not properly billing insurers and, as a result, collections of accounts receivable had dropped, (ii) the reimbursement rate for Albuterol could be expected to drop significantly, (iii) Inc. was in default of its borrowing base covenants with GE, such that GE had sent a notice of default and refused to advance further credit, (iv) Inc. was forced to enter into a forbearance agreement with GE that required, among other things, Inc. to remit a large tax refund to GE, and (v) Inc. and the Operating Subsidiaries would lack the cash to operate by mid-July. Yet, according to the Trustee, Linehan failed to inform the Board of the forbearance agreement. *Compl.*, ¶ 90. The Trustee further alleges that Linehan did not did not tell the Board that the Operating Subsidiaries were running out of cash, and did not call any Board meetings between December, 2007 and July, 2008.

These facts, taken as true and viewed in the light most favorable to the Trustee, are sufficient to allege that Linehan consciously disregarded his responsibilities or was intentionally derelict in fulfilling his duty, *Disney*, 906 A.2d at 66, and thus breached his duty of loyalty to Inc. They are also sufficient for the Court to infer that Linehan acted in a grossly negligent manner – *i.e.*, with reckless indifference or conduct beyond the "bounds of reason," *McPadden v. Sidhu*, 964 A.2d 1262 (Del. 2008), and thus breached his duty of care to Inc.[40] Accordingly, the Complaint will not be dismissed

---

[40] Although the Court has discussed these acts/omissions together and concludes that the Trustee has stated a claim for breach of fiduciary duty as against Linehan, the Court does not conclude that the Trustee has stated a claim to the extent that the alleged breach is premised upon Linehan's failure to insure that Inc.'s board committees functioned. There are insufficient factual allegations respecting the duties of those committees or the effect of their failure to function to base a breach of fiduciary duty claim on this theory. *See supra*, n. 13.

with respect to acts or failures to act (iv) - (vii) as delineated on p. 75 *supra*.

The Trustee next complains that Linehan, as the CEO of Inc., Winmar and SRI 2,[41] and as chairman of the Board, and as an officer and director of SRI and Winmar, breached his fiduciary duties by failing to retain a financial crisis manager to advise the Board and the boards of the Operating Subsidiaries on the actions that could have been taken to address the declining financial condition of Inc. and the Operating Subsidiaries and, upon insolvency, actions that could and should have been taken to maintain the going concern value of the assets of the Operating Subsidiaries for the benefit of their creditors. Essentially, the Trustee alleges, on behalf of all four companies, that Linehan should have retained a turnaround professional and his decision not to do so was a breach of his fiduciary duty. As this claim is asserted on behalf of all four companies, it is governed by the laws of Delaware, Missouri and North Dakota.

The Court concludes that to the extent the Trustee is attempting to allege that the decision

---

[41] The Court notes that SRI 2's certificate of incorporation, contained in the appendix to the Officers' Motion, may be considered by the Court in connection with the Officers' Motion pursuant to the order entered on September 2, 2011. *See* Docket No. 71. Article 6 of that certificate of incorporation, entitled "Personal Liability of Directors" provides that "the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director is hereby eliminated to the fullest extent permitted by the provisions of paragraph (7) of subsection (b) of § 102 of the General Corporation Law of the State of Delaware . . . ." That provision of Delaware's statute provides that a certificate of incorporation may include a provision "eliminating or limiting the personal liability of a director . . . for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) for any breach of the director's duty of loyalty . . . (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law . . . ." Del. Code Ann. Tit. 8, § 102 (West 2011). It is well-established in Delaware that this statute exculpates directors from liability for a breach of the duty of care claim. *See, e.g., In re NYMEX Shareholder Litig.*, No. 3621-VCN, 2009 WL 3206051 (Del. Ch. 2009). Here, the Trustee alleges that Linehan acted in his capacity as CEO of SRI 2, not as a member of the SRI 2 board. Therefore, section 102(b)(7), which exculpates *directors*, does not apply. Although the Officers cite *In re Verestar, Inc.*, 343 B.R. 444 (Bankr. S.D.N.Y. 2006) for the proposition that "even allegations . . . against them solely in the capacities as officers should also be dismissed due to the exculpation clauses," *see Defendants Stephen D. Linehan, Richard J. Sabolik and Scott D. Smith's Br. In Supp. Of their Mot. To Dismiss*, p. 28, n. 20, the Court respectfully disagrees with the *Verestar* court's brief analysis. The *Verestar* court stated, in two sentences, that since Delaware decisions impose the same fiduciary duties on officers and hold officers to the same standards as they do directors, the exculpatory provision in the corporation's certificate of incorporation also protected the officers. The *Verestar* court did not cite any Delaware authority for this proposition, and this Court has been unable to locate any either.

not to hire a turnaround professional is a breach of the duty of loyalty, the Complaint fails to state a claim under any relevant state law. There is no allegation of self-dealing or subjective bad faith in connection with this failure to act. Thus, in Delaware, the Trustee would have to allege factual content from which the Court could plausibly infer that Linehan *consciously* disregarded his obligations, was *intentionally* derelict in his duties, or made an irrational business judgment. *Lyondell Chem. Co. V. Ryan*, 970 A.2d 235 (Del. 2009); *In re Citigroup Shareholder Deriv. Litig.*, 964 A.2d 106 (Del. Ch. 2009). To the extent the Trustee is attempting to state a director oversight liability claim under Delaware law (which would also be a breach of the duty of loyalty), the allegations do not rise to the level required by the decisions in *Caremark* and *Stone*. The Trustee has not alleged a "sustained or systematic failure of the board to exercise oversight." *Caremark*, 698 A.2d at 968. Moreover, if this is the Trustee's allegation, she is once again attempting to stretch the oversight liability cases beyond the factual contexts in which they have been decided. Here, the Trustee apparently argues that the failure to hire a turnaround professional exposed Inc. and the Operating Subsidiaries to continuing losses and an inability to successfully avoid chapter 7 liquidations. However, there are no factual allegations supporting an inference that even if a turnaround professional had been hired, the outcomes here could or would have been different for Inc. or any of the Operating Subsidiaries. Absent such allegations, no director oversight claim can properly lie. Moreover, to state a breach of the duty of loyalty claim in Missouri, the Trustee would have to allege factual content from which the Court could plausibly infer that Linehan dealt with the property of Inc. and SRI for his own purpose or advantage, or engaged in self-dealing or a conflicted transaction. *Peterson*, 783 S.W.2d at 905. In North Dakota, the Trustee would have to allege factual content from which the Court could plausibly infer that Linehan engaged in fraud, self-dealing or

a conflicted transaction.  The Complaint contains no such factual allegations.

To the extent the Trustee is alleging that the decision not to hire a turnaround professional is a breach of the duty of care, the Court also concludes that the Complaint fails to state a claim under any relevant state law.  Of the three states' laws at issue here, Delaware law is the most well defined with respect to the duty of care.  Under Delaware law, Linehan was obligated to consider all material information reasonably available to him.  To breach this duty he had to act in a grossly negligent manner – *i.e.*, with reckless indifference or conduct beyond the bounds of reason. *McPadden v. Sidhu,* 964 A.2d 1262 (Del. 2008).  There are simply no allegations in the Complaint that he did not consider all material information reasonably available to him.  Rather, the Trustee appears to argue that Linehan had a duty to hire a third party to prepare additional information that he then should have considered.  The Trustee cites no authority for this proposition and the Court has been unable to locate any either.  In other words, there is simply no reported decision in Delaware (or Missouri or North Dakota for that matter) that either the parties or the Court were able to locate in which a director has been held liable for a breach of a duty of care for failing to employ an outside expert (like a turnaround professional) to prepare additional information that must then be considered by the board.  While turnaround professionals would no doubt be thrilled with such a holding (that would then ensure their hiring in every troubled financial situation), that does not appear to be the law and, from this Court's perspective, it should not be the law.

Lastly, the Trustee complains that Linehan, as CEO of Inc. and SRI 2, as an officer and director of SRI, and as an officer and director of Winmar, approved the filing of chapter 7 cases for Inc. and the Operating Subsidiaries without giving any consideration to the orderly wind down of the business operations of the Operating Subsidiaries.  However, the factual allegations in the

Complaint do not establish that Linehan had any real part in this decision. The Complaint alleges that Linehan was involved in a "very serious automobile accident" on July 18, 2008. *Compl.*, ¶ 22. Chevallier, the bankruptcy attorney, was not contacted until late July, 2008. *Compl.*, ¶ 159. Although a Board meeting was held on July 28, 2008 with Chevallier present, Linehan was not there and no formal action was taken. *Compl.*, ¶ 160. Further Board meetings were held in August, but Linehan is not alleged to have been present. The only allegation respecting Linehan is that Sabolik and Smith met Linehan in the hospital where Linehan was "recovering from his accident" and obtained his consent for the bankruptcy filing. *Compl.*, ¶ 168. Despite the formal positions that he still held with Inc. and the Operating Subsidiaries, Linehan is not alleged to have had any input into the decision other than to apparently give his consent while recovering in the hospital. This factual content is insufficient for the Court to draw a reasonable inference that Linehan is liable for the alleged misconduct in making the decision to file for relief under chapter 7 rather than under chapter 11. *Iqbal*, 29 S.Ct. at 1949.

The Court notes that there are other factual allegations in the Complaint with respect to Linehan that do not fit neatly into one of the nine specific instances of alleged breaches of fiduciary duty as they are categorized in Count 1 of the Complaint. *See Compl.*, ¶ 185 (a) - (i) (enumerating nine items which the Trustee alleges constitute breaches of Linehan's duties). In the section of the Complaint entitled "Gross Mismanagement of Business Operations," subsection (1) is entitled "Mismanagement by Linehan and Sabolik." *Compl.*, p. 40. In that section of the Complaint, the Trustee alleges that Linehan (and Sabolik) "grossly and recklessly mismanaged the Soporex Debtor's businesses for the entire two and one-half years the businesses were operated," *Compl.*, ¶ 138, and she alleges facts respecting three general areas of concern. First, she repeats her claim Linehan

breached his fiduciary duties in the selection and hiring of Carecentric, *see Compl.*, ¶¶ 138-142, which the Court has discussed above and which factual allegations the Court has concluded are insufficient to state a claim. *See supra*, p. 84. Second, the Trustee generally alleges that Linehan established Inc.'s headquarters in Dallas rather than at the heart of the "Soporex Debtors' business operations in Murray, Kentucky"[42] as a matter of "personal convenience," which unnecessarily increased the overhead expenses of the Operating Subsidiaries and was partially responsible for their decline. *See, e.g., Compl.*, ¶¶ 143-145. Specifically, the Trustee alleges that this decision led to Inc. charging a management fee to SRI and Winmar related to "payroll and payroll expenses for the offices in Dallas and for professional and legal costs" that were charged to the Operating Subsidiaries." *Compl.*, ¶ 144. The Trustee also alleges that there was "excessive and unnecessary spending at the Soporex parent level," including

> (i) excessive salaries and other benefits provided to Soporex's corporate officers based in Dallas, including Linehan's daughter, Lisa Linehan; (ii) excessive expenditures for ill-advised marketing initiatives for Winman's sleep study business, all of which failed; (iii) excessive expenditures for legal and professional services in connection with financial and business transactions that were never consummated including, but not limited to Linehan's ill-advised recapitalization plan; and (iv) excessive sums paid for financing and business transactions that either did not close or for which Soporex received no value, including but not limited to the purchase of a minority equity interest in CSC.

*Compl*, ¶ 145.

Essentially, the Trustee complains of a multitude of operational business decisions – all of which directly implicate the business judgment rule. Although the Court is unable to determine on whose behalf the Trustee is complaining in this context – the Court notes that Delaware, Missouri and North Dakota all adhere to the business judgment rule, and courts in all three states are loathe

---

[42] Only SRI is alleged to have operated out of Murray, Kentucky. The Complaint alleges that Winmar conducted its operations in North Dakota; the Complaint does not allege where SRI 2 conducted its operations.

to interfere with the intra vires business decisions of directors and officers in the absence of factual allegations showing irrationality, fraud, illegality, bad faith, or the like. There are no such factual allegations here with respect to these operational decisions.

Finally, the Trustee alleges that despite knowledge that Inc. and the Operating Subsidiaries were approaching insolvency, Linehan (and Sabolik) continued to focus on a recapitalization plan that they "believed would cure all of Soporex's financial problems." *Compl.*, ¶ 148. The Trustee further alleges that the "single-minded focus on the recapitalization plan and their disregard of creditors' interests during the final months of business operations were the result of self-interest. Linehan . . . [was] attempting to recapitalize in order to be able to sell some or all of [his] preferred shares as part of the recapitalization of Soporex." *Compl.*, ¶ 148. The Complaint alleges that Linehan held 7.64% of Inc.'s preferred stock*, Compl.*, ¶ 32, that Linehan's equity investment drove many of the decisions he made, *id.*, and that an April, 2008 "Confidential Offering Memorandum" prepared by an investment banking firm that sought to raise additional capital did not mention using any capital to retire the existing $16 million of debt, but it did mention using the capital to enable current shareholders to sell up to 20% of their preferred shares. *Compl.*, ¶ 132.

These allegations, taken as true, are sufficient to state a claim against Linehan, notwithstanding the business judgment rule, because they plausibly suggest that Linehan was motivated by considerations of self-interest rather than the best interest of the corporations. The Officers' Motion will be denied with respect to these allegations.

Accordingly, Count 1 of the Complaint will be dismissed in part. The claims that survive the Officers' Motion are those relating to acts or failures to act (iv) - (vii) as set forth on page 75, *supra*, and the Trustee's allegations regarding Linehan's self-interest in pursuing a recapitalization

plan.

### 3. The Trustee's Claim for Breach of Fiduciary Duty against Sabolik

Sabolik is not alleged to have been on the Board - the Trustee alleges that he was an "advisor" to the Board's audit committee only. *Compl.*, ¶ 19. Moreover, according to the Trustee, Sabolik was (i) CFO of Inc. from March 31, 2006 until July 21, 2008, at which point he became President of Inc. and served in that capacity through the petition date, *Compl.*, ¶ 22, (ii) on SRI's board from December 28, 2006 through the petition date, *Compl.*, ¶ 35, (iii) SRI's CFO from March 31, 2006 through the petition date, *Compl.*, ¶ 36, (iv) on SRI 2's board through the petition date, *Compl.*, ¶ 40, (v) SRI 2's CFO from April 13, 2007 through the petition date, *Compl.*, ¶ 41, (vi) a Winmar director from December 28, 2006 through the petition date, *Compl.*, ¶ 112, and (vii) Winmar's CFO during that same time period. *Compl.*, ¶ 114.

The Trustee complains of six specific acts or failures to act that the Trustee contends constituted a breach of Sabolik's fiduciary duties of care and loyalty:[43]

> (i)    As CFO of Inc. and the Operating Subsidiaries, grossly mismanaging Inc.'s and the Operating Subsidiaries' financial affairs by, *inter alia*, recklessly disregarding his duty and obligation to properly control and mange their cash, by failing to maintain financial projections, including but not limited to cash flow forecasts, and by failing to provide timely, accurate and reliable financial reports to the Board;
>
> (ii)    as the CEO of Inc.,[44] entering into a second contract with Carecentric in May, 2007, and ignoring the advice of SRI's billing and collections and compliance officer, Camfield, that Inc. should take the billing and collection functions in-house;
>
> (iii)    as CFO of Inc. and the Operating Subsidiaries, failing to develop any feasible plan, process, or procedure to address the declining financial condition, the insolvency and the lack of operating funds of Inc. and the Operating Subsidiaries, and failing to take any steps to ensure

---

[43] The Trustee does not specify which acts are alleged to constitute a breach of the duty of care and which acts are alleged to constitute a breach of the duty of loyalty.

[44] The Court is unable to locate any allegation that Sabolik was Inc.'s CEO in May, 2007. Perhaps the Trustee meant to allege here that Sabolik entered into the Carecentric contract in his capacity as CFO.

the collection of the accounts receivable of SRI, which at the time of SRI's bankruptcy filing totaled in excess of $6.3 million;

(iv) as CFO and President of Inc., failing to retain a financial crisis manager to address the insolvency of Inc. and the Operating Subsidiaries and the imminent lack of funds to operate the businesses of the Operating Subsidiaries;

(v) as the President of Inc. and as an officer and/or director of Winmar, failing to take any steps to preserve the value of Winmar's ongoing sleep-study contracts or to otherwise preserve the going concern value of Winmar's assets; and

(vi) as an officer of Inc. and as an officer and/or director of SRI and SRI 2, failing to take any steps to preserve the operating assets and the original patient files and records of SRI and SRI 2, and ultimately transferring these assets for no consideration.

As should be clear from the recital of the foregoing six instances of conduct that allegedly constitute a breach of Sabolik's duties, some of the conduct occurred on behalf of one corporation only, and some occurred on behalf of two or more corporations. Applying the choice of law analysis discussed above, *see supra* pp. 59-62, the Court concludes that the six instances of conduct summarized above should be analyzed as follows: item (i) implicates the law of Delaware, North Dakota and Missouri; item (ii) implicates only Delaware law; item (iii) implicates the law of all three states; item (iv) implicates only Delaware law; item (v) implicates the law of Delaware and North Dakota; and item (vi) implicates the law of Delaware and Missouri.

The Trustee first alleges that Sabolik, in his capacity as CFO of Inc. and the Operating Subsidiaries,[45] mismanaged Inc. and the Operating Subsidiaries by failing to maintain financial projections or cash flow forecasts and failing to provide timely, accurate and reliable financial reports to the Board. The Trustee does not allege *any* facts suggesting that Inc. or the Operating Subsidiaries did not prepare or maintain financial projections or cash flow statements. The only

---

[45] The Complaint contains conflicting allegations as to when Sabolik was Inc.'s CFO. Paragraph 97 of the Complaint identifies Gaudio as Inc.'s CFO on July 8, 2008, but paragraph 22 of the Complaint identifies Sabolik as Inc.'s CFO from March 31, 2006 until July 21, 2008.

factual allegations that appear to support this claim are that the Outside Directors did not receive any financial reports from Inc. or the Operating Subsidiaries between September and December, 2007, *Compl.*, ¶ 155, and that during the first half of 2008, Gaudio prepared and circulated monthly financial statements to Sabolik (and Linehan) that were not sent to the Board. *Compl.*, ¶ 146. The Trustee also alleges that from May 2008 forward, Gaudio, in his capacity as Inc.'s CFO, regularly prepared rolling 90-day cash budgets and presented them to Sabolik. *Compl.*, ¶ 147.

The Court concludes that these allegations are insufficient to state a claim for breach of the fiduciary duty of loyalty under any relevant state law. There are no allegations of self-dealing or subjective bad faith. At most, the allegations plausibly state a claim for negligence (not even gross negligence), which is legally insufficient under Delaware law.

The Court also concludes that these allegations are insufficient to state a claim for breach of the duty of care. Under Delaware law, the standard for breach of the duty of care is gross negligence – *i.e.*, reckless indifference or conduct beyond the "bound of reason." *McPadden v. Sidhu,* 964 A.2d 1262 (Del. 2008). Although the duty of care is not well defined in Missouri, Missouri courts look to *Fletcher's Cyclopedia*, which notes that generally, a corporate director or officer will not be held liable for mere negligent mismanagement untainted by self-dealing and also appears to require at least gross negligence. In the only duty of care case in Missouri the Court was able to locate, *Boulicault v. Oriel Glass Co.*, 223 S.W. 423 (Mo. 1920), the Missouri Supreme Court stated that the duty of care owed is "that which ordinarily prudent and diligent men would exercise under similar circumstances." *Boulicault*, 223 S.W. at 426. Although that formulation would seem to imply that ordinary negligence might suffice, the *Boulicault* case involved a corporate president's failure to discover embezzlement by the bookkeeper. The president admitted that he signed checks in blank

payable to the bookkeeper, yet never compared the checks returned with the check book stubs to discover that the total of the checks exceeded the approved payments, though the total exceeded the approved payments "each month for years." In that circumstance, the court stated "we hold that this constituted such negligence as to justify the judgment rendered in the trial court." *Boulicant*, 223 S.W. at 428. While the *Boulicant* court appeared to formulate an ordinary negligence test, the facts before it were more akin to gross negligence. Similarly, the North Dakota courts have held that corporate officers and directors are shielded from liability except for self-dealing, willful misconduct, or gross negligence. *Red River Wings, Inc. v. Hoot, Inc.*, 751 N.W.2d at 221-222.

In short, the allegations in the Complaint do not satisfy these legal standards. In addition, the Trustee has not alleged any factual content from which the Court can plausibly infer that the failure to provide monthly financial reports to the Board resulted in any loss, another reason for dismissal of this portion of the Complaint.

The Complaint next asserts that Sabolik breached his fiduciary duties by entering into the Carecentric contract in May, 2007 and by ignoring Camfield's advise that Inc. should bring SRI's billing and collection functions in-house. The factual allegations supporting this claim are discussed above, *see supra* at pp. 29-32, as the Carecentric Allegations against the Outside Directors. For the reasons discussed in connection with this same claim against Linehan, the Court concludes that these allegations are also insufficient to state a claim for a breach of the fiduciary duties of loyalty or due care as against Sabolik. *See supra* at pp. 83-85. The Complaint does not allege that Inc. had any alternative to approving the Carecentric contract, that there were other outside vendors who could have provided the same service on better terms, or that the billing and collections functions could have been brought in-house any earlier than they were. Moreover, claims seeking to impose liability

for a decision that resulted in a loss because that decision was ill-advised are reviewed under the business judgment rule, without reference to the *content* of the decision but rather the process employed in reaching it, and there are no factual allegations that Sabolik's decision, to the extent it was his decision, was the result of an irrational process or one which was not deliberately considered in good faith. *Caremark*, 698 A.2d at 967.

The Trustee next alleges that Sabolik failed to develop a feasible plan, process, or procedure to address the declining financial condition of Inc. and the Operating Subsidiaries, and failed to take steps to ensure the collection of SRI's accounts receivable – two separate instances of conduct. The factual allegations supporting the latter failure (*i.e.*, the failure to ensure collection of accounts receivable) overlap with those supporting item (vi) – *i.e.*, that Sabolik failed to take steps to preserved the assets and original patient files of SRI and SRI 2, and the ultimate transfer of those assets for "no consideration." *Compl.*, ¶ 190. As to the failure to develop a plan to address the companies' declining financial condition, the Court concludes, for the reasons set forth above in the discussion concerning these same allegations against Linehan, *see supra*, pp. 87-88, that the Trustee has stated a claim against Sabolik.

As to the failure to take steps to ensure the collection of SRI's accounts receivable and the failure to preserve SRI and SRI 2's original patient files, the Court first notes that the Complaint contains no allegations that SRI 2's patient files were transferred to anyone. *See Compl*, ¶ 172 (SRI's patient lists, files and patient records were transferred to Med4 Home); ¶ 173 ("Sabolik and Smith orchestrated the transfer of SRI's patient list and patient files to Med 4 Home"); ¶ 179 ("Camfield informed Smith that it was imperative that SRI retain copies of the patient files . . . over the next day and a half all of SRI's original patient records were boxed and loaded onto trucks"); *Ex. A to*

*Complaint* (asset purchase agreement between Med 4, Winmar and *SRI* but not SRI 2). Accordingly, the Complaint fails to state a claim as to any failure to take steps to preserve the assets/patient files of SRI 2.

As to the failure to take steps to ensure the collection of SRI's accounts receivable and the failure to preserve SRI's patient files, the Court is unsure of the conduct of which the Trustee complains. Is the Trustee asserting, again, that Sabolik should have gotten SRI's billing and collections functions in-house sooner, which presumably (although not allegedly) would have ensured the collection of SRI's accounts receivable? Or is the alleged failure to take steps to ensure the collection of SRI's accounts receivable simply another way of saying, somewhat redundantly, that Sabolik failed to preserve SRI's patient files? To the extent it is the former, the Court has already concluded that the Trustee has failed to allege facts from which the Court may plausibly infer that the billing and collection functions could have been brought in-house any sooner than they were. *See supra* at p. 98. To the extent it is the latter, the Court concludes that the Trustee has failed to state a claim against Sabolik on a breach of the duty of loyalty theory. Since SRI was a Missouri corporation, the duty of loyalty is governed by Missouri law.[46] Missouri courts have noted that the duty of loyalty imposes an obligation on officers and directors to avoid conflict-of-interest transactions. *Peterson v. Continental Boiler Works, Inc.*, 783 S.W.2d 896 (Mo. 1990). The Trustee's factual allegations raise no such concerns. Further, the factual allegations do not fall within any of the substantive areas in which Missouri courts have identified duty of loyalty breaches. *Peterson*, 783 S.W.2d at 905.

---

[46] The Court notes that the Trustee asserts this claim against Sabolik not only in his capacity as an officer/director of SRI and SRI 2, but also as an officer of Inc. The Court does not understand how Inc. can assert a breach of fiduciary duty claim premised upon a loss of patient files of SRI. The Court therefore reviews the Complaint's sufficiency under Missouri, and not Delaware, law.

Moreover, to the extent that the Trustee premises this claim upon a breach of the duty of care, the Court concludes that the Complaint also fails to state a claim.  Although Missouri law does not appear to have defined "gross negligence" as narrowly as Delaware, *Boulicant*, 223 S.W. at 426, the Trustee alleges that in February, 2008, when Carecentric learned that Soporex had brought SRI's billing and collection functions in-house, Carecentric cut off Inc.'s "access to its own pharmacy data and its own billing and collection data." *Compl*., ¶ 73.  Inc. then sued Carecentric. *Compl*., ¶ 74.  Since Sabolik (and others) had not made copies of SRI's billing and collections data, Inc. hired Med Staff to re-submit claims to insurers that Carecentric had improperly submitted. *Compl*., ¶ 76. When Inc. could no longer afford to pay Med Staff, the re-billing process was also brought in-house, but was terminated on August 20, 2008, *Compl*., ¶ 76., and SRI filed for relief under chapter 7 two days later.

There are no facts alleging that a chapter 7 trustee could not, despite the chapter 7 filings, collect the SRI accounts receivable.  In fact, the Asset Purchase Agreement with Med 4 Home, which is attached to the Complaint, shows that SRI's (and Winmar's) accounts receivable were *excluded* from the sale to Med 4 Home.  *Ex. A to Compl*., p. 2.  A plausible inference from these facts is that Sabolik *did* take steps to preserve the accounts receivable, and to the extent they were not collectible, the inability to collect them resulted from the actions of Carecentric, not Sabolik.[47]

---

[47] The Trustee's claim against Sabolik for failure to preserve the patient files is asserted against Sabolik in the capacity, among others, of a director of SRI 2.  The parties have raised numerous legal issues respecting the potential exculpation of this claim by virtue of the provision in SRI 2's certificate of incorporation and section 102(b)(7) of Delaware's General Corporation law.  The Court need not reach these issues, since the Court concludes that the Complaint contains no allegations that SRI 2's patient files were transferred to anyone and were not preserved.  *See Compl*, ¶ 172 (SRI's patient lists, files and patient records were transferred to Med 4 Home); ¶ 173 ("Sabolik and Smith orchestrated the transfer of SRI's patient list and patient files to Med 4 Home"); ¶ 179 ("Camfield informed Smith that it was imperative that SRI retain copies of the patient files . . . over the next day and a half all of SRI's original patient records were boxed and loaded onto trucks"); *Ex. A to Complaint* (asset purchase agreement between Med 4, Winmar and *SRI* but not SRI 2).  This defect is fatal to the Trustee's claim against Sabolik as it pertains to SRI 2, whether liability for this claim is exculpated or not.

The Trustee next asserts that Sabolik breached his fiduciary duties as CFO and President of Inc. by deciding not to retain a financial crisis manager.  For the same reasons discussed above with respect to Linehan, this Court concludes that the Complaint fails to state a claim against Sabolik for breach of either the fiduciary duty of loyalty or care.  *See supra* at pp. 89-91.

The Trustee next alleges that Sabolik breached his fiduciary duties by failing to take any steps to preserve the value of Winmar's ongoing sleep-study contracts or to preserve the going concern value of Winmar.  This claim is governed by North Dakota law.[48]  As noted earlier, under North Dakota law, officers and directors are shielded from liability except in cases of self-dealing and willful misconduct, and when a challenge is made to an action, absent claims of fraud, self-dealing, unconscionability or other misconduct, the court should apply the business judgment rule and should limit its inquiry to whether the action was authorized and whether it was taken in good faith and in furtherance of the legitimate interests of the corporation.  *Agassiz West Condo. Assoc. v. Solum*, 527 N.W.2d 244, 248 (N.D. 1995).  Courts will not interfere with the decisions of officers/directors in the reasonable and honest exercise of their judgment where that judgment is uninfluenced by personal considerations.  *Dixon v. McKenzie County Grazing Assoc.*, 675 N.W.2d 414 (N.D. 2004).

Here, the Court concludes that the Trustee's allegations are insufficient to plead around the business judgment rule as it is formulated in North Dakota.  The Trustee alleges that on August 20, 2008, Sabolik told Winmar's officers that Winmar would be filing for relief under chapter 7 and that Winmar would cease operations and that at that time, Winmar's employees were conducting sleep studies pursuant to some 60 contracts with hospitals and clinics, which studies were therefore

---

[48] The Trustee asserts this claim against Sabolik in his capacity as "President of Inc. and as an officer and/or director of Winmar."  *Compl.*, ¶ 190.  The Trustee has not explained or briefed how Inc. can assert a claim premised upon a failure to preserve the value of Winmar's assets and the Court will accordingly assess the sufficiency of the Trustee's claim under North Dakota law.

terminated. *Compl.*, ¶¶ 176-177. The Trustee alleges that Winmar's business (which also included an "oxygen business, according to Ex. A to the Complaint) was being operated profitably were it not for being burdened with Inc.'s excessive corporate overhead. *Compl.*, ¶ 194.

However, the Trustee does *not* allege (i) that Winmar's sleep study business could have continued as a going concern in light of the other financial problems identified in the Complaint, (ii) that there were buyers ready, willing and able to purchase the sleep-study business as a going concern, (iii) that the business could have been operated as a going concern had the directors/officers chosen instead to file for relief under chapter 11, or (iv) any other factual content showing what the going concern value of the sleep-study contracts was or that it was greater than its liquidation value. Under these circumstances, the Trustee has failed to plead around the business judgment rule. And, since there are no allegations of fraud, self-dealing, or other improper influences that motivated the decision to terminate the sleep studies, the Complaint fails to state a claim against Sabolik.

This lack of factual content also infects the Trustee's claim that Sabolik breached his fiduciary duties by failing to preserve the going concern value of Winmar generally, resulting in the Court's conclusion that the Complaint fails to state a claim against Sabolik and must be dismissed. *See also*, pp. 72-73 (discussion of the allegations regarding the corporate waste claim with respect to the transfer of Winmar's "oxygen business" to Med 4 Home).

As is the case with respect to Count 1 against Linehan, there are other factual allegations in the Complaint with respect to Sabolik that do not fit neatly into one of the six enumerated alleged breaches of fiduciary duty as they are categorized in Count 2 of the Complaint against Sabolik. *See Compl.*, ¶ 190 (a) - (f) (enumerating six items which the Trustee alleges constitute breaches of Sabolik's duties). In the section of the Complaint entitled "Gross Mismanagement of Business

Operations," subsection (1) is entitled "Mismanagement by Linehan and Sabolik." *Compl.*, p. 40. In that section of the Complaint, the Trustee alleges that Sabolik (and Linehan) "grossly and recklessly mismanaged the Soporex Debtor's businesses for the entire two and one-half years the businesses were operated," *Compl.*, ¶ 138, and she alleges facts respecting three general areas of concern.

First, she repeats her claim that Sabolik breached his fiduciary duties in the selection and hiring of Carecentric, *see Compl.*, ¶¶ 138-142, which the Court has discussed above and which factual allegations the Court has concluded are insufficient to state a claim. *See supra*, pp. 83-85.

Second, the Trustee generally alleges that Linehan established Inc.'s headquarters in Dallas rather than at the heart of the "Soporex Debtors' business operations in Murray, Kentucky"[49] as a matter of "personal convenience," which unnecessarily increased the overhead expenses of the Operating Subsidiaries, which was partially responsible for their decline. *See, e.g., Compl.*, ¶¶ 143-145. Sabolik, however, is not alleged to have had any part in the decision to locate Inc.'s headquarters in Dallas, or in any of the decisions to pay (i) allegedly excessive salaries or (ii) allegedly excessive expenses for marketing initiatives, legal services or fees for failed financing transactions. And, as noted earlier, all of these operational decision directly implicate the business judgment rule, and courts in Delaware, Missouri and North Dakota all avoid intervening in intra vires operational decisions in the absence of factual allegations showing irrationality, fraud, illegality, bad faith, or the like. There are no such factual allegations here against Sabolik, with respect to these operational decisions. Thus, this claim fails.

Third and finally, the Trustee also alleges that despite knowledge that Inc. and the Operating

---

[49] Only SRI is alleged to have operated out of Murray, Kentucky. The Complaint alleges that Winmar conducted its operations in North Dakota; the Complaint does not allege where SRI 2 conducted its operations.

Subsidiaries were approaching insolvency, Sabolik (and Linehan) continued to focus on a recapitalization plan which they "believed would cure all of Soporex's financial problems." *Compl.*, ¶ 148. The Trustee further alleges that the "single-minded focus on the recapitalization plan and their disregard of creditors' interests during the final months of business operations were the result of self-interest . . . Sabolik . . . [was] attempting to recapitalize in order to be able to sell some or all of [his] preferred shares as part of the recapitalization of Soporex." *Compl.*, ¶ 148. However, the Complaint does not allege that Sabolik held any preferred stock in Inc. *Compl.*, ¶ 32. While it alleges that an entity called "Sabolik Family Limited Partnership" held 7.64% of the preferred shares in Inc., *Compl.*, ¶ 32, there are no allegations in the Complaint that Sabolik held any interest in that entity. Therefore, the Complaint fails to state a claim for breach of fiduciary duty against Sabolik with respect to these factual allegations.

## III.    CONCLUSION

For the reasons set forth above, (i) the Outside Directors' Motion is granted and Count 4 of the Complaint is dismissed; (ii) Letson's Motion is granted and Counts 4 and 5 of the Complaint are dismissed; and (iii) the Officers' Motion is granted with respect to Counts 3 and that count of the Complaint is dismissed. As it relates to Counts 1 and 2, the Officers' Motion is granted in part and denied in part. Specifically, Count 1 of the Complaint is dismissed except as regards acts and failures to act (iv) - (vii) as delineated on page 75, *supra,* and as regards the Trustee's allegations regarding Linehan's self-interest in pursuing a recapitalization plan, and Count 2 of the Complaint is dismissed except as regards acts and failures to act (iii) as delineated on p. 95, *supra.*

## IV.    LEAVE TO AMEND

The Trustee, in response to the Motions, did not formally seek leave to amend the Complaint.

At the hearing on the Motions, however, the Trustee indicated that she would seek leave to amend the Complaint in the event the Court concluded that the Complaint is legally insufficient under *Twombly* and *Iqbal*. The Defendants indicated that they would oppose such a motion.

Following the hearing but before the issuance of these Proposed Findings of Fact and Conclusions of Law, the Trustee filed a motion for leave to amend. That motion is set for hearing on November 29, 2011 and has been opposed by the Defendants. Accordingly, the Court will take up the propriety of any further amendments to the Complaint at the hearing on that motion, when both the Court and all parties will have had the benefit of a thorough review of the Trustee's proposed third amended complaint.

### ### End of Proposed Findings of Fact and Conclusions of Law ###